# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

| | | |
|---|---|---|
| **TOTAL REBUILD, INC.,** | § | |
| | § | **Civil Action No. 6:15-cv-01855-RFD-CBW** |
| **Plaintiff,** | § | |
| | § | **JUDGE DOHERTY** |
| **vs.** | § | |
| | § | **MAGISTRATE WHITEHURST** |
| **PHC FLUID POWER, L.L.C.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

_____

## PLAINTIFF'S CLAIM CONSTRUCTION BRIEF

Plaintiff, Total Rebuild, Inc. ("Total") respectfully submits that claim construction and necessity of a *Markman* hearing is unnecessary in the present case as the meaning of all terms and phrases contained within the claims of U.S. Patent 8,146,428 (" '428 Patent" or "patent-in-suit", attached as Exhibit A) are simple to understand in their ordinary meaning as understood by those of ordinary skill in the art and as defined by the '428 Patent specification. Though it is believed unnecessary, due to its scheduling obligation in accordance with the Court's Scheduling Order of July 14, 2016 (Doc. 50), Plaintiff respectfully submits this Claim Construction Brief under *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995)(en banc), *affd*, 517 U.S. 370 (1996) regarding Total's proposed constructions of the disputed claim terms in the '428 Patent.

## TABLE OF CONTENTS

I. INTRODUCTION ......................................................................................................... *1*

    *A*. Technology Overview…………………………………………………………1

    *B*. The Law of Claim Construction…………………………………………..……1

        *1.* Claim terms should be given their ordinary meaning…………………………2
        *2.* Focus should be on the intrinsic evidence………………………………………2
        *3.* Scope should not be limited by an example………………………………………5
        *4.* Claim differentiation gives each claim a different scope………………………6
        *5.* Means-Plus-Function Terms…………………………………………………………7
            a. Determine whether a term is in means-plus-function form……….7
            b. Construction of means-plus-function terms………………………..8
                i. Identify the function…………………………………………8
                ii. Identify the structure……………………………………..9

II. DISPUTED TERMS ....................................................................................... *9*

        1. Explosion-Proof Safety Housing………………………………….…………..10
        2. Closeable Access Opening In Said Housing…………………………………...14
        3. Means Within Said Housing For Coupling Said High-Pressure Pneumatics
           Testing Equipment To Said High-Pressure Device For Testing……………16
        4. Means Linking Said High-Pressure Pneumatics Testing Equipment To Said
           Control Panel Or Coupling Said Control Panel To The Testing Equipment
           Inside Said Housing……………………………………………………………...19
        5. Means For Monitoring And Recording………………………………………...24
        6. Stationary Housing……………………………………………………………26

III. TERMS DO NOT REQUIRE CONSTRUCTION………………………...…..…*28*

IV. CONCLUSION ……………………………………………………….…………*30*

## <u>TABLE OF AUTHORITIES</u>

**Cases***:*

*Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1318 (Fed. Cir. 1999)…………....8, 17, 20

*Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1372-73 (Fed. Cir. 2003)…………8

*Arnold PipeRentals Co. v. Engineering Enterprises, Inc*., 350 F.2d 885 (5th Cir. 1965)…
………………………………………………………………………………..…..23

*Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.,* 55 F.3d 615, 620 (Fed. Cir.
1995)………………………………………………………………..………………2, 16

*Bell & Howell Doc. Mgmt. Prods. Co. v. Altek Sys.,* 132 F.3d 701, 705 (Fed. Cir.
1997)…………………………………………………………………………....3, 4

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc*., 145 F.3d 1303, 1308 (Fed.
Cir. 1998)………………………………………………………………………...22

*Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 531 (Fed. Cir. 1996), *cert. denied*, 522 U.S
812 (1997)…………………………..……………………………………………..7, 20, 25

*Comark Commc'ns, Inc. v. Harris Corp.,* 156 F.3d 1182, 1186-87 (Fed. Cir.
1998)………..…………………………………………………………..5, 12, 29

*Cybor Corp v. FAS Techs*., 138 F.3d 1448, 1456 (Fed. Cir. 1998)………………….…1, 3

*Eastman Kodak v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1552 (Fed. Cir. 1997)..3

*Ecolab Inc. v. Paraclipse, Inc.*, 285 F.3d 1362, 1375 (Fed. Cir. 2002)…………………..7

*Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1303 (Fed. Cir. 1997)……………………5

*EMI Group N. Am., Inc. v. Intel Corp.*, 157 F.3d 887, 892 (Fed. Cir. 1998), *cert. denied*,
526 U.S. 1112 (1999)……………………………………………………………...3

*Envirco Corp. v. Clestra Cleanroom, Inc.*, 209 F.3d 1360, 1364 (Fed. Cir. 2000)……….8

*Free Motion Fitness, Inc. v. Cybex Int'l*, 423 F.3d 1343 (Fed. Cir. 2005)……………..7

*Glaxo Inc. v. Noropharm Ltd.*, 110 F.3d 1562, 1565 (Fed. Cir. 1997)……………………4

*Generation II Orthotics, Inc. v. Med. Tech. Inc.*, 263 F.3d 1356, 1366 (Fed. Cir.
2001)………………………………………………………...…………………3, 8

ii

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 955 (Fed. Cir. 2000)………………………………………………………………………....2

*Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1384 (Fed. Cir. 1986)*……………………………………………………………………….. 11, 18, 23

*IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1433 (Fed. Cir. 2000), *cert. dismissed*, 530 U.S. 1299 (2000)…………………………………………………………5

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.,* 381 F. 3d 111, 1115 (Fed. Cir. 2004)……………………………………………………………..…2, 15, 16, 27

*Ishida Co. v. Taylor*, 221 F.3d 1310, 1316 (Fed. Cir. 2000); *Micro Chem.*, 194 F.3d at 1258……………………………………………………………………………..9

*Interactive Gift Express, Inc. v. Compuserve, Inc.,* 256 F.3d 1323, 1331 (Fed.Cir.2001)……………………………………………………………..…13, 16

*Johnson Worldwide Assocs., v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999) ………………………………..………………………………………..…2, 6, 9, 13, 15, 28

*Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999)……………………………………………………………………..6, 7, 21

*Kemco Sales, Inc. v. Control Papers Co.,* 208 F.3d 1352, 1360 (Fed. Cir. 2000)……..….8

*Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)…………………3

*Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362 (Fed. Cir. 2000)………………..2, 7

*Kudlacek v. DBC, Inc.*, 25 Fed. Appx. 837, 843 (Fed. Cir. 2001)………………………...7

*Lemelson v. Gen. Mills, Inc.,* 968 F.2d1202, 1206 (Fed.Cir.1992)………………………5

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) …………….7

*Lighting World, Inc. v. Birchwood Lighting, Inc.,* 382 F.3d 1354 (Fed. Cir. 2004)………8

*Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*, 152 F.3d 1368, 1373 (Fed. Cir. 1998)……………………………………………………………………………4, 5

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995)(en banc), *affd*, 517 U.S. 370 (1996) ……………………………………………………….……………..…1

*Micro Chem., Inc. v. Great Plains Chem. Co.,* 194 F.3d 1250, 1258 (Fed. Cir. 1999) ........……………………………………………………….…………………...…..8, 9, 17, 19

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351,1360 (Fed. Cir. 2008) …………………………………………………………..……………..15, 28, 29

*Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999) …………… 22

*Oreck Holdings, LLC v. Dyson, Inc.*, 434 F. Supp. 2d 385, 391 (E.D. La. 2006) ……..1, 2

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005)………...1, 2, 4, 5, 6, 23, 29

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999)……...3

*Scriptgen Pharm. v. 3-Dimensional Pharm., Inc.*, 79 F. Supp. 2d 409, 411 (D. Del. 1999)……………………………………………………………………………………3

*Seachange Int'l, Inc. v. C-Cor Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005)……………6, 7

*Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995)………..4

*Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir. 1988)……………...6

*SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985)……5, 6

*Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1288 (Fed. Cir. 2012)………………………………………………………………………..……..11, 18

*Tandon Corp. v. United States Int'l Trade Comm'n,* 831 F.2d 1017, 1023, 4 USPQ2d 1283, 1288 (Fed.Cir.1987)…………………………………………………………….12

*Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002)……….13, 16

*Thermalloy, Inc. v. Aavid Eng'g, Inc.,* 121 F.3d 691, 692-93 (Fed. Cir. 1997)…………..3

*Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1277 (Fed. Cir. 1995)…………...4

*Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996)………..2, 3, 6

*White v. Dunbar*, 119 U.S. 47, 52, (1886)……………………………………………...2

*York Products, Inc. v. Cent. Tractor Farm and Family Ctr.*, 99 F.3d 1568, 1572 (Fed. Cir. 1996)……………………………………………………………………………………3

*Ziegler v. Phillips Petroleum Co*., 483 F.2d 858 (5th Cir. 1973) .......................………23

**SECONDARY SOURCES**

Dictionary of Engineering, McGraw-Hill, 2nd ed. © 2002……………………………...11, 17, 23

Merriam-Webster's 11th Collegiate Dictionary © 2003………………………………………...26

**STATUES AND RULES**

35 U.S.C. § 112(f)………………………………………………………………………...7, 17, 19

## I.       Introduction

### a.   Technology Overview

Total is the owner of the '428 Patent invented by Terry Lavergne, Director of Total and sole inventor of the '428 Patent. Total asserts that Defendant infringes claims 1-19 of the '428 Patent. The patent-in-suit relates to an apparatus and method for a safety system for testing high-pressure devices involving facilitation of such high pressure testing while providing for protection from concussive, explosive, and blasts due to a failure in the device to be tested at such high pressures. Safety during such tests is critical for protection of workers and by-standers in and around the tested device. Due to the necessary high pressures at which the high pressure devices are tested, a failure of the high-pressure can cause injury or loss of life to personnel as well as catastrophic damage to equipment in the vicinity.

### b.   The Law of Claim Construction

The determination of patent infringement is a two-step process, requiring first a determination of "the correct meaning and scope of the patent claims," followed by a comparison of "the correctly construed claims to the allegedly infringing device." *Oreck Holdings, LLC v. Dyson, Inc.*, 434 F. Supp. 2d 385, 391 (E.D. La. 2006); *Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998).

As the Court is aware, determining the proper meaning of patent claims is a question of law, placing the task of claim construction on the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996). Because the claims themselves define the scope of the patent owner's right to exclude, the claims "are of primary importance, in the effort to ascertain precisely what is patented." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotations omitted). "The analysis should therefore

1

'begin and remain centered on the claim language itself.'" *Oreck*, 434 F. Supp. 2d at 392 (citing *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.,* 381 F. 3d 111, 1115 (Fed. Cir. 2004)).

### 1.   Claim terms should be given their ordinary meaning.

The Court should first look at the claim language and ascribe the plain and ordinary meaning of a disputed term. *Johnson Worldwide Assocs., v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999); *Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.,* 55 F.3d 615, 620 (Fed. Cir. 1995); *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 955 (Fed. Cir. 2000). Thus, the Court must presume that the terms in the claim mean what they say, and unless otherwise compelled, give full effect to the ordinary meaning of claim terms. *Johnson Worldwide*, 175 F.3d at 989. In fact, the Federal Circuit has gone as far as saying that there is a "heavy presumption in favor of the ordinary meaning." *Id.* "It is both unjust to the public and an evasion of the law to construe an invention in a manner different from the plain import of its terms." *Phillips*, 415 F.3d at 1312 (quoting *White v. Dunbar*, 119 U.S. 47, 52, (1886), internal quotations omitted). The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of the ordinary skill in the art in question at the time of invention. *Phillips*, 415 F.3d at 1313.

### 2.   Focus should be on the intrinsic evidence.

To discharge its obligation in construing the claims of a patent, Courts properly begin with the patent claims themselves, the specification of the patent and the patent's prosecution history. *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362 (Fed. Cir. 2000). This is typically referred to as intrinsic evidence. "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language," and in most cases, like this one, the intrinsic evidence should be

sufficient to determine the meaning of a claim term. *Vitronics,* 90 F.3d at 1582; *Bell & Howell Doc. Mgmt. Prods. Co. v. Altek Sys.,* 132 F.3d 701, 705 (Fed. Cir. 1997). While none of the intrinsic information should be ignored, the Federal Circuit has indicated that the claim language itself defines the scope of the claim, and a construing court does not accord the specification, prosecution history and other relevant evidence the same weight as the claims themselves. *Eastman Kodak v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1552 (Fed. Cir. 1997), overruled on other grounds by *Cybor Corp v. FAS Techs*., 138 F.3d 1448, 1456 (Fed. Cir. 1998); *see also York Products, Inc. v. Cent. Tractor Farm and Family Ctr.*, 99 F.3d 1568, 1572 (Fed. Cir. 1996); *Thermalloy, Inc. v. Aavid Eng'g, Inc.,* 121 F.3d 691, 692-93 (Fed. Cir. 1997).

Other evidence, called extrinsic evidence, is typically not needed or used to properly construe the claims. In fact, when the intrinsic evidence is unambiguous, it is improper for the court to rely on extrinsic evidence for purposes of claim construction. *Bell & Howell Doc. Mgmt.,* 132 F.3d at 706. In other words, "if the meaning of a disputed claim term is clear from the intrinsic evidence, that meaning and no other must prevail; it cannot be altered or superseded by expert witness testimony or other external sources simply because one of the parties wishes it were otherwise." *Scriptgen Pharm. v. 3-Dimensional Pharm., Inc.*, 79 F. Supp. 2d 409, 411 (D. Del. 1999) (quoting *Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)).

Extrinsic evidence may, however, be used by the court to enhance its understanding of the technology. *See EMI Group N. Am., Inc. v. Intel Corp.*, 157 F.3d 887, 892 (Fed. Cir. 1998), *cert. denied*, 526 U.S. 1112 (1999)). Simply put, the use of extrinsic evidence may be appropriate to ensure that the Court's understanding of the technical aspects of the patent is not entirely at variance with the understanding of one skilled in the art. *Generation II Orthotics, Inc. v. Med. Tech. Inc.*, 263 F.3d 1356, 1366 (Fed. Cir. 2001); *see also Pitney Bowes, Inc. v. Hewlett-*

*Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999). But while extrinsic evidence (e.g., expert testimony and/or industry treatises) may be admitted for this limited purpose (for the Court to educate itself about the patent and the relevant technology), the claims and the written description remain the primary and more authoritative sources of claim construction. *Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*, 152 F.3d 1368, 1373 (Fed. Cir. 1998); *Bell & Howell*, 132 F.3d at 705; *Glaxo Inc. v. Noropharm Ltd.*, 110 F.3d 1562, 1565 (Fed. Cir. 1997).

There are several reasons for the overall hesitation of the courts to rely upon extrinsic evidence. These include the fact that extrinsic evidence is by definition not part of the patent, thus detracting from a patent's public notice function. *Phillips*, 415 F.3d at 1318. Further, extrinsic evidence may not reflect the understanding of a skilled artisan in the art at the time of filing of the patent. *Id.* The fact that supporting extrinsic evidence is generated at the time of and for the purpose of litigation also makes it susceptible to bias; this is especially true as there is a virtually unbounded universe of potential extrinsic evidence that a party can and most likely will selectively filter for the Court in an attempt to advance its own case. *Id.* "Undue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the 'indisputable public records consisting of the claims, the specification and the prosecution history,' thereby undermining the public notice function of patent." *Phillips*, 415 F.3d at 1319 (quoting *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995)).

The focus should be on the ordinary meaning, but the specification and prosecution history cannot be ignored. *See Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1277 (Fed. Cir. 1995). The prosecution history "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent...Like the

specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317 (citing *Lemelson v. Gen. Mills, Inc.,* 968 F.2d1202, 1206 (Fed.Cir.1992)).

### 3.  Scope should not be limited by an example.

Reference to the specification and prosecution history must be balanced with the principle that it is impermissible to read a particular embodiment into the claim. *Comark Commc'ns, Inc. v. Harris Corp.,* 156 F.3d 1182, 1186-87 (Fed. Cir. 1998); *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1433 (Fed. Cir. 2000), *cert. dismissed*, 530 U.S. 1299 (2000). The Federal Circuit has repeatedly warned against confining claims to the often very specific embodiments of the invention described in the specification. *Phillips* at 1323. Thus it is clear that while claims should be read in view of the specification, it is improper to limit the scope of a claim to the preferred embodiment or specific examples disclosed in the specification. *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1303 (Fed. Cir. 1997). Along these lines, if the written description supports the definition of the term that is apparent from the claim language, then reading in a further limiting definition would be improper. *Mantech,* 152 F.3d at 1374.

The purpose of this prohibition is to preserve the function of the claims in a patent. If every claim were limited to the preferred embodiment, there would be no need for patent claims. *See SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985). Consistent with this function of the claims, the Federal Circuit has routinely found that a patent is not restricted to the examples, but is instead defined by the words in the claims. "That is not just because section 112 of the Patent Act requires that the claims themselves set forth the limits of the patent grant, but also because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Phillips*, 415 F.3d

at 1323. For instance, in *Specialty Composites v. Cabot*, the Federal Circuit found that just because the three examples described in the specification all refer to external plasticizers, the term "plasticizers" should not be limited to external plasticizers. *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir. 1988). Indeed, when the specification does not require such a limitation, no limitation should be read into the claims. *Id.* Likewise, in *SRI*, the Federal Circuit held that merely because "a specification describes only one embodiment does not require that each claim be limited to that one embodiment." *SRI Int'l* , 775 F.2d at 1121, n. 14. Thus, as a general rule, modifiers should not be added to broad terms standing alone, and mere inferences drawn from a description of an example of the invention cannot require a narrower definition of a claim term. *Johnson Worldwide*, 175 F.3d at 989 and 991.

    **4.   Claim differentiation gives each claim a different scope.**

Other claims of the patent in question, both asserted and unasserted, can be valuable sources of enlightenment as to the meaning of a claim term. *Phillips,* F.3d at 1314 (citing *Vitronics*, 90 F.3d at 1582). Differences among claims can be a successful guide in understanding the meaning of particular claim terms, i.e. the presence of a dependent claim adding a particular limitation indicates that the limitation is not present in the independent claim. *Id.* at 1314-15.

The doctrine of claim differentiation is a presumption "that separate claims do not have the same scope." *Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999). The idea that claims using different terms have different scopes "stems from 'the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings.'" *Seachange Int'l, Inc. v. C-Cor Inc.*, 413 F.3d 1361, 1369

(Fed. Cir. 2005)(quoting *Karlin Tech.*, 177 F.3d at 971-72); *see also Comark Communications,* 156 F.3d at 1187.

Claim differentiation is only a presumption and is not "a hard and fast rule of construction." *Seachange*, 413 F.3d at 1369 (quoting *Kraft Foods,* 203 F.3d at 1368 (Fed. Cir. 2000)). The presumption is at its strongest when a limitation from a dependent claim is sought to be read into an independent claim; however the presumption also exists to distinguish two independent claims containing different language. *Seachange*, 413 F.3d at 1369 (citing *Liebel-Flarshiem Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004)); *See also Ecolab Inc. v. Paraclipse, Inc.*, 285 F.3d 1362, 1375 (Fed. Cir. 2002). The differences in the meaning and scope of claim terms are presumably significant where the absence of a difference would make one of the claims superfluous. *Free Motion Fitness, Inc. v. Cybex Int'l*, 423 F.3d 1343 (Fed. Cir. 2005). In other words, claims should not be interpreted so as to make one claim read on the identical scope as another. *Kudlacek v. DBC, Inc.*, 25 Fed. Appx. 837, 843 (Fed. Cir. 2001).

### 5.  Means-Plus-Function Terms

While these general guidelines apply to all claims, there are special rules for claim construction when claims are written using functional language, referred to as "means-plus-function" limitations.

### a.  Determine whether a term is in means-plus-function form

Means-plus-function language is implicated when inventors use functional language in claims without recitation of any specific structure. 35 U.S.C. § 112(f) (2011). Patent drafters conventionally achieve this by using the words "means for," followed by recitation of the function performed. *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 531 (Fed. Cir. 1996), *cert. denied*, 522 U.S 812 (1997). Indeed, if a claim element contains the word "means" and recites a

function, it is presumed that the element is a means-plus-function element. *Envirco Corp. v. Clestra Cleanroom, Inc.*, 209 F.3d 1360, 1364 (Fed. Cir. 2000).

While there is a strong presumption that claims containing "means for" language should be interpreted under § 112(f), it is still merely a presumption and may be overcome if the claim itself recites sufficient structure or material for performing the claimed function. *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1318 (Fed. Cir. 1999); *Lighting World, Inc. v. Birchwood Lighting, Inc.,* 382 F.3d 1354 (Fed. Cir. 2004); *see also Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1372-73 (Fed. Cir. 2003) (In order to determine whether a claim term recites sufficient structure, the court must examine, in light of the specification, whether the claim term has an understood meaning to a person of ordinary skill in the art).

### b.  Construction of means-plus-function terms

Once the Court has found a claim limitation to be in "means-plus-function" form, the Court then construes the limitation by identifying the function of the limitation and the structures disclosed in the specification for performing that function. *Kemco Sales, Inc. v. Control Papers Co.,* 208 F.3d 1352, 1360 (Fed. Cir. 2000); *Micro Chem., Inc. v. Great Plains Chem. Co.,* 194 F.3d 1250, 1258 (Fed. Cir. 1999). In other words, claim construction of a means-plus-function limitation is a two-step process.

### i.  Identify the function

The first step of the process is to precisely identify the function. *Micro Chem*, 194 F.3d at 1258. To identify the function, the Court must construe the functional statement in the means-plus-function limitation by determining the meaning of the disputed phrases and terms in the recited function. *See Generation II Orthotics,* 263 F.3d at 1364. But in construing the functional statements, the Court should not adopt a function different from that explicitly recited in the

claim. *Id.* at 1364-65; *Micro Chem*, 194 F.3d at 1258. This is important because an error in construing the disputed terms in the functional statements can improperly alter the identification of structure in the specification that performs to that function. *Id.*

### ii.  Identify the structure

After identifying the function, the second step is to identify the structure described in the patent's specification that performs or corresponds to the identified function. *Micro Chem.*, 194 F.3d at 1258. The corresponding structure includes the structure in the specification that corresponds to that claim element, and any equivalents thereof. *Id.* In identifying the structure, the Court must keep in mind that when multiple embodiments in the specification correspond to the identified function, proper application of section 112(f) reads the limitation to embrace each of those embodiments (i.e., alternative structures described in a patent specification should be included) and their equivalents. *Ishida Co. v. Taylor*, 221 F.3d 1310, 1316 (Fed. Cir. 2000); *Micro Chem.*, 194 F.3d at 1258.

### II.     Disputed Terms

Total asserts that the terms of the '428 Claims are understandable to a person of ordinary skill in the art, as well as a lay person, without further explanation. Nonetheless, to the extent that construction is required, Total has provided proposed constructions based upon the context of the terms and phrases within the claims and based upon the written description contained in the '428 Patent. Total respectfully requests that the Court refrain from construing the claims, rather leaving it to the full scope of their ordinary meaning as Total is entitled. *See e.g.*, *Johnson Worldwide*, 175 F.3d at 989.

The parties have exchanged lists of disputed terms and proposed constructions for those terms in dispute. As set forth in their Joint Claim Construction and Prehearing Statement (Doc.

59), the parties are amenable to having the Court adopt the proposed constructions for the terms, "control panel located remote from said housing" meaning "a device, positioned outside of or exterior to the housing for operating the high-pressure testing equipment", "said sensor coupled to said bleed valve" meaning "a sensor in communication with the bleed valve for actuation of the bleed valve", "activate said bleed valve to prevent pressure buildup" meaning "actuation of the bleed valve to prevent pressure buildup in the high-pressure testing equipment when door is open", "portable housing" meaning "housing that is movable or transportable to different testing sites", "Bleed valve coupled to said high-pressure pneumatics testing equipment" meaning "a valve joined or linked to testing equipment to prevent pressure buildup in testing equipment when the closable access opening is not closed", and "Sensor for sensing that said access opening is closed" meaning "a switch capable of sensing input regarding whether the door is open or closed" and hopes that the parties will reach additional agreements regarding the following disputed claim constructions prior to the *Markman* hearing.

### 1. Explosion-Proof Safety Housing

| Term | Claims in which term is found | Total's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|---|
| explosion-proof safety housing | 1, 7, 8, 11, 14, 16 | a case or enclosure to cover and protect a structure or a mechanical device able to withstand and confine shock pressure, pressure blasts, flying fragments or debris, and energy resulting from combustion. | stationary bunker or portable housing with an enclosed space or cavity |

The term "Housing" alone is covered only briefly within the specification of the '428 patent, described as "comprising a bunker housing 11 having a chamber 12 therein." '428 Patent at Col. 2, Lines 49-51; Fig. 1. "Housing", itself, is a well understood term in the engineering field defined as "[a] case or enclosure to cover and protect a structure or a mechanical device".

Dictionary of Engineering, McGraw-Hill, 2nd ed. © 2002. It is well-established that a specification need not disclose what is well-known in the art. *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1288 (Fed. Cir. 2012); *Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1384 (Fed. Cir. 1986)*. In particular, a patent need not teach, and preferably omits, what is well known in the art. *Hybritech* at 1384. Thus, the term "Housing", as a term well understood in the art, did not require considerable explanation to be understood as being what it is and must be given its ordinary meaning. Fig. 1 of the '428 Patent is exemplary that the housing is a case or enclosure to cover and protect a structure or a mechanical device:



The '428 Patent at Fig. 1. This disclosure clearly shows the housing as a case or enclosure to contain within the housing not only the device to be tested but as well the pneumatic testing equipment and associated pumps, pluming, hoses, and valves. '428 Patent at Col. 3, Lines 36-38.

    The construction proposed by the Defendant attempts to confine the term to include the limitations, "stationary" and "portable". The doctrine of claim differentiation does not support such proposed construction. The doctrine of claim differentiation creates a presumption that each claim in a patent has a different scope and that "[t]here is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims. To the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine

11

of claim differentiation states the presumption that the difference between claims is significant." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998)(quoting *Tandon Corp. v. United States Int'l Trade Comm'n,* 831 F.2d 1017, 1023, 4 USPQ2d 1283, 1288 (Fed.Cir.1987)). The limitation of "stationary" appears in Claim 7, a dependent claim of independent Claim 1, and the limitation of "portable" appears in Claims 8 and 14, dependent claims of independent Claims 1 and 11, respectively, in which the term "explosion-proof safety housing" appears. To interpret the term "Housing" to mean a "stationary bunker" or "portable housing", as the Defendant suggests, would render Claims 7, 8, and 14 superfluous and redundant to Claims 1 and 11, respectively. *Id*. Thus, as Defendant's proposed construction attempts to read the limitations of dependent Claims 7, 8, and 14 into independent Claims 1 and 11, Defendant's construction should therefore be rejected.

Regarding "explosion-proof", the specification clearly discloses that "housing 11 may also be able to withstand and confine shock wave or shock pressure radiated by explosions resulting from the use of a gas as the pressure medium in high-pressure testing or is fluids is used as the pressure medium in high-pressure testing, the flashing or geysering of a compressed fluid to a vapor state resulting from the compressed fluid rapidly passing through an orifice wherein elastic energy is then converted to heat." '428 Patent at Col. 2, Lines 56-64; Fig. 1. This is to solve the problem of safety recited in the background section of the specification that the hazards associated with testing high-pressure devices includes, "shock from a pressure blast and flying fragments and debris…energy released to create such overpressures may result from combustion, or may be due to the release of elastic energy stored in a compressible fluid." '428 Patent at Col. 1, Lines 36-51.

It is clear from the use of the phrase "explosion-proof" in the context of the claims, as well as within the specification of the '428 Patent, that the housing must be capable of not only functioning as a case or enclosure for containing the device to be tested and high-pressure pneumatic testing equipment within, but also, withstand and contain such shock pressures, pressure blasts, flying fragments or debris, and the energy resulting from combustion. Without such a requirement it would not be possible to test a desired high pressure device in a safe manner so as to keep all pressure in the housing away from the operator. *See e.g.*, the '428 Patent at Col. 3, Lines 15-16.

Defendant's proposed construction completely ignores the defining characteristic that the housing is, as it says, "explosion-proof" and does not accurately reflect the use of the term in the art or in the context of the patent. *See  Johnson Worldwide*, 175 F.3d at 989 (claim terms must be given their ordinary and customary meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent). In light of the intrinsic evidence, including the "written description, the drawings, and the prosecution history," the term "explosion-proof safety housing" must be construed to be "a case or enclosure to cover and protect a structure or a mechanical device able to withstand and confine shock pressure, pressure blasts, flying fragments or debris, and energy resulting from combustion." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) (citing *Interactive Gift Express, Inc. v. Compuserve, Inc.,* 256 F.3d 1323, 1331 (Fed.Cir.2001)). The correct construction of "explosion proof safety housing" must be construed to include the meaning of the limitation "explosion proof", of which Total's proposed construction is the only construction proposed by the parties to define the housing as "explosion proof". To find otherwise would fail to give appropriate weight to the intrinsic evidence.

### 2.   Closeable Access Opening In Said Housing

| Term | Claims in which term is found | Total's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|---|
| closeable access opening in said housing | 1, 3, 4, 11, 16, 18 | A door in the housing which may be opened and closed for inserting a high-pressure device for testing. | a closeable walk-in door to the stationary bunker for entry by operators, or a small closeable door on the portable test housing. |

The '428 Patent explains that the explosion-proof safety housing 11, 45 includes a closeable access opening 19 comprising a door in the housing 11 wherein a high-pressure device for testing may be inserted or placed within the explosion-proof safety housing 11, 45 through such opening 19. '428 Patent at Col. 2, Lines 1-3; Col. 3, Lines 4-7; Col. 5 Line 60 to Col. 6, Line 1; Fig. 1. The closable access opening 19 is further defined as being able to be placed in an opened or closed condition. '428 Patent at Col. 3, Lines 55-64; Fig. 1. Such is the customary and ordinary meaning of a door in a housing.

Yet, Defendant's proposed construction again attempts to confine the term to include the limitations, this time "walk-in...for entry by operators" to the "stationary housing" and "small" closeable door to the "portable test housing". Total reiterates its arguments concerning Defendant's improper limitation with regard to "stationary housing" and "portable housing" as set forth above. As for Defendant's proposition that the closable access opening be limited to a "walk-in door" capable of allowing entry by operators or "a small closeable door", there is no support whatsoever for such assertion. The only limitation for entry through the closeable access opening is that it be capable of allowing for insertion or placing of a high-pressure device within the explosion-proof safety housing 11, 45. The '428 Patent at Col. 3, Lines 4-7. In the entirety of the written description and prosecution history of the '428 Patent, no reference is made to limit the closeable access opening so narrowly.

14

Defendant's proposed construction relies entirely upon the recitation that "housing door 19 is locked with a device such as an air cylinder so that no user/personnel can enter chamber 12." (The '428 Patent at Col. 3, Lines 55-57) in an attempt to mandate that the closeable access opening must be of a size to allow personnel to physically enter. See Defendant's claimed support Exhibit B, Rec. Doc. 59 at 14. Yet, Defendant neglects that its argument regarding the use of the word "enter" could allow access or entry of an operator by other means such as a reaching through the access or even driving a vehicle through. Entry is the inherent purpose of all doors whether they are a smaller cabinet door or a large garage door. Use of the word "enter" alone does not rise to the level of manifest exclusion or of restriction as to the size of the door 19. *Innova*, 381 F.3d at 1117. The '428 Patent specification makes no suggestion of the size of door 19, thus must be given its full meaning without the supplementation of additional limiting terms. *See e.g., O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351,1360 (Fed. Cir. 2008); *Johnson Worldwide*, 175 F.3d at 989 ("General descriptive terms will ordinarily be given their full meaning; modifiers will not be added to broad terms standing alone").

Furthermore, Defendant has provided no support at all for the limitation in its proposed construction that the closable access be limited to "small". As far as Total can determine by its thorough reading of the '428 Patent, the only reference within the '428 Patent specification regarding size refers to the portable safety system 40 stating that it "comprises a smaller portable enclosure". See The '428 Patent (Doc. 65-1) at Col. 5, Lines 45-46. An argument could be made that, in terms of Claims 8 and 14 which introduce the limitation of the "portable housing", the closable access would be inherently smaller, but such a limitation of "small" cannot apply to the construction of "closable access" in independent Claims 1 and 11 due to the doctrine of claim differentiation, as discussed above. Without a recitation of the "closable access" being "small",

15

or some other suggestion or motivation outside of the portable housing being itself small, Defendant's proposed construction has no support and utterly fails.

In light of the intrinsic evidence, Total requests that the Court adopt a construction that is consistent with the disclosure of the '428 Patent, which is "a door in the housing which may be opened and closed for inserting a high-pressure device for testing". *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) (citing *Interactive Gift Express, Inc. v. Compuserve, Inc.,* 256 F.3d 1323, 1331 (Fed.Cir.2001)). The Court must construe "closeable access opening in said housing" in the light of the '428 Patent specification (*Bell Commc'ns*, 55 F.3d 615, 620 (Fed. Cir. 1995)) and cannot read limitations into the claims where there has not been a showing of "a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction". *Innova*, 381 F.3d at 1116. As the '428 Patent does not support Defendant's proposed limitations, Defendant's construction should therefore be rejected. To find otherwise would fail to give appropriate weight to the intrinsic evidence.

### 3.  Means Within Said Housing For Coupling Said High-Pressure Pneumatics Testing Equipment To Said High-Pressure Device For Testing

| Term | Claims in which term is found | Total's Proposed Construction | Defendant's Proposed Construction |
|------|-------------------------------|-------------------------------|-----------------------------------|
| means within said housing for coupling said high-pressure pneumatics testing equipment to said high-pressure device for testing | 1, 11 | means-plus-function term encompassing pressure containing hoses, fittings, pressure containing fittings, manifold fittings, pump fittings, and any equivalents thereto. | "means for coupling" not supported in the specification; no corresponding structure is defined or clearly indicated in the figures. |

Total asserts that because "means within said housing for coupling said high-pressure pneumatics testing equipment to said high-pressure device for testing" contains the word

"means" and because the claims do not disclose any structure for coupling, it is a means-plus-function term that is subject to 35 U.S.C. § 112(f). *See*, *Micro Chem.*, 194 F.3d at 1257 ("If the word 'means' appears in a claim element in association with a function, [the Federal Circuit] presumes that § 112, ¶ 6 [now § 112(f)] applies"); *see also*, *Al-Site Corp.*, 174 F.3d at 1318 (the presumption that §112(f) applies can be "overcome if the claim itself recites sufficient structure or material for performing the claimed function"). As a means-plus-function limitation, Total is entitled to have the phrase construed to encompass any structures disclosed in the patent specification, as well as any equivalents thereto that perform the claimed function. *Id.* (§ 112(f) "requires both identification of the claimed function and identification of the structure in the written description necessary to perform that function").

The first step in construing a means-plus-function element is to identify the claimed function. *Micro Chem.*, 194 F.3d at 1257. Here, the means 12a functions for coupling the high pressure pneumatics testing equipment to the high-pressure device for. *See e.g.*, the '428 Patent at Col. 3, Lines 2-4; Fig. 1. After identifying the claimed function, the next step is "to identify the structure corresponding to the function." *Micro Chem., Inc.*, 194 F.3d at 1258. The coupling means encompasses all structures disclosed in the specification that correspond to connecting a high pressure pneumatics testing equipment to a high pressure device. *Id.* Though the structure of "means 12a for coupling the high-pressure pneumatics testing equipment to a high-pressure device for testing" is covered only briefly within the specification of the '428 patent, described only as such under the notation of means 12a ('428 Patent at Col. 3, Lines 2-4; Fig. 1), means 12a for coupling high pressure pneumatics are a well understood term in the engineering field defined as "to connect with a coupling, such as of two belts or two pipes." Dictionary of Engineering, McGraw-Hill, 2nd ed. © 2002. Wherein, "pipes" is understood as "[a] tube made of

metal, clay, plastic, wood, or concrete and used to conduct a fluid, gas, or finely divided solid." *Id*. The specification of the '428 Patent discloses that means 12a for coupling the high-pressure pneumatics testing equipment to a high-pressure device for testing is "[l]ocated entirely within chamber 12" of housing 11. '428 Patent at Col. 3, Lines 1-4; Fig. 1. Further, by having the high-pressure equipment and testing equipment located entirely within chamber 12, "a majority if not all associated pumps, plumbing, hoses, and bleed valves are to also be located entirely within chamber 12." '428 Patent at Col. 3, Lines 36-38. It is clear that such plumbing structures of hoses and pumps are recited in the '428 Patent specification for the purpose of functioning, among other things, as coupling the high pressure pneumatics testing equipment to the high-pressure device.

As expounded above regarding the construction of "housing", it is well-established that a specification need not disclose what is well-known in the art (*Streck* at 1288 (Fed. Cir. 2012); *Hybritech* at *1384* (Fed. Cir. 1986)) and that a patent need not teach, and preferably omits, what is well known in the art. *Hybritech* at 1384. Thus, the term "means within said housing for coupling", as a term well understood in the art, did not require considerable explanation to be understood as being the hoses, pumps, manifolds, and fittings coupling the high-pressure pneumatics testing equipment to a high-pressure device for testing and must be given its ordinary meaning. Section 112(f) dictates that the coupling means must be construed to include these disclosed structures as well as any equivalents thereto.

Defendant does not propose any construction for "means within said housing for coupling said high-pressure pneumatics testing equipment to said high-pressure device for testing", but rather stakes its proposed construction upon an attempt to invalidate the limitation as indefinite. This position fails. Total has identified the function and structure of the means-plus-function

18

limitation, provided the Court with an accurate proposed construction based upon the structures disclosed in the '428 Patent specification and those equivalents known to those of ordinary skill in the relevant art, and Defendant has provided the Court with no proposed claim construction. Therefore, Total requests that the Court adopt its construction for "means within said housing for coupling said high-pressure pneumatics testing equipment to said high-pressure device for testing" as it is the only construction provided.

### 4. Means Linking Said High-Pressure Pneumatics Testing Equipment To Said Control Panel Or Coupling Said Control Panel To The Testing Equipment Inside Said Housing

| Term | Claims in which term is found | Total's Proposed Construction | Defendant's Proposed Construction |
|------|------|------|------|
| means linking said high-pressure pneumatics testing equipment to said control panel<br><br>OR<br><br>coupling said control panel to the testing equipment inside said housing | 1, 2, 9, 11, 12, 16 | means-plus-function term encompassing electronic cables, data cables, audio/video cables, digital and/or analog cables, power cables, pressure containing hoses and tubing, and any equivalents thereto. | tubing capable of communicating pressure from the control panel to the testing equipment. |

The phrase "means linking said high-pressure pneumatics testing equipment to said control panel" appears in Claims 1, 2, 9, 11, and 12. Total asserts that because the phrase contains the word "means" and because the claims do not disclose any structure for attaching fluids, it is a means-plus-function term that is subject to 35 U.S.C. § 112(f). *See*, *Micro Chem.*, 194 F.3d at 1257. As a means-plus-function limitation, Total is entitled to have the phrase construed to encompass any structures disclosed in the patent specification, as well as any

19

equivalents thereto that perform the claimed function. *Id.* (§ 112(f) "requires both identification of the claimed function and identification of the structure in the written description necessary to perform that function").

Although the phrase "coupling said control panel to the testing equipment inside said housing", in Claim 16, does not contain the word "means" it is nonetheless a means-plus-function element because it invokes purely functional terms without reciting specific structure for performing the recited function. *Al-Site Corp.*, 174 F.3d at 1308; *see also Cole v. Kimberly-Clark Corp.*, 102 F.3d at 531 ("merely because an element does *not* include the word 'means' does not automatically prevent that element from being construed as a means-plus-function element"). Claim 16 of the '428 Patent recites the limitation as, "coupling said control panel to the testing equipment inside said housing". The '428 Patent at Col. 8, Lines 22-24. The claim does not contain a recitation of structure that would couple the control panel to the testing equipment inside the housing, supporting the finding that the phrase is intended to be a means-plus-function element under § 112(f). *Cole v. Kimberly-Clark*, 102 F.3d at 531 ("To invoke this statute, the alleged means-plus-function claim element must not recite a definite structure which performs the described function.")

Once both "means linking said high-pressure pneumatics testing equipment to said control panel" and "coupling said control panel to the testing equipment inside said housing" are determined to be in means-plus-function form, the claimed function and corresponding structures must be identified. In the context of both phrases, the "means linking" and method step of "coupling" are claimed as attaching the control panel to the high pressure testing equipment.

A differentiation between the limitations recited regarding such phrases in the respective claims must be made. As limited by Claims 1, 9, 11, and 16 of the '428 Patent, the "means

20

linking" and step of "coupling" function to link or couple the high-pressure pneumatic testing equipment and the control panel functioning for "operating said high-pressure pneumatics testing equipment". The '428 Patent at Col. 6, Lines 40-43; Col. 7, Lines 10-13, 35-38; Col. 8, Lines 23-26. This is generally supported by the '428 Specification reciting that the safety system 10 includes:

> a control panel 16 located outside of the chamber 12 of bunker housing 11 and means linking the high-pressure pneumatics testing equipment to the control panel 16 for operating the high-pressure pneumatics testing equipment within bunker housing 11 from control panel 16.

The '428 Patent at Col. 3, Lines 26-30. Though, as limited by Claims 2, 12, and 17 of the '428 Patent, the control panel is further defined as functioning to monitor and record the operation of the high-pressure testing equipment from the control panel. The '428 Patent at Col. 6, Lines 45-48; Col. 7, Lines 40-43; Col. 8, Lines 29-31. The specification sets forth that:

> In general the means linking the high-pressure pneumatics testing equipment to control panel 16 includes not only means for monitoring but also recording the operation of the high-pressure pneumatics testing equipment.

The '428 Patent at Col. 3, Lines 26-34; Fig. 1-4. Thus, the function of the "means linking" or step of "coupling" is to link and facilitate the function of the control panel, in view of Claims 1, 9, 11, and 16, as to operate the high-pressure testing equipment and, in light of Claims 2, 12, and 17, to further function to facilitate the monitoring and recording of such operation.

As discussed above, the doctrine of claim differentiation creates the presumption "that separate claims do not have the same scope." *Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999). Though such "monitoring and recording" cannot be read into Claims 1, 11, and 16, as their dependent Claims 2, 12, and 17 recite such features the construction of the "means linking" and step of "coupling" recited in Claims 2, 12, and 17 must be read in light of such limitations.

21

The structures disclosed regarding Claims 1, 9, 11, and 16 for performing that function are "[t]ubing 17 [which] runs from the chamber 12 through a small opening 18 on bunker housing 11 to the control panel 16". '428 Patent at Col. 4, Lines 12-14. As well, the control panel 16 is described as comprising pump on/off switch 34 which functions to send pneumatic signals to the corresponding high pressure testing device to either turn on or off the particular device, wherein an adjustable resistor 39 is provided to control or set the amount of fluid flow, and ball valve 37 is included to control the main pressure of the control panel 15. '428 Patent at Col. 5, Lines 5-10; Fig. 4. This conforms to the description that control panel 16 operates the high-pressure pneumatic testing equipment. '428 Patent at Col. 3, Lines 26-31.

Structural equivalence under § 112, ¶6 is met only if the differences are insubstantial, (*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc*., 145 F.3d 1303, 1308 (Fed. Cir. 1998)), or put another way, "if the assertedly equivalent structure performs the claimed function in substantially the same way to achieve substantially the same result as the corresponding structure described in the specification." *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999) (citing § 112, ¶ 6). Whether the "control panel" has physical control switches, resistors, valves, etc. or their digital computational equivalent means of controlling the testing equipment, they perform the claimed function of operating the high-pressure testing equipment in substantially the same way of setting limits and sending signals from and to the high-pressure testing equipment through the cables, hoses, tubing, and other equivalent structural "means linking" or "coupling" means to achieve substantially the same result of facilitating the high-pressure test.

The recited structures for the limitations of Claims 2, 12, and 17 are described as chart recorders and pressure gauges on the control panel to facilitate the monitoring and recording of

the high-pressure test conducted. The '428 Patent at Col. 5, Lines 27-29. '428 Patent at Col. 5, Lines 4-7, 17-29; Fig. 4. In addition to the traditional chart recorders using ink pen on plain paper, heated stylus on heat sensitive paper, or light or electron beam on photosensitive paper ("Chart Recorder" - Dictionary of Engineering, McGraw-Hill, 2nd ed. © 2002) and pressure gauges having metallic sensing elements or piezoelectric crystals to measure pressure ("Pressure Gage" - Dictionary of Engineering, McGraw-Hill, 2nd ed. © 2002), it was well known in the field of engineering and equipment testing at the time of filing of the patent that chart recorders and pressure gauges were and are incorporated not only as physical tools but also in analog and digital setups as computational programs and systems operated and executed through computers. See Affidavit of Mr. Lavergne, attached as Exhibit B.

In determining structural equivalence, whether the "means for monitoring and recording" be an physical or analog pressure gauge, chart recorder, etc. or their digital and computational equivalents, they perform the claimed function of monitoring and recording the operation of the high-pressure testing equipment in substantially the same way of receiving data and signals from the testing equipment through the cables, hoses, tubing, and equivalent structural "means linking" or "coupling" means to achieve substantially the same result of allowing for the monitoring and recording of the test. Claims of a patent generally are not strictly limited to a device described in the specifications or depicted in a drawing. *Arnold PipeRentals Co. v. Engineering Enterprises, Inc*., 350 F.2d 885 (5th Cir. 1965); *Ziegler v. Phillips Petroleum Co*., 483 F.2d 858 (5th Cir. 1973).

Once again, a patent need not teach, and preferably omits, what is well known in the art. *Hybritech* at 1384. The operation of the control panel 16 to turn on and off the testing equipment as well as allow for input of pressure is well known to require tubing and pressure containing

hoses to facilitate the passage of pneumatic pressures and other such electronic cables and power cables which would allow for turning the pneumatic testing equipment on and off. Further, such incorporated "means linking" or "coupling" for a control panel 16 for monitoring and recording are well known to include such analog/digital cables, data cables, audio/video cables, electronic and power cables capable of facilitating and allowing for the operation and function of chart recording and pressure gauge devices. See Affidavit of Mr. Lavergne, attached as Exhibit B.

Thus, Total respectfully request that the Court apply a separate construction between Claims 1, 9, 11, 16 and Claims 2, 12, and 17 regarding the phrase "means linking" and "coupling" between the control panel and the testing equipment. Regarding Claims 1, 9, 11, 16 the construction should be a means-plus-function phrase comprising tubing, pressure containing hoses, electronic cables, power cables, and any equivalents thereto. Regarding Claims 2, 12, and 17, the construction should be a means-plus-function phrase including the aforesaid structures as well as comprising analog/digital cables, data cables, audio/video cables, electronic and power cables, and any equivalents thereto. Section 112(f) dictates that the means linking or coupling must be construed to include these disclosed structures as well as any equivalents thereto. Total therefore requests that the Court adopt its constructions.

### 5.  Means For Monitoring And Recording

| Term | Claims in which term is found | Total's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|---|
| means for monitoring and recording | 2, 12, 17 | means-plus-function term encompassing chart recorders, monitors, screens, gauges, computers, data recording instruments, and any equivalents thereto. | Gauges and chart recorders connected to the control panel. |

The "means for monitoring and recording" in Claims 2, 12, and 17 of the '428 Patent sets forth that, for the apparatus claims, the "means linking said high pressure pneumatics testing equipment to said control panel includes means for monitoring and recording the operation of said high-pressure pneumatics testing equipment" (The '428 Patent at Col. 6, Lines 45-48; Col. 7, Lines 40-43) and, for the method claims, the additional step of "monitoring and recording of the operation of said high-pressure pneumatics testing equipment from said control panel." The '428 Patent at Col. 8, Lines 29-31. The "means for monitoring and recording" is presumed to be a means-plus-function term because it invokes the word "means" and does not state a structure for performing the control of the pressurized fluid. *See e.g., Cole v. Kimberly-Clark*, 102 F.3d at 531.

The '428 Patent describes that the "means linking the high-pressure pneumatics testing equipment  to control panel 16 includes not only means for monitoring but also recording the operation of the high-pressure pneumatics testing equipment." The '428 Patent at Col. 3, Lines 31-34. In the general composition of the apparatus shown in Fig. 4, control panel 16 is shown including the means for monitoring and recording the operation of the high-pressure pneumatics testing equipment comprising a chart recorder. The '428 Patent at Col. 5, Lines 26-29; Fig. 4. Further, gauge 36 is provided in the apparatus to display the pressure being directed through the control panel 16. The '428 Patent at Col. 5, Lines 4-7, 17-23; Fig. 4.

As discussed above regarding the "means linking" and "coupling" and as discussed in the Affidavit of Mr. Lavergne, Exhibit B, it was well known in the field of engineering and equipment testing at the time of filing of the patent that chart recorders and gauges were and are incorporated as analog/digital computational programs and systems operated and executed through computers. Thus, construction of the claim limitation will include said recited structures

within the '428 Patent specification as well as any equivalent devices and instruments which facilitate such operations, such as the monitors, screens, computers, and other data recording instruments. The "means for monitoring and recording" must be construed to include any of these structures as well as any of their equivalents.

### 6.  Stationary Housing

| Term | Claims in which term is found | Total's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|---|
| stationary housing | 7 | The housing substantially fixed in place or position | Relatively non-movable bunker intended for movement of personnel into and out of bunker chamber. |

The "stationary housing" claimed is set forth in the '428 Patent specification as "a stationary explosion-proof safety housing comprising a bunker housing 11 having a chamber 12 therein." The '428 Patent (Doc. 65-1) at Col. 2, Lines 49-51; Fig. 1. As shown in Fig. 1 and described in the '428 Patent specification, the housing was simply described as being "a stationary explosion-proof safety housing comprising a bunker housing 11 having a chamber 12 therein." The '428 Patent at Col. 2, Lines 49-51; Fig. 1. Description of the limitation of "stationary" was not seen to be necessary as it is a term generally understood by laypersons and those of skill in the art alike. "Stationary", is defined as "not moving: staying in one place or position". Merriam-Webster's 11th Collegiate Dictionary © 2003. As such, the stationary housing as understood by the '428 Patent disclosure is substantially fixed in place and position.

Defendant's proposed construction again attempts to confine a term to include limitations not present in the '428 Patent disclosure. Just as with its attempt to include the phrase "walk-in…for entry by operators" to the construction of "closeable access opening", the Defendant is yet again attempting to read such a "walk-in" limitation into the construction of the "stationary

housing". Defendant proposes that the stationary housing should be construed as being "intended for movement of personnel into and out of bunker chamber", yet there is no support whatsoever for such assertion. Though the closeable access opening (aka door 19) is provided in housing 11, the access is only described as being provided for allowing for insertion or placing of a high-pressure device within the explosion-proof safety housing 11, 45. The '428 Patent at Col. 3, Lines 4-7.

In the entirety of the written description and prosecution history of the '428 Patent, no reference is made that the stationary housing be capable of allowing movement of personnel into and out of the bunker chamber. Defendant's suggestion in Exhibit B to the Joint Claim Construction and Prehearing Statement (Doc. 59) that their interpretation of "When safety enter switch 20 senses that door 19 is closed, housing door 19 is locked with a device such as an air cylinder so that no user/personnel can enter chamber 12" (the '428 Patent at Col. 3, Lines 55-57), supports such construction, lacks any detail to suggest their interpretation. Entry into the chamber 12 does not in and of itself suggest or describe personnel being capable of bodily going into and out of the stationary housing, rather such description reiterates that the door 19 allows for access to the chamber 12 for insertion or placing of the device to be tested. Nothing more. As discussed above regarding Defendant's error in construing "closeable access opening", use of the word "enter" alone does not rise to the level of manifest exclusion or of restriction as to the size (*Innova*, 381 F.3d at 1117) and neglects that "entry" could be by other means of entry of operators or personnel into the housing.

The stationary housing 11 is described in the '428 Patent specification as intended to "withstand and confine shock wave or shock pressure radiated by explosions" (The '428 Patent (Doc. 65-1) at Col. 3, Lines 57-58) and to allow "inserting a high-pressure device for testing

within bunker housing 11" (The '428 Patent (Doc. 65-1) at Col. 4, Lines 4-7), but does not define a size limit for housing 11. As the '428 Patent specification makes no suggestion of the size the housing 11, "stationary housing" must be given its full meaning without the addition of restrictive and unsupported limiting terms. *See e.g., O2 Micro*, 521 F.3d at 1360; *Johnson Worldwide*, 175 F.3d at 989 ("General descriptive terms will ordinarily be given their full meaning; modifiers will not be added to broad terms standing alone"). To limit the stationary housing so narrowly would fail to give appropriate weight to the intrinsic evidence.

Although preferring the explanation provided by its proposed construction, Total does not object to the entirety of Defendant's proposed construction and would be amenable to an agreed construction of "stationary housing" that does not employ the unsupported language "intended for movement of personnel into and out of bunker chamber". Limiting the term so narrowly does not reflect the description as set forth in the '428 Patent, thus is unnecessarily limiting. Total would be amenable to a construction of "stationary housing" similar to Defendant's reciting, "relatively non-movable bunker." However, if such proposed construction is not agreeable to Defendant, Total respectfully asks the Court to construe it to be "the housing substantially fixed in place or position."

## III.    Terms Do Not Require Construction

Defendant has identified each of the foregoing terms as being in dispute; however Total asserts that each of these terms has an easily understood, ordinary meaning that is readily apparent to both those skilled in the art and lay people. Total therefore asks the Court to refrain from providing a construction for these terms.

Many of the constructions proposed by Defendant for these terms fail to provide any more guidance as to the scope of the claim than the original claim language. "[D]istrict courts are

not (and should not be) required to construe *every* limitation present in a patent's asserted claims ... Rather claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." *O2 Micro*, 521 F.3d at 1362 (internal citations omitted, emphasis in original). Where the constructions provided by Defendant do not aid in clarifying the scope of the patent, they should be disregarded in favor of the claims' original language. There is nothing in the '428 Patent to suggest that these terms are used in any manner inconsistent with their plain and ordinary meaning. Varying, in any way, the plain claim language would contradict the claim construction canons set forth by the Federal Circuit.

Any construction adopted by the Court must be consistent with the plain and ordinary meaning of the subject claim term. In many instances, Defendant has offered a proposed construction that improperly adds limitations to the plain claim language. *See e.g.*, *Phillips*, 415 F.3d at 1312 (it is improper to construe a claim "in a manner different from the plain import of its terms"); and *Comark Commc'ns*, 156 F.3d at 1186-87 (dictating against importing limitations). Defendant's tactic is most apparent when viewed in light of its proposed constructions of "closable access opening" and "stationary housing", as detailed in depth above. Defendant's propositions that the phrases be construed as imparting the limitations of "walk-in" and "intended for movement of personnel into and out of bunker chamber" is less clear than the original language and very likely will import an added limitation to the claims if read to require such unsupported language. It appears that Defendant's proposed limitations are taken from examples in the specification, but it is well settled law that it is impermissible to read a particular embodiment into the claims. *Id.* Because Defendant's proposed constructions deviate from the otherwise plain language of the claims, it would be improper for the Court to adopt them.

29

As such, Total respectfully requests the Court reject Defendant's proposed constructions and either leave the phrase unaltered as to be understood in their plain and ordinary meaning or adopt Total's alternative constructions which do not add limitations to the claims. With respect to the remaining terms not specifically addressed, Total asserts that each should be left to its plain and ordinary meaning.

## IV.    Conclusion

A limited number of terms contained in the '428 Patent are legitimately in dispute. Many of the claims identified by Defendant as disputed are so identified for the apparent purpose of limiting the asserted claims to avoid infringement. Where terms are clear without input from the Court or the parties, Total asks the Court to leave the terms as they are. Where the parties and the jury can benefit from the Court's guidance on claim construction, Total asks the Court to adopt its proposed constructions because they are consistent with the context of the '428 Patent claim language, specifications, and prosecution histories, as well as the understanding of those of skill in the relevant art. To the extent that Defendant attempts to vary the ordinary and plain meaning of the claims so as to read unnecessary, unsupported limitations into the claims, Total asks this Court to disregard its proposed constructions.

Respectfully submitted,

/s/ Chase A. Manuel_____
Steven G. Durio (#05230)
William W. Stagg (#1613)
Chase A. Manuel (#35223)
Durio, McGoffin, Stagg & Ackermann, PC
220 Heymann Boulevard (70503)
Post Office Box 51308
Lafayette, Louisiana   70505-1308
Phone:  (337) 233-0300
Fax:     (337) 233-0694
**Attorneys for Plaintiffs Total Rebuild, Inc.**

30

## **CERTIFICATE OF SERVICE**

I certify that I have, this 12th day of January 2017, provided all parties with a copy of the

foregoing pleading by means of the Western District's CM/ECF electronic filing system.


_____/s/  Chase A. Manuel_____
Chase A. Manuel