**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION**

| | | |
|---|---|---|
| **TOTAL REBUILD, INC.** | ) | |
| | ) | |
| **Plaintiff/Counterclaim-Defendant,** | ) | **Case No. 6:15-cv-01855-TAD-CBW** |
| | ) | |
| **v.** | ) | **JUDGE TERRY A. DOUGHTY** |
| | ) | |
| **PHC FLUID POWER, L.L.C.,** | ) | **MAGISTRATE JUDGE WHITEHURST** |
| | ) | |
| **Defendant/Counterclaim-Plaintiff.** | ) | **JURY TRIAL DEMANDED** |
| | ) | |

---

**DEFENDANT PHC FLUID POWER, LLC'S MEMORANDUM IN SUPPORT OF
MOTION FOR ATTORNEYS' FEES UNDER 35 U.S.C. § 285**

---

# TABLE OF CONTENTS

I.    INTRODUCTION ......................................................................................................... 1

II.    APPLICABLE FACTS AND EVIDENCE ................................................................. 3

   A.   PHC Prevailed on Its Inequitable Conduct Counterclaim and Defense Despite Mr. Lavergne's Ever-Changing and Contradictory Tales. ........................................................................ 3

   B.   Both Prior to and During this Case, Mr. Lavergne, Total, and Total's Counsel Concealed Documents and Information. .......................................................................................... 7

   C.   Total and its Counsel Took Wholly Unreasonable Infringement Positions Including Some in Contravention of the Court's Orders. ......................................................................... 12

   D.   Unreasonable Settlement Demands ......................................................................... 16

   E.   Total and its Counsel Repeatedly Made False Assertions That PHC Engaged in Litigation Misconduct. .......................................................................................................... 17

   F.   Total Fought to Save Its LUPTA Claims But Dropped It at the Last Moment. ....................... 19

   G.   PHC's Requests Only Its Reasonable Attorneys' Fees, Costs, and Expenses. ....................... 19

III.   LAW AND ARGUMENT ....................................................................................... 20

   A.   This is an Exceptional Case Warranting Attorney Fees and Expenses. .................................. 20

   B.   The Attorneys Fees and Expenses Must Be Assessed Jointly and Severally. .......................... 22

# TABLE OF AUTHORITIES

## Cases

*Allen v. C & H Distribs, L.L.C.*, 813 F.3d 566 (5th Cir. 2015)........................................................ 24

*Colonial Oaks Assisted Living Lafayette, v. Hannie Dev. Inc.*, No. 6:18-CV-01606, 2019 WL 3251379 (W.D. La. Jun. 14, 2019)...................................................................................... 23

*Cooper v. Primary Care Solutions, Inc.*, No. CV16259EWDCONSENT, 2017 WL 1086186 (M.D. La. Mar. 21, 2017) ............................................................................................................... 23

*Endotech USA v. Bio Comp. Intern. PLC*, No. CIV. A. 00–0957., 2000 WL 1594086 (E.D. La. Oct. 24, 2000)........................................................................................................................... 22

*Energy Heating, LLC v. Heat On-The-Fly, LLC*, 889 F.3d 1291 (Fed. Cir. 2018) ........................ 21

*Iris Connex, LLC v. Dell, Inc.*, 235 F. Supp. 3d 82 (E.D. Tex. 2017) ............................................. 20

*Mathis v. Spears*, 857 F.2d 749 (Fed. Cir. 1988) ........................................................................... 20

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 524 U.S. 545 (2014) .................................. 20

*Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276 (Fed. Cir. 2011) ........................... 21

*Total Rebuild, Inc. v. Streamline Hose & Fitting Inc.*, No. 6:15-cv-01172 (W.D. La. Filed Apr. 9, 2015)............................................................................................................................................ 1

*Tubos de Acero de Mexico, S.A. v. Am. Intern. Inv. Corp., Inc.*, 292 F.3d 471 (5th Cir. 2002) ...... 22

## Statutes

35 U.S.C. § 285 ............................................................................................................................... 20

## I.      INTRODUCTION

The Court has found the '428 Patent is unenforceable and thus Total Rebuild, Inc.'s patent infringement claims have failed. Total Rebuild, Inc.'s claim under the Louisiana Unfair Trade Practices Act ("LUPTA") also failed because it dropped that claim in the proposed pretrial order despite moving forward with that claim since the lawsuit was filed. As will be explained in detail, this is truly an exceptional case in all aspects and one for which Defendant/Counterclaimant PHC Fluid Power, LLC is entitled to attorney fees, expenses, and costs under 35 U.S.C. § 285, Louisiana R.S. 51:1405, equity, and the inherent power of this Court as well as pre-judgment and post-judgment interest. Indeed, this case is ripe for inclusion in a patent textbook on how not to go about (1) obtaining a patent, (2) asserting a patent, (3) conducting discovery, and (4) taking ever-twisting positions that defy law and fact.

Terry Lavergne, through his alter ego Plaintiff Total Rebuild, Inc. (collectively with Mr. Lavergne, "Total"), filed this lawsuit on June 11, 2015 (which was the second lawsuit for infringement of the '428 Patent— ████████████████████████████████████). *Total Rebuild, Inc. v. Streamline Hose & Fitting Inc.*, No. 6:15-cv-01172 (W.D. La. Filed Apr. 9, 2015); Mot. Ex. 3. Until approximately November 2017, Total demanded a 25% royalty on gross revenues of a wide swath of systems and products in what was effectively a demand for a payment equal to 25% of PHC's gross revenues from April 3, 2012, with an ongoing royalty of 25% of PHC's gross revenues. Around November 2017, Total reduced its demand to a 25% royalty on the profits from PHC's systems from April 2, 2012 through the life of the patent (approximately 14.5 years left at the time the demand changed). At the last judicial settlement conference, Total continued to demand tens of thousands of dollars. In its final exhibit list for the jury trial, Total included an expert report for a damages expert who alleged Total was entitled to nearly $30,000.

The demands for money are just one factor in the scheme and pattern of meritless litigation by Total and its attorneys, who have known of the claims were frivolous and bad faith for years. In September 2015 (mere months after the lawsuit was filed), PHC's counsel advised Total and its counsel

via letter that the LUPTA claim was without merits. On August 24, 2016, PHC's counsel provided to Total and its counsel screen captures of Total's display of the millennium test system on Total's website in February 6, 2005 and demanded withdrawal of Total's claims because the patent was unenforceable due to inequitable conduct. The Court relied in part on the images on that website because, at trial, Mr. Lavergne testified the systems shown on the website going back to 2002 had all the elements of claim 1 of the '428 Patent. Further, Total and its attorneys engaged in outright intentional discovery misconduct that resulted in late production of invoices that conclusively proved Total sold systems that had all elements of claims 1 and 16 years prior to Mr. Lavergne's filing the provisional application. The invoices were only produced the day before a Court-ordered forensic examination of Total's computer network. As is set forth herein, Mr. Lavergne and his counsel gave often contradictory statements to PHC's counsel, to the Court (both orally and in writing), and throughout discovery.

Total's infringement and LUPTA claims were and always have been frivolous, vexatious targeting of a competitor, and made in bad faith. As shown by the evidence supporting inequitable conduct, Mr. Lavergne knew he fraudulently obtained the '428 Patent. His attorneys either knew or should have known with any reasonable pre-filing (and certainly post-filing) investigation the patent would not be enforceable. Total's attorneys either knew or should have known that there were no bases in law or fact for the LUPTA claim. Other than cross-examining deponents noticed by PHC, Mr. Lavergne and his attorneys took only a single deposition (that of PHC) and never took the deposition of any other witness to the alleged wrongdoing at issue in the patent or LUPTA claims. Even to the end, after the Court had warned Total that it was "out of strikes" because Total continued to assert claims of infringement of systems that could not infringe (e.g. systems with no pump in the bunker), Total submitted an exhibit list in which more than 50% of the exhibits referenced or related to systems that were expressly excluded. At trial, the frivolous and vexatious tactics continued with Mr. Durio's attempt to add an "expert witness" who was not on the bench trial exhibit list and who had not met any requirement of Federal Rule of Civil Procedure 26 pertaining to the subject matter of the bench trial. Mr.

Durio's co-counsel, Ryan Goudelocke, followed Mr. Durio's pattern and on the final day of trial submitted an exhibit that likewise was not on the exhibit list. Yesterday, Total filed another motion asking for a hearing to present Mr. LaFleur's testimony on how systems without a pump in a bunker could be a good faith basis for infringement.

From beginning to the very end (and no doubt at any hearing on this Motion), Total and its counsel have pursued and continue to pursue a case that had no good faith bases in law or fact. No reasonable attorney of any level of experience, certainly not three lead counsel with decades of legal experience including two who are registered patent attorneys (Stagg and Goudelocke), and an associate who is a registered patent attorney (Manuel), could have brought this case or continued this case without knowing of Total's fatal legal and factual positions. The result is PHC spent over $1.3 million in fees and expenses with the specter of litigation hanging over it for four years to protect the company (and by implication its owners and employees) from an untruthful predator who sought to take 25% of PHC's gross revenues for a 20-year period. From its baseless beginnings to its willful discovery deception to its push to introduce precluded documents and surprise witnesses and documents, and its newest frivolous motion practice, Total and its counsel have engaged in extraordinary and reprehensible litigation that must be soundly rebuked and remedied with the assessment, jointly and severally against Mr. Lavernge, Total, his individual counsel, and their firm, of all attorney fees, expenses, and costs incurred by PHC from the first demand letter through the completion of this case including but not limited to any appeals.

## II.     APPLICABLE FACTS AND EVIDENCE

### A.     PHC Prevailed on Its Inequitable Conduct Counterclaim and Defense Despite Mr. Lavergne's Ever-Changing and Contradictory Tales.

The primary invention claimed in the '428 Patent is a pressure testing system wherein the high-pressure pneumatics testing equipment—*i.e.*, one or more pumps—is in the safety housing were testing occurs. (Trial Ex. 1 at col. 1, ll. 64-67). Claims 1 and 16 of the '428 Patent are directed to such system (and the method of the system), and neither claim recites an interlock feature whereby a sensor at the

door of the safety housing is coupled to a bleed valve to relieve pressure if the door is opened during testing ("Interlock Feature"). (*Id.* at col. 6, ll. 27-43, col. 8, ll. 12-27).

On August 24, 2016, PHC's counsel sent to Total's counsel screen captures obtained from the Wayback Machine. (Dkt. 189-1 at ¶ 9; Dkt. 189-16). The screen captures show Total's website as it existed prior to the Critical Date and clearly show offers for sale and public uses of Millennium Test Systems that anticipated claim 1 of the '428 Patent. (*Id.*). In that letter, PHC requested that Total dismiss all claims within the next 10 days because the '428 Patent was unenforceable due to inequitable conduct. (*Id.*). PHC also asserted it would send a Rule 11 motion if Total did not comply. (*Id.*). Total and its counsel rejected the letter and did not drop the lawsuit.

On January 11, 2017, PHC's counsel sent Total's counsel Total invoices obtained from third-party Cory Polk clearly showing sales, installations, and demonstrations of Millennium Test Systems that practiced claims 1 and 16 of the '428 Patent prior to the August 8, 2007 critical date. (Dkt. 189-1 at ¶ 17; Dkt. 189-25). Total refused to dismiss its patent claims and maintained the Millennium Test Systems were not material.

Then, in its Motion for Summary Judgment Denying Defendant's Affirmative Defense and Counterclaim for Inequitable Conduct (Dkts. 169, 170), Total asserted there was no inequitable conduct because Mr. Lavergne did not intend to deceive the USPTO. Total explained

> Mr. Lavergne, under the instruction of Mr. Phung and his obligation to disclose information which is material to the patentability of his application, directed Total's office manager, Ms. Benoit, to provide Mr. Phung with information regarding the Millennium Test System, and that Ms. Benoit failed to do so. Having delegated Ms. Benoit to provide such information to Mr. Phung, Mr. Lavergne believed that the Millennium Test System had been disclosed.

(Memo. in Support of Mot. for Summ. J. at 8, Dkt. 170-1). In its Ruling denying Total's Motion, the Court held "[t]hat explanation is shaky when considered on its own; it becomes implausible when paired with circumstantial evidence suggesting Lavergne intended to deceive the PTO." (Dkt. 252 at 4-5). Yet, despite this rebuke, Total and its counsel continued to press the case forward.

4

In its Pretrial Memorandum, Total indicated it would take a new position in view of the Court's holding that its previous position was "implausible." Total indicated it would argue Mr. Lavergne believed he was only patenting the interlock feature of claims 3-5, 11-15, and 18-19 and accidentally patented the pump-in-the-bunker concept. (Pretrial Mem. at 7, ¶¶ 6-7, Dkt. 344). Total ignored its contrary positions in the Verified Complaint and Amended Complaint that "[i]n use, an explosion proof safety housing provides a novel means of testing without the typical risk of injury from failure of safety equipment," its description of the invention as a pressure testing system without an interlock, and its assertion that Mr. Lavergne was the sole inventor of the claimed inventions. (Verified Compl. at ¶¶ 7, 8, 10, Dkt. 1; First Am. and Restated Compl. at ¶¶ 7, 8, 10, Dkt. 22). Total also ignored an email sent by Mr. Lavergne to a third party wherein Mr. Lavergne asserted that "[a]ny system here the pumps are in the bunker will infringe on my patent" (Trial Ex. 154); Total's prior assertion that PHC infringed claims 1 and 16 (Total's Disclosure of Asserted Claims at 2, Dkt. 71-5); the contemporaneous notes Mr. Phung took while talking with Mr. Lavergne while preparing the application that issued as the '428 Patent (Trial Exs. 187, 193); and even the summary of the invention forwarded by Mr. Lavergne to Mr. Phung (Trial Ex. 182). To rectify its previous assertion that Mr. Lavergne asked Ms. Benoit to disclose pre-Critical Date sales of Millennium Test Systems to Mr. Phung, Total asserted Mr. Lavergne asked her to make the disclosures "having no knowledge of whether such was required." (Pretrial Mem. at 8, ¶ 12). Total's new position was even more implausible, convoluted, inexplicable, and devoid of credibility than its original position.

At trial, Mr. Lavergne, the sole owner and director of Total, did not dispute and in fact admitted Total sold, installed, and demonstrated numerous Millennium Test Systems (including the ones identified Mr. Polk) wherein the pumps were in the safety housing (and that met all of the other elements of claims 1 and 16) and offered for sale on its website (as shown on the screen captures from the Wayback Machine) such systems long before the August 8, 2007 Critical Date of the '428 Patent. (Trial Tr. at 21:5-22:17, 85:21-86:25, Sept. 13). The offers for sale, sales, installations, and demonstrations were material to the

5

patentability of the '428 Patent because at least claims 1 and 16 would not have issued had they been disclosed to the PTO. There was never any dispute the offers for sale, sales, installations, and demonstrations of Millennium Test Systems were material to patentability, and that Mr. Lavergne was substantially involved with and knew of them. (Trial Exs. 107-12, 123-28, 130, 134-39, 141-43).

Within the first half hour of day one of the bench trial, Mr. Lavergne quickly admitted that he believed he invented the system in claim 1 and method in claim 16 and <u>intended</u> to patent the system in claim 1 and method in claim 16. (Trial Tr. at 20:14-16, 23:4-6, Sept. 12). This is directly contrary to the representations of the proof found in Total's proposed findings of fact where Total represented that Mr. Lavergne did not intend to patent the systems and method in claims 1 and 16 respectively. Also contrary to his prior testimony that he had asked Ms. Benoit to disclose pre-Critical Date sales of Millennium Test Systems to Mr. Phung, he stated at trial he had not instructed Ms. Benoit to disclose such sales. (*Id.* at 43:20-46:13).

During Mr. Lavergne's direct examination on the second day of the bench trial, he again changed his story. He asserted he only understood the claims of the '428 Patent to cover systems with the interlock feature. On cross, it was clear he was being untruthful because he testified he understood all elements of claim 1 in the provisional application, claim 1 in the utility patent application, and claims 1 and 16 of the '428 Patent. (Trial Tr. at 61:19-62:5, 66:8-11, 75:5-7, 91:11-22, 92:24-93:4, Sept. 12; Trial Tr. at 81:6-9, 87:3-89:17, 90:3-14, Sept. 13). He further testified none of those claims referenced a sensor, which is necessary for the interlock feature. (Trial Tr. at 42:6-11, 50:19-20, 66:8-11, Sept. 12; Trial Tr. at 80:7-11, Sept. 13). Total's counsel's theory at closing that Mr. Lavergne feigned ignorance that he did not understand the difference between a claim and a patent simply was not credible nor supportable by the evidence. (Trial, Tr. at 114:4-13, 117:19-118:3, Sept. 12).

On September 13, 2019, this Court issued its Preliminary Findings of Fact and Conclusions of Law. (Dkt. 388). In that ruling, the Court found the '428 Patent unenforceable for inequitable conduct because (1) Mr. Lavergne had withheld material prior art comprising Total's Millennium Test Systems

from the PTO during prosecution of the application that issued as the '428 Patent, and (2) Mr. Lavergne had done so with deceptive intent to deceive the PTO. (*Id.*).

    **B.**    **Both Prior to and During this Case, Mr. Lavergne, Total, and Total's Counsel Concealed Documents and Information.**

Mr. Lavergne, Total, and Total's counsel concealed highly relevant and material documents; gave a false address for a key witness; and offered false answers to discovery in an attempt to evade PHC's finding evidence of the sales, installations, and demonstrations that were the underlying factual bases for the inequitable conduct claim. But for PHC's efforts and expense incurred, such documents, witness, and revised discovery responses would not have been obtained.

On August 5, 2016, PHC served its First Set of Interrogatories and Requests for Production on Total ("First Discovery Requests"). (Dkt. 189-11; Dkt. 189-1 at ¶ 5). Several of the First Discovery Requests were directed to Total's sale of pressure testing systems sold on or before August 7, 2007, the Critical Date of the '428 Patent, because these systems could invalidate the '428 Patent. *Id.* On September 2, 2016, Total served its responses ("First Responses"). (Dkt. 189-1 at ¶¶ 6-8; First Disc. Resps, Dkt. 189-12; Exhibits A-C to First Disc. Resps, Dkts. 189-13, 189-14, 189-15; Trial Exs. 256, 257). In response to the Interrogatory No. 3 request of "List by customer and date all offers for sale and/or sales by Plaintiff of pressure testing systems," Total provided three Exhibits A, B, and C. (First Disc. Resps, Dkt. 189-12; Exhibits A-C to First Disc. Resps, Dkts. 189-13, 189-14, 189-15).

Exhibit A comprised a list of invoices. (Trial Ex. 257). Exhibit B comprised seven undated pictures of pressure testing systems. (Dkt. 189-14). Exhibit C comprised the invoices in Exhibit A. (Dkt. 189-15). The earliest dated invoice identified in Exhibits A and C was an August 22, 2008 invoice to Cameron. (Trial Ex. 257). August 22, 2008 was just 14 days after the filing date of the provisional application. (Trial Ex. 1).

Total's First Responses also included the following: "the subject matter of the '428 Patent was reduced to practice approximate at the time Mr. Lavergne filed U.S. Provisional Application No.

61/188,435 on August 8, 2008" (Trial Ex. 256 at Resp. 4); "[t]he conception, reduction to practice, design, and development of patent application Serial No. 13/398,209 were conducted in-house at Total's business location and did not involve documentation as all activities were carry [sic] out as physical experimentation" (Trial Ex. 256 at Resp. 11); and "[a] prototype device was developed during the reduction to practice of the '428 Patent apparatus. Such prototype was never publicly disclosed or in public use, being kept exclusively at Total's business facility and shielded from the public. Such device was constructed for purely experimental purposes and was never offered for sale or sold." (Trial Ex. 256 at Resp. 6).

On August 24, 2016, PHC's counsel sent Total's counsel a discovery deficiency letter with screen captures of Total's website from before August 8, 2008 that appeared to demonstrate that the invention was on sale before the Critical Date. (Dkt. 189-1 at ¶ 9; Dkt. 189-16). Neither Total nor its counsel responded with any recognition of the significance of those images, which was shown at trial to depict systems that met all elements of claims 1 and 16 of the '428 Patent years prior to the Critical Date. (*See* Trial Ex. 260).

On October 7, 2016, PHC's counsel sent Total's counsel a second discovery deficiency letter. (Dkt. 189-1 at ¶ 21; Dkt. 189-17). Besides asserting that Total's responses to Requests Numbers 3 and 44 were deficient, PHC asserted in the October 7 letter:

> Total's answer to Interrogatory Nos. 3 and 13 are deficient. The interrogatories request lists of all offers for sale and/or sales by Plaintiff of pressure safety systems. You answered with Exhibits A & C to the Discovery Responses. The earliest sale in these exhibits is August 22, 2008. We understand that Plaintiff was offering for sale and/or selling pressure safety systems prior to this date. For example, your answer to Interrogatory No. 4 states that "Total, upon information and belief on and around the period of 2006, was the only company in operation producing high pressure test systems." Total did not objection to the time frame of the interrogatories and, therefore, such objections to the time frame were waived. Please supplement to provide full and complete responses.

(*Id.*). On October 27, 2016, Total provided a response letter, Supplemental Answers to PHC's First Set of Interrogatories and Requests for Production ("Total's Supplemental Answers") and produced Exhibit G. (Trial Ex. 260). The response letter asserted:

> Total's answers to PHC's interrogatories no. 3 and 13 are complete and do not require supplementation. Interrogatory No. 3 directs its inquiry specifically to customer and date of all offers and/or sales of "pressure safety systems". Likewise, PHC's interrogatory no. 13 directs itself only to identification of the products of Total which "embodies, practices, or uses any of the alleged inventions claimed in the '428 Patent". Such interrogatories do not extend to the "high pressure test systems" identified in Total's answer to PHC's interrogatory no. 4, which were not "pressure safety systems" or products embodying the invention claimed in the '428 Patent.

(*Id.*). Total's Supplemental Answers included the following response to Request Number 3:

> **Response to Request No. 3:**
>
> See Exhibit C, previously submitted and marked "Highly Confidential Attorney's Eyes Only". See also invoices of Total's Millennium Test System prototype attached as Exhibit G, marked "Highly Confidential Attorney's Eyes Only".

(Trial Ex. 260). Exhibit G included five invoices, the earliest being dated September 26, 2007, which is just over a month after the critical date. (*Id.*). Exhibit G also included an invoice dated December 3, 2007 to Cameron addressed to "Cory Polk." (*Id.*). This was the first time that Mr. Polk had been identified or disclosed in any manner during the litigation.

On November 14, 2016, PHC's counsel sent Total's counsel the following email:

> Total produced invoices in response to PHC's Request for Production No. 44. The earliest invoice is dated September 26, 2007. My understanding is Total alleges invoices prior to this date were destroyed by flooding. Can you please confirm this?

(Dkt. 189-1 at ¶ 11; Dkt. 189-19). On November 16, 2018, Total responded:

> Pursuant to our general objection to any request calling for information not within the scope of permissible discovery, you have the documents responsive to Request No. 44. Total does not have in its possession or control any further responsive invoices or any prior to the September 26, 2007 invoice. It is not Total's position that any invoices prior to that date were destroyed in the recent flooding.

(Dkt. 189-1 at ¶ 12; Dkt. 189-20). This is contrary to Mr. Lavergne's deposition testimony at trial when he said his counsel was wrong. (Trial. Tr. 55:10-14, Sept. 13).

On November 28, 2016, PHC's counsel responded to Total's November 16 email via a discovery deficiency letter that included screen captures of the MTS on Total's website as seen on February 12, 2003 and January 7, 2009. (Dkt. 189-1 at ¶ 13; Dkt. 189-21). The letter explained that Total's objection to Interrogatory 3 on the basis that Total did not sell pressure safety systems prior to the Critical Date

was contradicted by the screen captures, which indicated "Millennium Test Systems are the market standard for <u>safety</u> and excellence." (Dkt. 189-1 at ¶ 13; Dkt. 189-21) (emphasis added).

On December 1, 2016, PHC demanded Total supplement its response to Interrogatory 7:

> Interrogatory No. 7 requests that Total "[i]dentify each and every Person that Plaintiff contends was involved in any 'experimental use,' access to, or viewing of prototypes of the claimed invention(s) in the '428 Patent and identify all documents relating to that contention." "Person" is defined to "mean[] any natural individual in any capacity whatsoever or any entity or organization."

> In your October 27, 2016 letter, you assert that Interrogatory No. 7 does not require supplementation "at this time as Total's identification of persons having relevant knowledge also have knowledge as to the products referenced in Exhibits A and B asserted by PHC." However, Interrogatory No. 7 requests that Total identify "each and every Person," not just Total employees. Such persons would include third-party individuals and entities who had access to or viewed the Millennium Test System. That third parties had access to or viewed the Millennium Test System is apparent at least from the publication of the Millennium Test System on Total's website at least as early as February 12, 2003.

(Dkt. 189-1 at ¶ 14; Dkt. 189-22). On December 16, 2016, Total updated its response to Interrogatory Number 7 to include persons identified in invoices that Total had produced, including:

> Cory Polk, last known to be residing in the country of Azerbaijan, having knowledge of Cameron's purchase of a Millennium System approximately on 12/3/07. See previously produced Exhibit G to Total's supplemental discovery answers of October 27, 2016, marked "Highly Confidential Attorney's Eyes Only".

(Dkt. 189-23). However, Mr. Polk returned to the United States from Azerbaijan in 2010. (Dkt. 200 at 15-10:18). Further, after Mr. Polk was located, Mr. Lavergne testified he met Mr. Polk in 2015 after he returned from Azerbaijan, and Mr. Polk made an offer to purchase Total's business. (Dkt. 189-24 at Resp. 7). Mr. Polk also testified he had had no plans to return to Azerbaijan. (Dkt. 200 at 107:17-25). Mr. Polk had saved many of his communications from 2006 and 2007 on a flash drive. (*Id*. at 136:11-137:10).

On January 11, 2017, PHC sent Total a discovery deficiency letter. (Dkt. 189-1 at ¶ 17; Dkt. 189-25). Attached to the letter were documents provided by Mr. Polk, including a quote from Total Rebuild dated 2005/2006 and a PowerPoint, drawings, and images of a system that Total sold to and installed at Cameron in 2006. (*Id*.). The documents show that Total sold the claimed "invention" before the Critical Date of the '428 Patent. *Id*. PHC demanded that Total supplement its discovery requests and "clearly

indicate whether responsive documents once existed but no longer exist or are no longer in Total's possession or control." (*Id.*). Total responded on January 16, 2017, indicating that "[a]ny further documents which may have existed prior to what we gave you were disposed of years ago in the normal course and scope of Total's business." (Dkt. 189-1 at ¶ 18; Dkt. 189-26). Mr. Lavergne testified both at his deposition and at trial that there was no destruction in the normal course of business and no document retention policy.(Trial Tr. at 167:20-168:4, Sept. 12; Lavergne Dep. 303:16-304:15, Dkt. 198).

On February 14, 2017, PHC filed a Motion to Compel in which it requested, *inter alia*, a forensic examination of Total's computer system given Total's changing positions. (Dkt. 85). The Motion laid out the extensive and costly efforts that PHC had gone through to identity and locate Cory Polk. (*Id.*). In response, Total asserted that it did not have any further documents. (Dkt. 93). On March 10, 2017, the Court ordered a forensic examination. (Dkt. 97 at 1-4). The Court also granted PHC its fees and held that the cost of the forensic examination may be shifted to Total. (*Id.*).

On April 7, 2017, after the forensic examination was ordered but the day before the forensic examination was conducted, Total served supplemental discovery responses to Interrogatory 3 and Requests Numbers 3 and 44 and produced Exhibits H, I and J. (Trial Ex. 264). Exhibit H comprised approximately forty invoices and quotes for MTS, thirty-five of which were before the Critical Date of the '428 Patent. (*Id.*). Many of these quotes and invoices are for systems that render one or more claims of the '428 Patent invalid and were presented at trial. (*Id.*; Trial. Tr. at 76:2-82:7, 84:4-88:2, 88:16-89:12, 90:6-101:17, Sept. 12; Trial Exs. 108-112, 123-126, 128, 136, 142).

On August 10, 2017, in view of Total's production of highly relevant invoices for MTSs the day before the forensic examination, PHC's counsel sent Total's counsel a proposed motion to shift the costs of the forensic examination to Total. (Decl. at ¶ 2, Mot. Ex. 1; Mot. Ex. 4). That motion set forth all the false and misleading statements made by Total's counsel to the Court. Rather than have the motion filed, Total agreed to pay all costs associated with the forensic examination (over $14,000) without intervention by the Court. (Dkt. 189-1 at ¶ 20; Dkt. 191-10). Total also subsequently withdrew its assertion PHC

11

infringed claims 1, 2, 6-10, and 16-17 of the '428 Patent, implicitly acknowledging those claims were invalid over Total's own sales of MTSs discovered by counsel for PHC or produced after the forensic examination was ordered. (Dkt. 189-1 at ¶ 3; Dkt. 189-9).

Mr. Lavergne originally asserted that he conceived of "the concept of placing the testing systems inside a bunker along with the tools to be tested, wherein the test system may be operated from the outside of the bunker," (Dkt. 189-12 at Resp. 4), the same subject matter that is claimed in each claim of the '428 Patent. However, after evidence of the invalidating sales of the MTS surfaced, Mr. Lavergne testified he obtained that concept from Baker Hughes in 2003 or 2004. (Dkt. 109 at 238:18-241:12). Mr. Lavergne's own testimony demonstrates that he knew he did not conceive of that subject matter. For example, Mr. Lavergne testified that he had worked on the system at Baker Hughes in 2003 and 2004 and that Baker Hughes had installed similar systems throughout its facilities at that time. (*Id.* at 238:18-241:12). Nonetheless, Mr. Lavergne executed under penalty of perjury and submitted to the PTO a declaration that states: "I believe I am the original, first and sole inventor . . . of the subject matter which is claimed and for which a patent is sought on the invention entitled Improved Safety System." (Dkt. 189-29; Trial Ex. 148).

Mr. Lavergne was personally and substantially involved with at least a dozen offers for sale and sales of MTSs to Cameron extending back at least 21 months before August 8, 2007, the critical date. (Trial Exs. 107-126, 128-130, 134). These offers for sale and sales generated hundreds of thousands of dollars in sales for Total. Mr. Lavergne also had been advertising the MTS on Total's website for years. (Trial Exs. 166-168). A comparison to the Wayback Machine captures to the system as allegedly offered on www.totalrebuild.com in 2009 shows the disclosure was unchanged. (Dkt. 189-21; Trial Exs. 166, 167, 168).

## C.   Total and its Counsel Took Wholly Unreasonable Infringement Positions Including Some in Contravention of the Court's Orders.

All claims of the '428 Patent require at least one pump in the explosion proof safety housing. Yet after proceeding on that theory for years, Total changed course late in its contentions and through its final exhibit list for the jury trial, even after warnings of sanction for doing so, Total asserted the inexplicable contrary position that no pump needed to be in the housing.

Pursuant to Rule 3-1(c) of the Local Patent Rules for the Eastern of Texas, which were expressly adopted by this Court (Dkt. 51 at 5), Total served on PHC patent infringement contentions that included "[a] chart identifying specifically where each element of each asserted claim is found within each Accused Instrumentality . . . ." (Dkt. 51-1 at 6). Total served upon PHC its Initial Infringement Contentions on August 23, 2016 (Dkt. 71-5); its Supplemental Infringement Contentions on January 3, 2017 (Dkt. 85-31); and its Second Supplemental Infringement Contentions on August 27, 2018 (Dkt. 189-10). In each of those contentions, Total identified the pump assemblies, which include the pumps to pressurize the device being tested, or the pumps themselves as the structure of the accused devices that meets the "high-pressure pneumatics testing equipment" limitation. In other words, Total asserted the "high-pressure pneumatics testing equipment" was only a pump or an assembly with a pump. In turn, this meant the claim limitation "high-pressure pneumatics testing equipment located within [the explosion-proof safety] housing" could only be met if a pump, whether or not in a pump assembly, was in the explosion-proof safety housing. Total never alleged any component not part of a pump assembly (such that if the pump assembly were in the safety housing, the pump of the pump assembly would also be in the safety housing) or a pump itself is the claimed high-pressure pneumatics testing equipment. Total did not do so because the claim limitation "high-pressure pneumatics testing equipment" could not reasonably be interpreted to include equipment without a pump.

On December 10, 2018, after the close of discovery, Total served its Third Supplemental Infringement Contentions ("Third Contentions") on PHC. (Dkt. 232-2). The Third Contentions, for the first time, alleged that system with their pumps outside the safety housing infringe. Total for the first time asserted, contrary to the '428 Patent, that the claimed "high pressure pneumatics testing equipment" need

not include a pump. In other words, Total had vastly expanded the theories (and potential accused systems and methods) by which it alleged PHC infringed. Moreover, Total argued the piping, tubing, and hose that connected the pumps to the device being tested were the "high-pressure pneumatics testing equipment." That position was unreasonable because the piping, tubing, and hose that connected the pumps to the device being tested were claimed elsewhere—in the element "means within said housing for coupling said high-pressure pneumatics testing equipment to said high-pressure device for testing." (Dkt. 382 at 2-9; Trial Ex. 1 at col. 6, ll. 36-8).

On February 28, 2019, PHC filed a Motion to Strike Total's Third Supplemental Infringement Contentions on the basis that they vastly expanded the scope of the theories under which Total claimed infringement. (Dkt. 243-1). PHC also requested, in the alternative, that the term "high-pressure pneumatics testing equipment" be construed. (*Id.*).

On March 28, 2019, this Court granted the Motion to Strike, struck Total's Third Supplemental Infringement Contentions, and ordered Total is "**PRECLUDED** from proceeding on any infringement theory not identified with **sufficient specificity** in its original infringement contentions, first supplemental infringement contentions, or second supplemental infringement contentions." (Dkt. 263 (emphasis in original)). The Court expressly held that Total's Original, First Supplemental, and Second Supplemental Infringement Contentions "targeted systems using pumps or pump systems *within* an explosion-proof safety housing," and in its Third Supplemental Infringement Contentions, "Total Rebuild takes a new position: it contends that a system using pumps or pump systems *outside* an explosion-proof safety housing can infringe its patent." (*Id.* at 2). That holding was reiterated in this Court's Ruling on PHC's Motion in Limine. (Dkt. 282 at 3 ("In the Order granting Defendant's Motion to Strike, the Court found that Plaintiff was improperly trying to expand its infringement contentions by

taking the new position that 'using pumps or pump systems outside an explosion-safety housing can infringe its patent.'")).[1]

On June 10, 2019, the Court issued its Memorandum Opinion and Order ("Claim Construction Order"). (Dkt. 278). In the Claim Construction Order, the Court held:

> Additionally, the Court's construction indicates that plumbing and hoses that couple the high-pressure pneumatics testing equipment to the high-pressure device for testing are not the recited "high-pressure pneumatics testing equipment." The "high-pressure pneumatics testing equipment" is a separately claimed element from the structure for "coupling said high-pressure pneumatics testing equipment to said high-pressure device." The plain language of the claims requires both the "high-pressure pneumatics testing equipment" and the "means . . . for coupling" to be "within said housing." To the extent that a party contends that plumbing and hoses are the recited "high-pressure pneumatics testing equipment," the Court rejects that argument.

(Dkt. 278 at 30). The Claim Construction Order, like the Ruling and Order on the Motion to Strike, expressly excluded the theories of infringement that Total attempted to add after discovery closed.

On July 19, 2019, Total served its proposed pretrial order on PHC. (Dkt. 290-2). In its proposed pretrial order, to the astonishment of PHC, Total continued to accuse six systems with the pumps and pump systems outside of the alleged explosion-proof safety housing as infringing. (*Id*. at 3-5). Total continued assertion of these six systems was directly contrary to the Ruling and Order on the Motion to Strike and the Claim Construction Order.

On August 29, 2019, this Court issued an order on PHC's Motion in Limine regarding Pumps Outside Safety Housing. (Dkt. 328). In the Order, the Court unambiguously held that Plaintiff is precluded from asserting systems with the pumps or pumps outside the explosion-proof safety housing infringe. (*Id*.)

---

[1] In a telling display of bad faith, Total ignored the Court's order setting a *Markman* hearing for March 29, 2019 and, on March 28, 2019, requested the hearing be cancelled notwithstanding PHC was prepared to move forward. (Dkt. 265 at 1). PHC then agreed to a Joint Stipulation to Submit the Markman Construction Hearing on the Briefs to reduce the burden on the Court and because PHC believed the Ruling and Order on the Motion to Strike precluded Total from asserting infringement by systems with pumps outside the bunker. Joint Stipulation to Submit the Markman Construction Hearing on the Briefs (Dkt. 265). Only after PHC so stipulated did Total maintain it would continue to assert infringement by systems with their pumps outside the bunker.

15

On August 30, 2019, in response to a second motion in limine and to the astonishment of PHC, Total maintained that it would assert infringement by the six systems at trial and stated that it was PHC's burden to show that they did not infringe. (Dkt. 331 at 1 n.1).

Subsequently on August 30, 2019, PHC filed a Motion for Rule 11 Sanctions on the basis that Total assertion of infringement by the six systems was unreasonable and baseless. (Dkt. 332). Only after PHC filed the Motion for Rule 11 Sanctions and Other Relief did Total agree on proposed jury instructions that did not include those six systems. However, on September 13, 209, Total filed an Exhibit List for the jury trial that included numerous documents that were directed only toward the six systems at issue. (Dkt. 364 at Total's Proposed Exs. 14-22, 24-35, 37-51). Total hoped to argue infringement of these systems at trial and refused to fully relinquish its assertions they infringed. Total's assertion that the six systems infringed was and always has been baseless.

In the joint jury instructions that were submitted to the Court, Total identified only two systems as infringing. (Dkt. 361-1). Total's Expert opined that Total's lost profits from these two systems was $17,850. (Dkt. 295-5 at 6 (first two tan entries represent alleged damages for two systems identified in Jury Verdict Form)). In other words, after over four years of ligation and the assertion of a patent that was unenforceable due to inequitable conduct, the best Total could do was allege less than $30,000 in damages.

### D.      Unreasonable Settlement Demands

Total asserted throughout this litigation all systems manufactured or sold by PHC infringed the '428 Patent. In its identification of accused instrumentalities pursuant to Patent Rule 3-1(b), Total simply listed all descriptions of equipment found in PHC's marketing material as infringing.[2] Total did so without regard to whether it had conducted a pre-suit investigation; it simply assumed all systems infringed. Total did so to exert maximum pressure on PHC to settle.

---

[2] See Total's Patent Rule 3-1(b) disclosures in its Dkt. 71-5 at 2-3; Dkt. 85-31 at 2-3; and Dkt. 189-10 at 2-3.

From the filing of the lawsuit until approximately November 2017, Total demanded a 25% royalty on gross revenues of a wide swath of systems and products in what was effectively a demand for a payment equal to 25% of PHC's gross revenues from April 3, 2012, with an ongoing royalty of 25% of PHC's gross revenues. (Miller Decl. at ¶ 2).[3] This demand was based on claims of infringement of the '428 Patent, which has been conclusively found to be unenforceable, and a claim for violations of the Louisiana Unfair Trade Practices Act ("LUPTA") that was abandoned by Total in the final proposed pretrial order. Around November 2017, Total reduced its demand to a 25% royalty on the profits from PHC's systems from April 2, 2012 through the life of the patent (approximately 14.5 years left at the time the demand changed). (*Id*. at ¶ 3). At the last judicial settlement conference, Total continued to demand tens of thousands of dollars. In its final exhibit list for the jury trial, Total included an expert report for a damages expert who alleged Total was entitled to nearly $100,000. (*Id*. ¶ at 4). Despite knowing of the unenforceability of the patent, Total and its counsel continued to demand unreasonable sums of money for the life of the patent.

### E.    Total and its Counsel Repeatedly Made False Assertions That PHC Engaged in Litigation Misconduct.

There is not now nor has there ever been a good faith basis to assert PHC engaged in litigation misconduct. Total had full access to PHC files on its systems. On June 7-9, 2017, Chase Manuel, counsel for Total, spent over 20 hours at PHC's Houston, Texas facility reviewing, inspecting, and scanning design documents, drawings, invoices, and other related documents for pressure testing systems sold by PHC on or after April 3, 2012, the date of issue of the '428 Patent. (Dkt. 154-1 at ¶ 2).

Over a year later, on July 23, 2018, this case was reassigned to Judge Brian A. Jackson. Dkt. 147. On August 22, 2018, Judge Jackson set trial for January 22, 2019. (Dkt. 149 at 1). Between June 7-9, 2017 and August 22, 2018, Total did not: (1) serve any interrogatories or requests for production on PHC;

---

[3] A simple calculation of a 25% royalty based solely on the gross revenue of the 9 systems in Royston's Report (Dkt. 295-5) would show the extreme magnitude of this demand over the 300 plus systems sold by PHC since 2012. The demanded royalty would easily be in the millions of dollars.

(2) indicate that any of PHC's discovery responses were deficient; (3) request additional inspection of PHC's systems (or anything else from PHC); or notice or take a single deposition. Only after the Court set a trial date on August 22, 2018 did Total re-engage in discovery and actually attempt to identify specific allegedly infringing systems.[4] The reason for Total's inaction was simple—it knew the '428 Patent was invalid and/or unenforceable for inequitable conduct and was hoping to run out the clock.

On September 17, 2018, Total moved to continue the trial date, alleging that PHC "has obstructed the imposition of an agreed scheduling order and the rapidly approaching trial date does not adequately allow for completion of discovery by the parties, or preparation of expert reports for trial." (Dkt. 152 at 1). The Court denied the motion, holding that Total's allegations of discovery misconduct by PHC were "unsupported," "the prejudice Plaintiff alleges as a result of the January 22, 2019 trial setting is likely attributable to Plaintiff's failure to diligently prosecute its case over a three-year prior," and "[i]f Plaintiff is prejudiced by the January 22, 2019 trial setting, it is because Plaintiff failed to exercise due diligence." (Dkt. 161 at 3 n.5, 4, 4 n.6). The Court also stated that it "is troubled by Plaintiff's serious yet unsupported allegations. Should the Court conclude that any party has made an unfounded allegation of litigation misconduct, the Court will sanction that party under its inherent authority." (*Id*. at 3 n.5).

On March 20, 2019, in its Opposing to PHC's Motion to Strike, Total again attempted to blame PHC for its untimely infringement contentions. Total argued that "Total's contentions were not filed under December 2018 because PHC delayed inspections by Total's expert, Brian Fleur," and "[t]hroughout this litigation, PHC has delayed, obfuscated, and restricted Total's access to usable discovery regarding PHC's allegedly infringing devices." (Dkt. 253 at 2, 6).

The Court again rejected Total's claims. In its Ruling and Order on the Motion to Strike, the Court held:

> This is not the first time Total Rebuild has accused PHC Fluid Power of misconduct without supporting the accusations; it also did so in its briefing on a motion to continue.

---

[4] The only discovery at all Total served during this period was a single set of requests for admission, which were served on November 2, 2017.

> (Doc. 152-2 at p. 4). In its ruling on that motion, the Court found that the accusations lacked support and warned the parties that sanctions could follow unfounded accusations of misconduct. (Doc. 161 at p. 3). The Court finds Total Rebuild's unsupported accusations of misconduct as unpersuasive now as it found them then.

(Dkt. 263 at 4-5). The simple fact is Total did not pursue discovery because it knew the '428 Patent was invalid and/or unenforceable and that the vast majority of PHC's systems could never infringe the '428 Patent. Yet, Total asserted in its opening statement at the bench trial that PHC was making false statements: "We're going to show that because most of the testimony they're going to present is based on false or actually untruthful assertions." (Trial Tr. at 10:8-10, Sept. 12).

### F.      Total Fought to Save Its LUPTA Claims But Dropped It at the Last Moment.

In the Verified Complaint and First Amended and Restated Complaint, Total asserted against PHC a claim for Unfair Competition and Unfair Trade Practices under the Louisiana Unfair Trade Practices Act, LSA-R.S. 51:1401 *et seq.* (Dkt. 1; Dkt. 22). Contrary to its response to PHC's Motion to dismiss that claim (Dkt. 18), Total did not have a reasonable basis to assert this claim. Instead of simply dismissing it early on as PHC requested in August 2015, Total simply omitted it from the proposed Pretrial Order years later. (*See generally* Dkt. 310). The claim was omitted in no small part because Mr. Lavergne's deposition revealed he had provided fishing trips, food, alcohol, and hundreds of bottles of hot sauce to customers and potential customers, which would be the very type of conduct Total asserted was unlawful. (Dkt. 198 at 258:13-259:4; Dkt. 200 at 121:2-123:9). There was not and never has been a good faith basis for Total's LUPTA claim, which was admitted by Total's last second drop of the claim.

### G.      PHC's Requests Only Its Reasonable Attorneys' Fees, Costs, and Expenses.

PHC seeks its attorney fees and expenses in the amount of $1,309,510.02 ($1,174,276.98 in fees adjusted for the $16,960.56 previously paid by Total under Dkt. 99, and $135,233.04 in expenses), plus costs, prejudgment and post-judgment interest. PHC submits herewith as <u>Exhibit 5</u> the Affidavit of Paul Herbert in support of its request for attorneys' fees, expenses, and costs as evidence that the amounts requested by PHC in this four-plus year litigation are reasonable. The cost of the defense also is within

the AIPLA reported range of the median for cost for patent infringement cases based on Total's demands. (Miller Decl. at ¶12, Mot. Ex. 2; Mot. Ex. 12). PHC also submits herewith at Exhibits 6 and 10 the invoices for services rendered by counsel for PHC relating to this litigation. (Miller Decl. at ¶ 6, Mot. Ex. 2; Mot. Ex. 6; LaCour Aff. at ¶ 4, Mot. Ex. 10). This Court has the discretion to a PHC prejudgment interest given the exceptional nature of the case. *Mathis v. Spears*, 857 F.2d 749, 761 (Fed. Cir. 1988). Such pre-judgment interest should be at the rate of no less than the prime rate for borrowing funds of 5.25% annualized using a 360-day year as shown currently shown by the Federal Reserve. (Miller Decl. at ¶ 13, Mot. Ex. 2; Mot. Ex. 13). PHC is entitled to post-judgment interest on the foregoing amounts in accordance with 28 U.S.C. § 1961 at 1.86%, which is the current yearly T-Bill rate according to the Federal Reserve. (Miller Decl. at ¶ 12, Mot. Ex. 2; Mot. Ex. 13).

## III.   LAW AND ARGUMENT

### A.   This is an Exceptional Case Warranting Attorney Fees and Expenses.

"The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. There is no one standard for an exceptional case. "[A]n exceptional case is simply one that stands out from others with respect to the substantive strength of a party's litigation position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 524 U.S. 545, 554 (2014). "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.* District courts "may consider a nonexclusive list of factors, including frivolousness, motivations, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Iris Connex, LLC v. Dell, Inc.*, 235 F. Supp. 3d 826, 842 (E.D. Tex. 2017) (citing *Octane Fitness, Inc.*, 524 U.S. at 1756 n.6). "Patent litigants must establish their entitlement to fees under § 285 by preponderance of the evidence. *Id.* at 557.

Unlike simply prevailing by showing non-infringement, a finding of inequitable conduct is

sufficient to find an exceptional case and entitlement to fees and expenses. "[P]revailing on a claim of inequitable conduct often makes a case 'exceptional,' leading potentially to an award of attorneys' fees under 35 U.S.C. § 285." *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1289 (Fed. Cir. 2011). "District courts have often awarded attorneys' fees under § 285 following a finding of inequitable conduct, and [the Federal Circuit] has upheld such awards." *Energy Heating, LLC v. Heat On-The-Fly, LLC*, 889 F.3d 1291, 1307 (Fed. Cir. 2018). Indeed, the Federal Circuit has held that "given the strict standard in *Therasense*, we are of the view that a district court must articulate a basis for denying attorneys' fees following a finding of inequitable conduct." *Id*. The Court found the '428 Patent unenforceable due to Mr. Lavergne's inequitable conduct from withholding and concealing material prior art with an intent to deceive. This alone is sufficient for a finding of exceptional case.

If that finding alone is insufficient, the overwhelming weight of the evidence and facts dictate this is an exceptional case. Total has made enormous unsupportable settlement demands only to approach the Court before trial with less than $30,000 (systems without pump in housing) in damages according to its expert. (Dkt. 295-5 at 6 (first two gross sales multiplied by 3% plus 2 lines of lost profits)). Total has hidden relevant documents and hid behind multiple excuses (e.g. flood, ordinary business practices of destroying documents, failure of "the girls" to search and produce, and failure of counsel to provide instruction and search for documents (Trial Tr. at 53:2-25, 55:10-19, Sept. 13; Trial Ex. 248) only to produce them when the Court caught Total. Total has taken conflicting and changing infringement positions. It asserted claims that had not legal or factual basis. It asserted the LUPTA claim only to drop it at the last minute. Total and its counsel ignored multiple warning letters from PHC over a several years. Total's counsel is subject to a pending Rule 11 motion. Total disregarded an Order to compel (Dkt. 136 at 2) only to produce financial documents that allegedly supported it damages expert long after the close of discovery and immediately prior to trial. (Dkt. 309-3). Moreover, although Total represented it previously produced those financial documents, it would not respond to repeated emails from PHC's counsel requested the date of the previous production. (Miller Decl. ¶¶ at 7-9, Mot. Ex. 2; Mot. Exs. 7,

8, 9). Even after repeated warnings regarding false allegations of litigation misconduct, it continued to make such allegations including in its opening statement. Finally, in the ultimate showing of disregard for the law and this Court, Total filed its exhibit list (Dkt. 364) for the jury trial on Sep. 6, 2019, in which it included documents for systems and methods without at least one pump inside the housing. It did this even though the Court warned that extreme sanctions would occur if such documents were introduced. (Dkt. 357 at 4). All Total's conduct, as described in detail in section II, *infra*, supports a finding of exceptional case and warrants an award of attorney fees and expenses to PHC.

**B.      The Attorneys Fees and Expenses Must Be Assessed Jointly and Severally.**

Throughout this litigation, Mr. Lavergne and Total have alleged they are the alter egos of each other. In fact, Total used this excuse to avoid dismissal of its claims due to a late assignment of rights to sue for past infringement by Mr. Lavergne. Federal law and Louisiana dictate the assessment of attorney fees and expenses against Mr. Lavergne and Total for at least three reasons.

**1.      Mr. Lavergne Fraudulent Acts Render the Him Liable Under Louisiana Law.**

Liable under 35 US.C. § 285 exists against Mr. Lavergne because he committed the fraudulent acts at issue as a corporate officer to Total. "Under Louisiana law, an individual may be held personally liable for a fraudulent act committed in his capacity as a corporate officer." *Endotech USA v. Bio Comp. Intern. PLC*, No. CIV. A. 00–0957., 2000 WL 1594086, at *11 (E.D. La. Oct. 24, 2000). "[S]uch personal liability is independent from and does not require the disregard of the corporate entity under the alter ego doctrine." *Id.*; *see Tubos de Acero de Mexico, S.A. v. Am. Intern. Inv. Corp., Inc.*, 292 F.3d 471, 479 (5th Cir. 2002) ("[A]n action seeking to hold a corporate officer or director personally liable for fraud is separate from and does not require disregard of the corporate entity under the alter ego doctrine.").

The Court held Mr. Lavergne committed the fraudulent act in this case. "Defendant has proven with clear and convincing evidence that Mr. Lavergne deliberately withheld information regarding prior sales from the PTO" and "Defendant has proven with clear and convincing evidence that Mr. Lavergne

specifically intended to deceive the PTO, and engaged in equitable conduct in order to obtain the '428 Patent." (Dkt. 388 at 5-6). Mr. Lavergne testified he was "sole owner, sold director and sole shareholder of Total" during the entire prosecution of the application that issued as the '428 Patent. (Dkt. 66-2 at ¶¶ 3, 7). Mr. Lavergne also testified prosecution of the application that issued as the '428 Patent was by him as an officer of Total. (*Id.* at ¶¶ 8-17). Accordingly, liability may be assessed directly against Mr. Lavergne for his fraudulent obtaining of the '428 Patent in his capacity as an officer of Total, or effectively as Total itself.

### 2.      Mr. Lavergne May Be Held Directly Liable as Total's Alter Ego.

Liability also must be assessed directly against Mr. Lavergne as Total's alter ego. "[C]ourts may disregard the corporate form and exercise jurisdiction over an individual officer if the corporation is the 'alter ego' of the officer." *Cooper v. Primary Care Solutions, Inc.*, No. CV16259EWDCONSENT, 2017 WL 1086186, at *5 (M.D. La. Mar. 21, 2017); *see also Colonial Oaks Assisted Living Lafayette, v. Hannie Dev. Inc.*, No. 6:18-CV-01606, 2019 WL 3251379, at *3 (W.D. La. Jun. 14, 2019). "Some of the factors courts consider when determining whether to apply the alter ego doctrine include, but are not limited to: 1) commingling of corporate and shareholder funds; 2) failure to follow statutory formalities for incorporating and transacting corporate affairs; 3) undercapitalization; 4) failure to provide separate bank accounts and bookkeeping records; and 5) failure to hold regular shareholder and director meetings." *Colonial Oaks*, 2019 WL 3251379, at *3.

Mr. Lavergne and Total have alleged in this lawsuit they are "alter egos." There is no evidence that the finances of Mr. Lavergne are any different than his personal finances. In fact, he testified that he uses his employees at Total to work on his other business ventures and manage those other entities finances. (Trial Tr. at 19:8-15, 60:6-14, Sept. 13). There is no evidence that he has followed statutory formalities as evidenced by the execution of the assignments of the '428 Patent immediately before the filing of the lawsuit – three years after the patent issued and nearly seven years after the first application was filed. (Trial Ex. 222 at 8-10; Trial Ex. 223). There is no indication of any shareholder or director

meetings because accordingly to Mr. Lavergne, he is the sole owner and director. (Dkt. 66-2).

Even if Mr. Lavergne now argues he is not the alter ego, he cannot. Because this Court relied upon Total and Mr. Lavergne's representation of alter ego status in denying a partial motion for summary judgment filed by PHC (Dkt. 148 at 5-6), <u>Mr. Lavergne and Total are judicially estopped from now arguing Mr. Lavergne and Total are not alter egos</u>.

"Judicial estoppel is a common law doctrine that prevents a party from assuming inconsistent position in litigation." *Allen v. C & H Distribs, L.L.C.*, 813 F.3d 566, 572 (5th Cir. 2015). "The doctrine's purpose is to protect the integrity of the judicial process by preventing parties from playing fast and loose with the courts to suit the exigencies of self interest." *Id*. "Judicial estoppel has three elements: (1) The party against whom it is sought has asserted a legal position that is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently." *Id*.

On November 23, 2016, PHC filed a Motion for Partial Summary Judgment based on Mr. Lavergne's failure to assign to Total the right to sue for past infringement of the '428 Patent in his March 25, 2015 assignment to Total. (Dkt. 60). In response and relying on the Affidavit of Terry Lavergne (an intentional, not inadvertent, act), Total argued an assignment of right to sue for past infringement and damages was unnecessary because Total had always been the owner of the '428 Patent as Mr. Lavergne's "alter ego." (Dkt. 66-1 at ¶ 4 ("Acting under his authority as the director and sole shareholder of Total, Mr. Lavergne is the alter ego of Total."); Dkt. 66 at 12 ("In this capacity it is obvious that Terry Lavergne was more than a mere employee of Total and occupies such a relation to Total that he is its alter ego in such a capacity.")). The Court denied the Motion for Partial Summary Judgment on the basis that "taking the facts in the light most favorable to Plaintiff, Lavergne was the alter ego of Plaintiff Total Rebuild." (Dkt. 148 at 5). Judicial estoppel now precludes Total from arguing Mr. Lavergne is not Total's alter ego. Fees and expenses must be assessed accordingly.

### 3. Section 285 Provides for Direct Assessment.

Section 285 liability may be assessed against Mr. Lavergne directly so long as (1) he is

responsible for conduct that makes the case exceptional, (2) he is afforded due process, and (3) it is equitable to do so." *Iris Connex, LLC*, 235 F. Supp. 3d at 843. Here, all factors are met.

Mr. Lavergne and his attorneys were responsible for all the conduct that makes this case exceptional. First, it was Mr. Lavegne alone who intentionally deceived the PTO by withholding material prior art comprising sales of Millennium Test Systems prior to the critical date. Second, Mr. Lavergne was complicit with his attorneys' ever-changing story as to why the Millennium Test System invoices were not disclosed to the PTO. The excuses, which contradicted one another, ranged from "implausible" to extremely implausible. Third, Mr. Lavergne and his attorneys are solely responsible for concealing the Millennium Test System documents and witness information in this litigation. The successive timing of the disclosures of various invoices and Total ever-changing excuses as to why the documents did not exist (and sworn statements and representations to the Court in support of those excuses) lead to only one conclusion—Mr. Lavergne and his attorneys intentionally concealed the invoices until a forensic examination was ordered.

Mr. Lavergne was also afforded due process. Mr. Lavergne is alleged to be Total's alter ego and is the sole owner and director of Total. Mr. Lavergne was also the only Total employee who testified during this litigation. He has had ample time to present his story to this Court. However, to the extent the Court finds Mr. Lavergne has not been afforded due process, PHC requests that he be provided with an opportunity to respond to this Motion and a hearing.

Equitable considerations militate in favor of assessing fees directly against Mr. Lavergne. As discussed above, Mr. Lavergne is responsible for the conduct that renders this case exceptional. There are no innocent owners of Total, and Mr. Lavergne cannot place the blame elsewhere within Total. Liability must be assessed directly against Mr. Lavergne.

Respectfully submitted,

MILLER LEGAL PARTNERS PLLC

/s/ Samuel F. Miller
Samuel F. Miller, TN Bar No. 22936
Nicholas R. Valenti, TN Bar No. 35420
Sara R. Ellis, TN Bar No. 30760
Hayley H Baker, TN Bar No. 37439
Fifth Third Center – Suite 2000
424 Church Street
Nashville, Tennessee 37129
Tel/Fax: (615) 988-9011
Email: smiller@millerlegalpartners.com
        nvalenti@millerlegalpartners.com
        sellis@millerlegalpartners.com
        hbaker@millerlegalpartners.com


NEUNERPATE

/s/ Cliff A. LaCour
Brandon W. Letulier - #28657
Cliff A. LaCour - #30581
One Petroleum Center, Suite 200
1001 West Pinhook Road
Lafayette, Louisiana 70503
Tel: (337) 237-7000
Fax: (337) 233-9450
Email: bletulier@neunerpate.com
        clacour@neunerpate.com


*Attorneys for PHC Fluid Power, L.L.C.*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 18th day of September 2019, a copy of the foregoing was served on counsel of record listed below via the Court's ECF system:

William W. Stagg
Steven G. Durio
Tyler Rush
Ryan Goudelocke
Durio, McGoffin, Stagg & Ackermann, PC
220 Heymann Boulevard
Post Office Box 51308
Lafayette, LA 70505-1308
Bill@dmsfirm.com Buzz@dmsfirm.com
Tyler@dmsfirm.com
Ryan@dmsfirm.com

Brandon W. Letulier
Cliff A. LaCour
NeunerPate
One Petroleum Center, Suite 200
1001 W. Pinhook Road
Lafayette, LA 70503
bletulier@neunerpate.com
clacour@neunerpate.com

Chase A. Manuel
Brazee, Edwards, & Durio
2901 Johnston Street, Suite 206
Lafayette, Louisiana 70503
Telephone:  (337) 237-0492
Facsimile:  (337) 232-7758
chasemanuel@brazeelawfirm.com

/s/ Samuel F. Miller
Samuel F. Miller

27