**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | | |
|---|---|---|
| **TOTAL REBUILD, INC.** | ) | |
| | ) | |
| **Plaintiff/Counterclaim-Defendant,** | ) | **Case No. 6:15-cv-01855-TAD-CBW** |
| | ) | |
| **v.** | ) | **JUDGE TERRY A. DOUGHTY** |
| | ) | |
| **PHC FLUID POWER, L.L.C.,** | ) | **MAGISTRATE JUDGE WHITEHURST** |
| | ) | |
| **Defendant/Counterclaim-Plaintiff.** | ) | **JURY TRIAL DEMANDED** |
| | ) | |

---

**MEMORANDUM IN SUPPORT OF MOTION FOR ATTORNEYS' FEES, EXPENSES, AND COSTS UNDER 28 U.S.C. § 1927**

---

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................................. 1

II.    LAW AND ARGUMENT .................................................................................................... 3

    A.   Total's Counsel's Persistent Prosecution of Total's Meritless Claims and Litigation was Unreasonable and Vexatious ................................................................................................. 3

    B.   Total's Counsel Engaged in More than Simply Losing a Case. ........................................... 3

        1.   Total's Counsel's Failed to Conduct Any Material Prefiling Investigation. ...................... 5

        2.   Total's Counsel's Withheld Relevant Documents, Or At Least, Took No Meaningful Efforts to Ensure Total Conducted a Reasonable Search. ....................................................... 10

        3.   Total's Counsel's Asserted Claims with No Chance of Success Even After Notice. ........ 16

        4.   Total's Counsel's Engaged in Other Unreasonable Litigation Conduct. ........................... 20

    C.   All Fees, Expenses, and Costs Should Be Assessed Against Total's Counsel. .................... 23

III.    CONCLUSION ................................................................................................................. 24

# TABLE OF AUTHORITIES

## Cases

*Amphenol Corp. v. Gen. Time Corp.*, 397 F.2d 431 (7th Cir. 1968) ...................................................6

*Antonious v. Spalding & Evenflo Cos, Inc.*, 275 F.3d 1066 (Fed. Circ. 2002) ...............................5

*Baulch v. Johns*, 70 F.3d 813 (5th Cir. 1995) ..............................................................................5

*Beauregard Par. Sch. v. Honeywell Inc.*, No. 2:07CV1459, 2008 WL 652147 (W.D. La. Mar. 11, 2008) .........................................................................................................................4

*Browning v. Kramer*, 931 F.2d 340 (5th Cir. 1991).......................................................................3

*F.D.I.C. v. Calhoun*, 34 F.3d 1291 (5th Cir. 1994)....................................................................5, 6

*Ferag AG v. Quipp Inc.*, 45 F.3d 1562 (Fed. Cir. 1995), *cert. denied*, 516 U.S. 816 (1995) ...............6

*Gotch v. Ensco Offshore Co.*, 168 F.R.D. 567 (W.D. La. 1996) ............................................................4

*Greig v. Thibodeaux*, No. CIV.A. 03-0417, 2006 WL 4547196 (W.D. La. Sept. 27, 2006), *report and recommendation adopted in part, rejected in part*, No. CIV.A. 03-0417, 2007 WL 1521445 (W.D. La. May 22, 2007) ...........................................................................................4

*Hillman Lumber Prod., Inc. v. Webster Mfg., Inc.*, 727 F. Supp. 2d 503 (W.D. La. 2010).............3, 4

*In re Sealed Appellant*, 194 F.3d 666 (5th Cir. 1999)....................................................................4

*Judin v. United States*, 110 F.3d 780 (Fed. Cir. 1997)....................................................................5

*Lewis v. Brown & Root, Inc.*, 711 F.2d 1287 (5th Cir. 1983), *on reconsideration*, 722 F.2d 209 (5th Cir. 1984)....................................................................................................................3

*Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282 (5th Cir. 2002)........................................3

*Marceaux v. Lafayette City-Parish Consol. Govern.*, 14 F. Supp. 3d 760 (W.D. La. 2014)................4

*Mathis v. Spears*, 857 F.2d 749 (Fed. Cir. 1988) .......................................................................24

*Nat'l Ass'n of Gov't Emps. v. Nat'l Fed'n of Fed. Emps.*, 844 F.2d 216 (5th Cir.1988).....................4

*Procter & Gamble v. Amway Corp.*, 280 F.3d 519 (5th Cir. 2002)..............................................4, 23

*S. Bravo Sys., Inc. v. Containment Techs. Corp.*, 96 F.3d 1372 (Fed. Cir. 1996)................................5

*Stewart v. Courtyard Mgmt. Corp.*, 155 F. App'x 756 (5th Cir. 2005) ...........................................4

*Thomas v. Capital Sec. Servs.*, Inc., 836 F.2d 866 (5th Cir. 1988)................................................3

*Tura v. Sherwin-Williams Co.*, 1991 U.S. App. LEXIS 11792  (6th Cir. May 28, 1991) (unpublished)....................................................................................................................6

*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011)..............................................21

*View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981 (Fed. Cir. 2000) ....................................5

*W. Heritage Ins. v. Robertson*, 224 F.3d 764 (5th Cir. 2000) .........................................................4

*White v. Gen. Motors Corp.*, 908 F.2d 675 (10th Cir. 1990) ...........................................................6

## Statutes

28 U.S.C. § 1927...................................................................................................................1, 3, 4, 5

28 U.S.C. § 1961.........................................................................................................................24

35 U.S.C. § 102(b) .......................................................................................................................6

## I.      INTRODUCTION

Actions have consequences. 28 U.S.C. § 1927 is the remedy for egregious conduct by attorneys that multiplies proceedings in an unreasonable or vexatious manner. This is precisely what happened here. Total's attorneys Durio, McGoffin, Stagg, Ackerman, PC and attorneys Chase A. Manuel, Steven G. Durio, William W. Stagg, and Ryan Goudelocke (collectively, "Total's Counsel") undertook to assert a case that cost over $1.3 million dollars to defend without conducting any reasonable pre-filing investigation and after learning of facts that should have been bright red flags during the litigation as to the unenforceability of the patent and the lack of infringement, they continued to push the case to trial anyway. Total's Counsel, three of which have specialized knowledge of patent law, simply chose to ignore the facts and law without regard for the enormous financial and emotional impact on PHC, which is the victim in this case—not Total or Mr. Lavergne.

Total's infringement and LUPTA claims were and always have been frivolous, vexatious targeting of their client's competitor, and bad faith. As shown by the evidence supporting inequitable conduct, Mr. Lavergne knew he fraudulently obtained the '428 Patent. Total's Counsel either knew or should have known with any reasonable pre-filing (and certainly post-filing) investigation the patent would not be enforceable and there was no reasonable counter to the on-sale bar and inequitable conduct defenses. Total's Counsel either knew or should have known that there was no bases in law or fact for the LUPTA claim. Other than cross-examining deponents noticed by PHC, Total's Counsel noticed only a single deposition (that of PHC) and, although they cross examined witnesses noticed by PHC for depositions, they never took the deposition of any other witness to the alleged wrongdoing at issue in the patent or LUPTA claims. Even to the end, after the Court had warned Total that it was "out of strikes" because Total continued to assert claims of infringement of systems that could not infringe (e.g. systems with no pump in the bunker), Total's Counsel submitted an exhibit list in which more than 50% of the exhibits referenced or related to systems that were expressly excluded. At trial, the

frivolous and vexatious tactics continued with Mr. Durio's attempt to add an "expert witness" who was not on the bench trial exhibit list and who had not met any requirement of Federal Rule of Civil Procedure 26 pertaining to the subject matter of the bench trial. Mr. Durio's co-counsel, Ryan Goudelocke followed Mr. Durio's pattern and on the final day of trial, and submitted an exhibit that likewise was not on the exhibit list. Yesterday, Total filed another motion asking for a hearing to present Mr. LaFleur's testimony on how systems without a pump in a bunker could be a good faith basis for infringement. The Court denied the request for hearing.

From the very beginning to the very end (and no doubt at any hearing on this Motion), Total and its counsel have pursued and continue to pursue a case that had no good faith bases in law or fact. No reasonable attorney of any level of experience, certainly not three lead counsel with decades of legal experience including two who are registered patent attorneys (Stagg and Goudelocke), and an associate who is a registered patent attorney (Manuel), could have brought this case or continued this case without knowing of Total's fatal legal and factual positions. The result is PHC spent over $1.3 million in fees and expenses with the specter of litigation hanging over it for four years to protect the company (and by implication its owners and employees) from an untruthful predator who sought to take 25% of PHC's gross revenues for a 20-year period. From its baseless beginnings to its willful discovery deception to its push to introduce precluded documents and surprise witnesses and documents, and its newest frivolous motion practice, Total and its counsel have engaged in extraordinary and reprehensible litigation that must be soundly rebuked and remedied with the assessment, jointly and severally against Mr. Lavernge, Total, his individual counsel, and their firm, of all attorney fees, expenses, and costs incurred by PHC from the first demand letter through the completion of this case including but not limited to any appeals. Justice in this case requires such remedial measure of assessing all attorney fees, expenses, and costs at Total's Counsel.

## II.    LAW AND ARGUMENT

### A.    Total's Counsel's Persistent Prosecution of Total's Meritless Claims and Litigation was Unreasonable and Vexatious

This Court has the authority and power to enter an award of PHC's attorneys' fees, expenses, and costs against Total's Counsel. Under 28 U.S.C. § 1927, "Any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. "All that is required to support § 1927 sanctions is a determination, supported by the record, that an attorney multiplied proceedings in a case in an unreasonable manner." *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 291 (5th Cir. 2002) (citing *Browning v. Kramer*, 931 F.2d 340, 344 (5th Cir. 1991); *see also Lewis v. Brown & Root, Inc.*, 711 F.2d 1287, 1292 (5th Cir. 1983), *on reconsideration*, 722 F.2d 209 (5th Cir. 1984) (Conducting litigation in an "irresponsible *manner*" that multiplies needless proceedings serves as a basis for an award of sanctions.) (emphasis in original)). "[S]ection 1927 imposes a *continuing obligation* on attorneys by prohibiting the persistent prosecution of a meritless claim." *Thomas v. Capital Sec. Servs.*, Inc., 836 F.2d 866, 875 (5th Cir. 1988) (emphasis added). "The statute is designed to curb litigation abuses by counsel, irrespective of the merits of the client's claims or defenses." *Hillman Lumber Prod., Inc. v. Webster Mfg., Inc.*, 727 F. Supp. 2d 503, 507 (W.D. La. 2010).

Here, Total's Counsel litigation conduct—from filing the lawsuit through trial—gives rise to the necessity of § 1927 sanctions.

### B.    Total's Counsel Engaged in More than Simply Losing a Case.

"In order to impose sanctions under § 1927, the court must find evidence of bad faith, improper motive, *or* reckless disregard of the duty owed to the court."[1] *Marceaux v. Lafayette City-Parish*

---

[1] "The only meaningful difference between an award made under § 1927 and one made pursuant to the court's inherent powers is, as noted above, that awards under § 1927 can be made only against attorneys or other persons authorized

*Consol. Govern.*, 14 F. Supp. 3d 760, 767 (W.D. La. 2014) (emphasis added); *see also Stewart v. Courtyard Mgmt. Corp*., 155 F. App'x 756, 760 (5th Cir. 2005) ("Proving that a counsel's behavior was both 'vexatious' and 'unreasonable' requires 'evidence of bad faith, improper motive, or reckless disregard of the duty owed to the court.'"). Bad faith may be inferred when the attorney's actions are so without merit that they demand the conclusion they were undertaken for an improper purpose like delay. *Beauregard Par. Sch. v. Honeywell Inc*., No. 2:07CV1459, 2008 WL 652147, at *2 (W.D. La. Mar. 11, 2008); *see also In re Sealed Appellant*, 194 F.3d 666, 671 (5th Cir. 1999) ("When bad faith is patent from the record and specific findings are unnecessary to understand the misconduct giving rise to the sanction, the necessary finding of 'bad faith' may be inferred.")

In cases where a reasonable investigation (such as a discussion of the background facts with a client) or discovery reveals the lack of merit of claims and thus a breach of a duty of good faith to the Court, sanctions under § 1927 are appropriate. "Counsel's failure to reasonably investigate plaintiff's claim or material produced in discovery, which would have revealed the claim's lack of merit, is bad faith litigation." *W. Heritage Ins. v. Robertson*, 224 F.3d 764 (5th Cir. 2000). Failing to cooperate in the discovery process, submitting patently inaccurate and misleading interrogatory responses, and failing to comply with the court's discovery orders also are bases for sanctions under § 1927. *See Greig v. Thibodeaux*, No. CIV.A. 03-0417, 2006 WL 4547196, at *3 (W.D. La. Sept. 27, 2006), *report and recommendation adopted in part, rejected in part*, No. CIV.A. 03-0417, 2007 WL 1521445 (W.D. La. May 22, 2007); *Gotch v. Ensco Offshore Co*., 168 F.R.D. 567, 573 (W.D. La. 1996). Repeated filings despite the court's warnings, and other proof of excessive litigiousness, further support imposing § 1927 fees. *Procter & Gamble v. Amway Corp.*, 280 F.3d 519, 525-26 (5th Cir. 2002) (citing *Nat'l Ass'n of Gov't Emps. v. Nat'l Fed'n of Fed. Emps.*, 844 F.2d 216, 224 (5th Cir.1988)). As noted by the Fifth

---

to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both." *Hillman Lumber Prod., Inc. v. Webster Mfg., Inc*., 727 F. Supp. 2d 503, 509 (W.D. La. 2010).

Circuit, frivolous arguments waste scarce judicial resources and unnecessarily increase the legal fees charged to the parties. *Baulch v. Johns*, 70 F.3d 813, 817 (5th Cir. 1995).

This is not simply a motion brought because Total lost its case at trial. There is no dispute that § 1927 sanctions are not available against the attorneys on the other side in every case. This, however, is not every case. All the behavior described above that would give rise to sanctions under § 1927 occurred in this case. Total's Counsel brought a case without a reasonable investigation into the claims, intentionally proceeded with claims when discovery showed the lack of merit, withheld relevant documents, made inaccurate statements in interrogatory responses, failed to comply with Court's Orders, ignored warnings on excluded evidence, asserted claims with no chance of success (e.g. systems with no pump within a bunker), and engaged in other excessive litigiousness such as attempting to call a witness that was not disclosed on the bench trial witness list.

1.      **Total's Counsel's Failed to Conduct Any Material Prefiling Investigation.**

The Federal Circuit has construed Rule 11, in the context of patent infringement actions, to require that an attorney interpret the pertinent claims of the patent in issue before filing a complaint alleging patent infringement. *Antonious v. Spalding & Evenflo Cos, Inc.*, 275 F.3d 1066, 1072 (Fed. Circ. 2002); *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 986 (Fed. Cir. 2000); *Judin v. United States*, 110 F.3d 780, 784 (Fed. Cir. 1997); *S. Bravo Sys., Inc. v. Containment Techs. Corp.*, 96 F.3d 1372, 1375 (Fed. Cir. 1996). Although the attorney may consult with the client, Rule 11 requires that the attorney not rely solely on the client's claim interpretation, but instead perform an independent claim analysis. *S. Bravo Sys.*, 96 F.3d at 1375.

Any reasonable pre-complaint investigation would have revealed the glaring sales, offers for sale, demonstrations, and installation that would render the '428 patent unenforceable. "The 'reasonableness' of the rules requires a party to consider 'whether any obvious affirmative defenses bar the case.'" *F.D.I.C. v. Calhoun*, 34 F.3d 1291, 1299 (5th Cir. 1994). The question for reasonableness is whether the affirmative defense was "so obvious a bar that under the circumstances

5

it was unreasonable to bring suit." *Id.*; *see also White v. Gen. Motors Corp.*, 908 F.2d 675, 682 (10th Cir. 1990) ("An attorney need not forbear to file her action if she has a colorable argument as to why an otherwise applicable affirmative defense is inapplicable in a given situation."); *Tura v. Sherwin-Williams Co.*, 1991 U.S. App. LEXIS 11792, at *8 (6th Cir. May 28, 1991) (unpublished) (prefiling inquiry includes obligation to investigate obvious affirmative defenses). As a matter of law, a patent is invalid if the underlying invention had been in "use" or "on sale" more than one year prior to the filing of the patent application. 35 U.S.C. § 102(b). "On sale" does "not mean an actual accomplished sale but activity by the inventor or his company in attempt to sell the patented idea." *Amphenol Corp. v. Gen. Time Corp.*, 397 F.2d 431, 433 (7th Cir. 1968). An "attempt to sell" includes "any attempt to commercialize" the invention. *Ferag AG v. Quipp Inc.*, 45 F.3d 1562, 1566 (Fed. Cir. 1995), *cert. denied*, 516 U.S. 816 (1995). According to the Federal Circuit, "the inventor is strictly held to the requirement that he file his patent application within one year of any attempt to commercialize the invention." *Id.* (emphasis added). This reflects a "policy of preventing inventors from exploiting the commercial value of their inventions while deferring the beginning of the statutory term." *Id.*

All Total's Counsel had to do in this case was look on the internet and ask Mr. Lavergne when he first started to sell systems within claims 1 and/or 16. They did not have to rely upon Mr. Lavergne's newly-conjured up assertion that he only patented a system with sensors connected to bleed valves. The three patent attorneys certainly could have seen, as clearly as Mr. Lavergne testified at trial, that claims 1 and 16 contain absolutely no mention of sensors and did not require sensors.

To compound the lack of investigation, Total's Counsel simply chose to ignore the clear evidence from Total's website presented to them in January 2016 and the invoices produced by them in 2017. On August 24, 2016, PHC's counsel sent to Total's counsel screen captures obtained from the Wayback Machine. (Dkt. 189-1 at ¶ 9; Dkt. 189-16). The screen captures show Total's website as it existed prior to the Critical Date and clearly show offers for sale and public uses of Millennium Test Systems that anticipated claim 1 of the '428 Patent. (*Id.*). In that letter, PHC requested that Total

6

dismiss all claims within the next 10 days because the '428 Patent was unenforceable due to inequitable conduct. (*Id.*). PHC also asserted it would send a Rule 11 motion if Total did not comply. (*Id.*). Total and its counsel rejected the letter and did not drop the lawsuit.

On January 11, 2017, PHC's counsel sent Total's counsel Total invoices obtained from third-party Cory Polk clearly showing sales, installations, and demonstrations of Millennium Test Systems that practiced claims 1 and 16 of the '428 Patent prior to the August 8, 2007 critical date. (Dkt. 189-1 at ¶ 17; Dkt. 189-25). Total refused to dismiss its patent claims and maintained the Millennium Test Systems were not material.

Then, in its Motion for Summary Judgment Denying Defendant's Affirmative Defense and Counterclaim for Inequitable Conduct (Dkts. 169, 170), Total asserted there was no inequitable conduct because Mr. Lavergne did not intend to deceive the USPTO. Total explained

> Mr. Lavergne, under the instruction of Mr. Phung and his obligation to disclose information which is material to the patentability of his application, directed Total's office manager, Ms. Benoit, to provide Mr. Phung with information regarding the Millennium Test System, and that Ms. Benoit failed to do so. Having delegated Ms. Benoit to provide such information to Mr. Phung, Mr. Lavergne believed that the Millennium Test System had been disclosed.

(Memo. in Support of Mot. for Summ. J. at 8, Dkt. 170-1). In its Ruling denying Total's Motion, the Court held "[t]hat explanation is shaky when considered on its own; it becomes implausible when paired with circumstantial evidence suggesting Lavergne intended to deceive the PTO." (Dkt. 252 at 4-5). Yet, despite this rebuke, Total and its counsel continued to press the case forward.

In its Pretrial Memorandum, Total indicated it would take a new position in view of the Court's holding that its previous position was "implausible." Total indicated it would argue Mr. Lavergne believed he was only patenting the interlock feature of claims 3-5, 11-15, and 18-19 and accidentally patented the pump-in-the-bunker concept. (Pretrial Mem. at 7, ¶¶ 6-7, Dkt. 344). Total ignored its contrary positions in the Verified Complaint and Amended Complaint that "[i]n use, an explosion proof safety housing provides a novel means of testing without the typical risk of injury from failure of safety

equipment," its description of the invention as a pressure testing system without an interlock, and its assertion that Mr. Lavergne was the sole inventor of the claimed inventions. (Verified Compl. at ¶¶ 7, 8, 10 Dkt. 1; First Am. and Restated Compl. at ¶¶ 7, 8, 10, Dkt. 22). Total also ignored an email sent by Mr. Lavergne to a third party wherein Mr. Lavergne asserted that "[a]ny system here the pumps are in the bunker will infringe on my patent" (Trial Ex. 154); Total's prior assertion that PHC infringed claims 1 and 16 (Total's Disclosure of Asserted Claims at 2, Dkt. 71-5); the contemporaneous notes Mr. Phung took while talking with Mr. Lavergne while preparing the application that issued as the '428 Patent (Trial Exs. 187, 193); and even the summary of the invention forwarded by Mr. Lavergne to Mr. Phung (Trial Ex. 182). To rectify its previous assertion that Mr. Lavergne asked Ms. Benoit to disclose pre-critical date sales of Millennium Test Systems to Mr. Phung, Total asserted Mr. Lavergne asked her to make the disclosures "having no knowledge of whether such was required." (Pretrial Mem. at 8, ¶ 12). Total's new position was even more implausible, convoluted, inexplicable, and devoid of credibility than its original position.

At trial, Mr. Lavergne, the sole owner and director of Total, did not dispute and in fact admitted Total sold, installed, and demonstrated numerous Millennium Test Systems (including the ones identified Mr. Polk) wherein the pumps were in the safety housing (and that met all of the other elements of claims 1 and 16) and offered for sale on its website (as shown on the screen captures from the Wayback Machine) such systems long before the August 8, 2007 critical date of the '428 Patent. (Trial Tr. at 21:5-22:17, 85:21-86:25, Sept. 13). The offers for sale, sales, installations, and demonstrations were material to the patentability of the '428 Patent because at least claims 1 and 16 would not have issued had they been disclosed to the PTO. There was never any dispute the offers for sale, sales, installations, and demonstrations of Millennium Test Systems were material to patentability, and that Mr. Lavergne was substantially involved with and knew of them. (Trial Exs. 107-12, 123-28, 130, 134-39, 141-43).

Within the first half hour of day one of the bench trial, Mr. Lavergne quickly admitted that he believed he invented the system in claim 1 and method in claim 16 and intended to patent the system in claim 1 and method in claim 16. (Trial Tr. at 20:14-16, 23:4-6, Sept. 12). This is directly contrary to the representations of the proof found in Total's proposed findings of fact where Total represented that Mr. Lavergne did not intend to patent the systems and method in claims 1 and 16 respectively. Also contrary to his prior testimony that he had asked Ms. Benoit to disclose pre-critical date sales of Millennium Test Systems to Mr. Phung, he stated at trial he had not instructed Ms. Benoit to disclose such sales. (*Id.* at 43:20-46:13).

During Mr. Lavergne's direct examination on the second day of the bench trial, he again changed his story. He asserted he only understood the claims of the '428 patent to cover systems with the interlock feature. On cross, it was clear he was being untruthful because he testified he understood all elements of claim 1 in the provisional application, claim 1 in the utility patent application, and claims 1 and 16 of the '428 Patent. (Trial Tr. at 61:19-62:5, 66:8-11, 75:5-7, 91:11-22, 92:24-93:4, Sept. 12; Trial Tr. at 81:6-9, 87:3-89:17, 90:3-14, Sept. 13). He further testified none of those claims referenced a sensor, which is necessary for the interlock feature. (Trial Tr. at 42:6-11, 50:19-20, 66:8-11, Sept. 12; Trial Tr. at 80:7-11, Sept. 13).. Total's counsel's theory at closing that Mr. Lavergne feigned ignorance that he did not understand the difference between a claim and a patent simply was not credible nor supportable by the evidence. (Trial, Tr. at 114:4-13, 117:19-118:3, Sept. 12).

The only reasonable inference is similar to the one found by the Court regarding Mr. Lavergne's intent. No reasonable and good faith attorney could have ignored such information and proceeded forward with a claim of infringement of such a clearly fatally defective patent.

Similarly, Total's Counsel failed to conduct a good faith investigation of Total's LUPTA claim. In the Verified Complaint and First Amended and Restated Complaint, Total asserted against PHC a claim for Unfair Competition and Unfair Trade Practices under the Louisiana Unfair Trade Practices Act, LSA-R.S. 51:1401 *et seq.* (Dkt. 1; Dkt. 22). Contrary to its response to PHC's Motion to dismiss

9

that claim (Dkt. 18), Total did not have a reasonable basis to assert this claim. Instead of simply dismissing it early on as PHC requested in August 2015, Total simply omitted it from the proposed Pretrial Order years later. (*See generally* Dkt. 310). The claim was omitted in no small part because Mr. Lavergne's deposition revealed he had provided fishing trips, food, alcohol, and hundreds of bottles of hot sauce to customers and potential customers, which would be the very type of conduct Total asserted was unlawful. (Dkt. 198 at 258:13-259:4; Dkt. 200 at 121:2-123:9). If Total's Counsel had simply asked Mr. Lavergne regarding his sales practices (he was after all attacked PHC's alleged sales tactics), they would have readily discovered he was doing more than he alleged PHC was doing. There was not and never has been a good faith basis for Total's LUPTA claim, which was admitted by Total's last second drop of the claim.

### 2.     Total's Counsel's Withheld Relevant Documents, Or At Least, Took No Meaningful Efforts to Ensure Total Conducted a Reasonable Search.

Mr. Lavergne, Total, and Total's counsel concealed highly relevant and material documents; gave a false address for a key witness; and offered false answers to discovery in an attempt to evade PHC's finding evidence of the sales, installations, and demonstrations that were the underlying factual bases for the inequitable conduct claim. But for PHC's efforts and expense incurred, such documents, witness, and revised discovery responses would not have been obtained.

On August 5, 2016, PHC served its First Set of Interrogatories and Requests for Production on Total ("First Discovery Requests"). (Dkt. 189-11; Dkt. 189-1 at ¶ 5). Several of the First Discovery Requests were directed to Total's sale of pressure testing systems sold on or before August 7, 2007, the critical date of the '428 Patent, because these systems could invalidate the '428 Patent. *Id*. On September 2, 2016, Total served its responses ("First Responses"). (Dkt. 189-1 at ¶¶ 6-8; First Disc. Resps, Dkt. 189-12; Exhibits A-C to First Disc. Resps, Dkts. 189-13, 189-14, 189-15; Trial Exs. 256, 257). In response to the Interrogatory No. 3 request of "List by customer and date all offers for sale and/or sales by Plaintiff of pressure testing systems," Total provided three Exhibits A, B, and C. (First

Disc. Resps, Dkt. 189-12; Exhibits A-C to First Disc. Resps, Dkts. 189-13, 189-14).

Exhibit A comprised a list of invoices. (Trial Ex. 257). Exhibit B comprised seven undated pictures of pressure testing systems. (Dkt. 189-14). Exhibit C comprised the invoices in Exhibit A. (Dkt. 189-15). The earliest dated invoice identified in Exhibits A and C was an August 22, 2008 invoice to Cameron. (Trial Ex. 257). August 22, 2008 was just 14 days after the filing date of the provisional application. (Trial Ex. 1).

Total's First Responses also included the following: "the subject matter of the '428 Patent was reduced to practice approximate at the time Mr. Lavergne filed U.S. Provisional Application No. 61/188,435 on August 8, 2008" (Trial Ex. 256 at Resp. 4);" "[t]he conception, reduction to practice, design, and development of patent application Serial No. 13/398,209 were conducted in-house at Total's business location and did not involve documentation as all activities were carry [sic] out as physical experimentation" (Trial Ex. 256 at Resp. 11); and "[a] prototype device was developed during the reduction to practice of the '428 Patent apparatus. Such prototype was never publicly disclosed or in public use, being kept exclusively at Total's business facility and shielded from the public. Such device was constructed for purely experimental purposes and was never offered for sale or sold." (Trial Ex. 256 at Resp. 6).

On August 24, 2016, PHC's counsel sent Total's counsel a discovery deficiency letter with screen captures of Total's website from before August 8, 2008 that appeared to demonstrate that the invention was on sale before the critical date. (Dkt. 189-1 at ¶ 9; Dkt. 189-16). Neither Total nor its counsel responded with any recognition of the significance of those images, which was shown at trial to depict systems that met all elements of claims 1 and 16 of the '428 Patent years prior to the Critical Date. *See* Trial Ex. 260.

On October 7, 2016, PHC's counsel sent Total's counsel a second discovery deficiency letter. (Dkt. 189-1 at ¶ 21; Dkt. 189-17). Besides asserting that Total's responses to Requests Numbers 3 and 44 were deficient, PHC asserted in the October 7 letter:

> Total's answer to Interrogatory Nos. 3 and 13 are deficient. The interrogatories request lists of all offers for sale and/or sales by Plaintiff of pressure safety systems. You answered with Exhibits A & C to the Discovery Responses. The earliest sale in these exhibits is August 22, 2008. We understand that Plaintiff was offering for sale and/or selling pressure safety systems prior to this date. For example, your answer to Interrogatory No. 4 states that "Total, upon information and belief on and around the period of 2006, was the only company in operation producing high pressure test systems." Total did not objection to the time frame of the interrogatories and, therefore, such objections to the time frame were waived. Please supplement to provide full and complete responses.

(*Id.*). On October 27, 2016, Total provided a response letter, Supplemental Answers to PHC's First Set of Interrogatories and Requests for Production ("Total's Supplemental Answers") and produced Exhibit G. (Trial Ex. 260). The response letter asserted:

> Total's answers to PHC's interrogatories no. 3 and 13 are complete and do not require supplementation. Interrogatory No. 3 directs its inquiry specifically to customer and date of all offers and/or sales of "pressure safety systems". Likewise, PHC's interrogatory no. 13 directs itself only to identification of the products of Total which "embodies, practices, or uses any of the alleged inventions claimed in the '428 Patent". Such interrogatories do not extend to the "high pressure test systems" identified in Total's answer to PHC's interrogatory no. 4, which were not "pressure safety systems" or products embodying the invention claimed in the '428 Patent.

(*Id.*). Total's Supplemental Answers included the following response to Request Number 3:

> **Response to Request No. 3:**
>
> See Exhibit C, previously submitted and marked "Highly Confidential Attorney's Eyes Only". See also invoices of Total's Millennium Test System prototype attached as Exhibit G, marked "Highly Confidential Attorney's Eyes Only".

(Trial Ex. 260). Exhibit G included five invoices, the earliest being dated September 26, 2007, which is just over a month after the critical date. (*Id.*). Exhibit G also included an invoice dated December 3, 2007 to Cameron addressed to "Cory Polk." (*Id.*). This was the first time that Mr. Polk had been identified or disclosed in any manner during the litigation.

On November 14, 2016, PHC's counsel sent Total's counsel the following email:

> Total produced invoices in response to PHC's Request for Production No. 44. The earliest invoice is dated September 26, 2007. My understanding is Total alleges invoices prior to this date were destroyed by flooding. Can you please confirm this?

(Dkt. 189-1 at ¶ 11; Dkt. 189-19). On November 16, 2018, Total responded:

> Pursuant to our general objection to any request calling for information not within the scope of permissible discovery, you have the documents responsive to Request No. 44. Total does not have in its possession or control any further responsive invoices or any prior to the September 26, 2007 invoice. It is not Total's position that any invoices prior to that date were destroyed in the recent flooding.

(Dkt. 189-1 at ¶ 12; Dkt. 189-20). This is contrary to Mr. Lavergne's deposition testimony at trial when he said his counsel was wrong. (Trial. Tr. 55:10-14, Sept. 13).

On November 28, 2016, PHC's counsel responded to Total's November 16 email via a discovery deficiency letter that included screen captures of the MTS on Total's website as seen on February 12, 2003 and January 7, 2009. (Dkt. 189-1 at ¶ 13; Dkt. 189-21). The letter explained that Total's objection to Interrogatory 3 on the basis that Total did not sell pressure safety systems prior to the Critical Date was contradicted by the screen captures, which indicated "Millennium Test Systems are the market standard for safety and excellence." (Dkt. 189-1 at ¶ 13; Dkt. 189-21) (emphasis added).

> Interrogatory No. 7 requests that Total "[i]dentify each and every Person that Plaintiff contends was involved in any 'experimental use,' access to, or viewing of prototypes of the claimed invention(s) in the '428 Patent and identify all documents relating to that contention." "Person" is defined to "mean[] any natural individual in any capacity whatsoever or any entity or organization."
>
> In your October 27, 2016 letter, you assert that Interrogatory No. 7 does not require supplementation "at this time as Total's identification of persons having relevant knowledge also have knowledge as to the products referenced in Exhibits A and B asserted by PHC." However, Interrogatory No. 7 requests that Total identify "each and every Person," not just Total employees. Such persons would include third-party individuals and entities who had access to or viewed the Millennium Test System. That third parties had access to or viewed the Millennium Test System is apparent at least from the publication of the Millennium Test System on Total's website at least as early as February 12, 2003.

(Dkt. 189-1 at ¶ 14; Dkt. 189-22). On December 16, 2016, Total updated its response to Interrogatory Number 7 to include persons identified in invoices that Total had produced, including:

> Cory Polk, last known to be residing in the country of Azerbaijan, having knowledge of Cameron's purchase of a Millennium System approximately on 12/3/07. See previously produced Exhibit G to Total's supplemental discovery answers of October 27, 2016, marked "Highly Confidential Attorney's Eyes Only".

(Dkt. 189-23). However, Mr. Polk returned to the United States from Azerbaijan in 2010. (Dkt. 200 at 15-10:18). Further, after Mr. Polk was located, Mr. Lavergne testified he met Mr. Polk in 2015 after he returned from Azerbaijan, and Mr. Polk made an offer to purchase Total's business. (Dkt. 189-24

at Resp. 7). Mr. Polk also testified he had had no plans to return to Azerbaijan. (Dkt. 200 at 107:17-25). Mr. Polk had saved many of his communications from 2006 and 2007 on a flash drive. (*Id*. at 136:11-137:10).

On January 11, 2017, PHC sent Total a discovery deficiency letter. (Dkt. 189-1 at ¶ 17; Dkt. 189-25). Attached to the letter were documents provided by Mr. Polk, including a quote from Total Rebuild dated 2005/2006 and a PowerPoint, drawings, and images of a system that Total sold to and installed at Cameron in 2006. (*Id*.). The documents show that Total sold the claimed "invention" before the Critical Date of the '428 Patent. *Id*. PHC demanded that Total supplement its discovery requests and "clearly indicate whether responsive documents once existed but no longer exist or are no longer in Total's possession or control." (*Id*.). Total responded on January 16, 2017, indicating that "[a]ny further documents which may have existed prior to what we gave you were disposed of years ago in the normal course and scope of Total's business." (Dkt. 189-1 at ¶ 18; Dkt. 189-26). Mr. Lavergne testified both at his deposition and at trial that there was no destruction in the normal course of business and no document retention policy.(Trial Tr. at 167:20-168:4, Sept. 12; Lavergne Dep. 303:16-304:15, Dkt. 387-4).

On February 14, 2017, PHC filed a Motion to Compel in which it requested, *inter alia*, a forensic examination of Total's computer system given Total's changing positions. (Dkt. 85). The Motion laid out the extensive and costly efforts that PHC had gone through to identity and locate Cory Polk. (*Id.*). In response, Total asserted that it did not have any further documents. (Dkt. 93). On March 10, 2017, the Court ordered a forensic examination. (Dkt. 97 at 1-4). The Court also granted PHC its fees and held that the cost of the forensic examination may be shifted to Total. (*Id*.).

On April 7, 2017, after the forensic examination was ordered but the day before the forensic examination was conducted, Total served supplemental discovery responses to Interrogatory 3 and Requests Numbers 3 and 44 and produced Exhibits H, I and J. (Trial Ex. 264). Exhibit H comprised approximately forty invoices and quotes for MTS, thirty-five of which were before the Critical Date

of the '428 Patent. (*Id*.). Many of these quotes and invoices are for systems that render one or more claims of the '428 Patent invalid and were presented at trial. (*Id*.; Trial. Tr. at 76:2-82:7, 84:4-88:2, 88:16-89:12, 90:6-101:17, Sept. 12; Trial Exs. 108-112, 123-126, 128, 136, 142).

On August 10, 2017, in view of Total's production of highly relevant invoices for MTSs the day before the forensic examination, PHC's counsel sent Total's counsel a proposed motion to shift the costs of the forensic examination to Total. (Decl. at ¶ 2, Mot. Ex. 1; Mot. Ex. 4). That motion set forth all the false and misleading statements made by Total's counsel to the Court. Rather than have the motion filed, Total agreed to pay all costs associated with the forensic examination (over $14,000) without intervention by the Court. (Dkt. 189-1 at ¶ 20; Dkt. 191-10). Total also subsequently withdrew its assertion PHC infringed claims 1, 2, 6-10, and 16-17 of the '428 Patent, implicitly acknowledging those claims were invalid over Total's own sales of MTSs discovered by counsel for PHC or produced after the forensic examination was ordered. (Dkt. 189-1 at ¶ 3; Dkt. 189-9).

Mr. Lavergne originally asserted that he conceived of "the concept of placing the testing systems inside a bunker along with the tools to be tested, wherein the test system may be operated from the outside of the bunker," (Dkt. 189-12 at Resp. 4), the same subject matter that is claimed in each claim of the '428 Patent. However, after evidence of the invalidating sales of the MTS surfaced, Mr. Lavergne testified he obtained that concept from Baker Hughes in 2003 or 2004. (Dkt. 109 at 238:18-241:12). Mr. Lavergne's own testimony demonstrates that he knew he did not conceive of that subject matter. For example, Mr. Lavergne testified that he had worked on the system at Baker Hughes in 2003 and 2004 and that Baker Hughes had installed similar systems throughout its facilities at that time. (*Id*. at 238:18-241:12). Nonetheless, Mr. Lavergne executed under penalty of perjury and submitted to the PTO a declaration that states: "I believe I am the original, first and sole inventor . . . of the subject matter which is claimed and for which a patent is sought on the invention entitled Improved Safety System." (Dkt. 189-29; Trial Ex. 148).

Mr. Lavergne was personally and substantially involved with at least a dozen offers for sale and sales of MTSs to Cameron extending back at least 21 months before August 8, 2007, the critical date. (Trial Exs. 107-126, 128-130, 134). These offers for sale and sales generated hundreds of thousands of dollars in sales for Total. Mr. Lavergne also had been advertising the MTS on Total's website for years. (Trial Exs. 166-168). A comparison to the Wayback Machine captures to the system as allegedly offered on www.totalrebuild.com in 2009 shows the disclosure was unchanged. (Dkt. 189-21; Trial Exs. 166, 167, 168).

Over the two days of trial, Mr. Lavergne repeatedly testified his lawyers drafted discovery responses; he was not a lawyer; and did not understand all of the legal "stuff" in the documents. (*See, e.g.*, Trial Tr. 63:1-6, 67:6-20, 129:17-130:1, 152:17-25, Sept. 12). He also testified he relied upon his lawyers to draft the answers to the interrogatories and other documents in the case. (*See, e.g.*, Trial Tr. 63:1-6, 67:6-20, 129:17-130:1, 152:17-25, Sept. 12). There can be no question that through the various answers, Total's Counsel are directly responsible for the answers and the attempts to supplement in a manner that would not be readily followed without substantial analysis.

### 3. Total's Counsel's Asserted Claims with No Chance of Success Even After Notice.

Setting aside the simple investigation that would have determined the patent was unenforceable, even if it was enforceable, Total's counsel asserted meritless claims. All claims of the '428 Patent require at least one pump in the explosion proof safety housing. Yet after proceeding on that theory for years, Total changed course late in its contentions and through its final exhibit list for the jury trial, even after warnings of sanction for doing so, Total asserted the inexplicable contrary position that no pump needed to be in the housing.

Pursuant to Rule 3-1(c) of the Local Patent Rules for the Eastern of Texas, which were expressly adopted by this Court (Dkt. 51 at 5), Total served on PHC patent infringement contentions that included "[a] chart identifying specifically where each element of each asserted claim is found

within each Accused Instrumentality . . . ." (Dkt. 51-1 at 6). Total served upon PHC its Initial Infringement Contentions on August 23, 2016 (Dkt. 71-5); its Supplemental Infringement Contentions on January 3, 2017 (Dkt. 85-31); and its Second Supplemental Infringement Contentions on August 27, 2018 (Dkt. 189-10). In each of those contentions, Total identified the pump assemblies, which include the pumps to pressurize the device being tested, or the pumps themselves as the structure of the accused devices that meets the "high-pressure pneumatics testing equipment" limitation. In other words, Total asserted the "high-pressure pneumatics testing equipment" was only a pump or an assembly with a pump. In turn, this meant the claim limitation "high-pressure pneumatics testing equipment located within [the explosion-proof safety] housing" could only be met if a pump, whether or not in a pump assembly, was in the explosion-proof safety housing. Total never alleged any component not part of a pump assembly (such that if the pump assembly were in the safety housing, the pump of the pump assembly would also be in the safety housing) or a pump itself is the claimed high-pressure pneumatics testing equipment. Total did not do so because the claim limitation "high-pressure pneumatics testing equipment" could not reasonably be interpreted to include equipment without a pump.

On December 10, 2018, after the close of discovery, Total served its Third Supplemental Infringement Contentions ("Third Contentions") on PHC. (Dkt. 232-2). The Third Contentions, for the first time, alleged that system with their pumps outside the safety housing infringe. Total for the first time asserted, contrary to the '428 Patent, that the claimed "high pressure pneumatics testing equipment" need not include a pump. In other words, Total had vastly expanded the theories (and potential accused systems and methods) by which it alleged PHC infringed. Moreover, Total argued the piping, tubing, and hose that connected the pumps to the device being tested were the "high-pressure pneumatics testing equipment." That position was unreasonable because the piping, tubing, and hose that connected the pumps to the device being tested were claimed elsewhere—in the element "means within said housing for coupling said high-pressure pneumatics testing equipment to said high-

pressure device for testing." (Dkt. 382 at 2-9; Trial Ex. 1 at col. 6, ll. 36-8).

On February 28, 2019, PHC filed a Motion to Strike Total's Third Supplemental Infringement Contentions on the basis that they vastly expanded the scope of the theories under which Total claimed infringement. Motion to Strike (Dkt. 243-1). PHC also requested, in the alternative, that the term "high-pressure pneumatics testing equipment" be construed. (*Id*.).

On March 28, 2019, this Court granted the Motion to Strike, struck Total's Third Supplemental Infringement Contentions, and ordered Total is "**PRECLUDED** from proceeding on any infringement theory not identified with **sufficient specificity** in its original infringement contentions, first supplemental infringement contentions, or second supplemental infringement contentions." (Dkt. 263 (emphasis in original)). The Court expressly held that Total's Original, First Supplemental, and Second Supplemental Infringement Contentions "targeted systems using pumps or pump systems *within* an explosion-proof safety housing," and in its Third Supplemental Infringement Contentions, "Total Rebuild takes a new position: it contends that a system using pumps or pump systems *outside* an explosion-proof safety housing can infringe its patent." (*Id*. at 2). That holding was reiterated in this Court's Ruling on PHC's Motion in Limine. (Dkt. 282 at 3 ("In the Order granting Defendant's Motion to Strike, the Court found that Plaintiff was improperly trying to expand its infringement contentions by taking the new position that 'using pumps or pump systems outside an explosion-safety housing can infringe its patent.'")).[2]

On June 10, 2019, the Court issued its Memorandum Opinion and Order ("Claim Construction Order") (Dkt. 278). In the Claim Construction Order, the Court held:

---

[2] In a telling display of bad faith, Total ignored the Court's order setting a *Markman* hearing for March 29, 2019 and, on March 28, 2019, requested the hearing be cancelled notwithstanding PHC was prepared to move forward. (Dkt. 265 at 1). PHC then agreed to a Joint Stipulation to Submit the Markman Construction Hearing on the Briefs to reduce the burden on the Court and because PHC believed the Ruling and Order on the Motion to Strike precluded Total from asserting infringement by systems with pumps outside the bunker. Joint Stipulation to Submit the Markman Construction Hearing on the Briefs (Dkt. 265). Only after PHC so stipulated did Total maintain it would continue to assert infringement by systems with their pumps outside the bunker.

> Additionally, the Court's construction indicates that plumbing and hoses that couple the high-pressure pneumatics testing equipment to the high-pressure device for testing are not the recited "high-pressure pneumatics testing equipment." The "high-pressure pneumatics testing equipment" is a separately claimed element from the structure for "coupling said high-pressure pneumatics testing equipment to said high-pressure device." The plain language of the claims requires both the "high-pressure pneumatics testing equipment" and the "means . . . for coupling" to be "within said housing." To the extent that a party contends that plumbing and hoses are the recited "high-pressure pneumatics testing equipment," the Court rejects that argument.

(Dkt. 278 at 30). The Claim Construction Order, like the Ruling and Order on the Motion to Strike, expressly excluded the theories of infringement that Total attempted to add after discovery closed.

On July 19, 2019, Total served its proposed pretrial order on PHC. (Dkt. 290-2). In its proposed pretrial order, to the astonishment of PHC, Total continued to accuse six systems with the pumps and pump systems outside of the alleged explosion-proof safety housing as infringing. (*Id*. at 3-5). Total continued assertion of these six systems was directly contrary to the Ruling and Order on the Motion to Strike and the Claim Construction Order.

On August 29, 2019, this Court issued an order on PHC's Motion in Limine regarding Pumps Outside Safety Housing. (Dkt. 328). In the Order, the Court unambiguously held that Plaintiff is precluded from asserting systems with the pumps or pumps outside the explosion-proof safety housing infringe. (*Id*.).

On August 30, 2019, in response to a second motion in limine and to the astonishment of PHC, Total maintained that it would assert infringement by the six systems at trial and stated that it was PHC's burden to show that they did not infringe. (Dkt. 331 at 1 n.1).

Subsequently on August 30, 2019, PHC filed a Motion for Rule 11 Sanctions on the basis that Total assertion of infringement by the six systems was unreasonable and baseless. (Dkt. 332). Only after PHC filed the Motion for Rule 11 Sanctions and Other Relief did Total agree on proposed jury instructions that did not include those six systems. However, on September 13, 209, Total filed an Exhibit List for the jury trial that included numerous documents that were directed only toward the six systems at issue. (Dkt. 364 at Total's Proposed Exs. 14-22, 24-35, 37-51). Total hoped to argue

infringement of these systems at trial and refused to fully relinquish its assertions they infringed. Total's assertion that the six systems infringed was and always has been baseless.

In the joint jury instructions that were submitted to the Court, Total identified only two systems as infringing. (Dkt. 361-1). Total's Expert opined that Total's lost profits from these two systems was $17,850. (Dkt. 295-5 at 6 (first two tan entries represent alleged damages for two systems identified in Jury Verdict Form)). In other words, after over four years of ligation and the assertion of a patent that was unenforceable due to inequitable conduct, the best Total could do was allege less than $30,000 in damages.

### 4.    Total's Counsel's Engaged in Other Unreasonable Litigation Conduct.

Total's counsel engaged in other unreasonable litigation conduct such as legally unsupportable settlement demands to unsubstantiated claims of litigation misconduct by PHC. All such conduct should be considered in awarded sanctions.

Total asserted throughout this litigation all systems manufactured or sold by PHC infringed the '428 Patent. In its identification of accused instrumentalities pursuant to Patent Rule 3-1(b), Total simply listed all descriptions of equipment found in PHC's marketing material as infringing.[3] Total did so without regard to whether it had conducted a pre-suit investigation; it simply assumed all systems infringed. Total did so to exert maximum pressure on PHC to settle.

From the filing of the lawsuit until approximately November 2017, Total demanded a 25% royalty on gross revenues of a wide swath of systems and products in what was effectively a demand for a payment equal to 25% of PHC's gross revenues from April 3, 2012, with an ongoing royalty of 25% of PHC's gross revenues. (Miller Decl. at ¶ 2, Mot. Ex. 2).[4] This demand was based on claims of infringement of the '428 Patent, which has been conclusively found to be unenforceable, and a claim

---

[3] *See* Total's Patent Rule 3-1(b) disclosures in its Dkt. 71-5 at 2-3; Dkt. 85-31 at 2-3; and Dkt. 189-10 at 2-3.
[4] A simple calculation of a 25% royalty based solely on the gross revenue of the 9 systems in Royston's Report (Dkt. 295-5) would show the extreme magnitude of this demand over the 300 plus systems sold by PHC since 2012. The demanded royalty would easily be in the millions of dollars.

for violations of the Louisiana Unfair Trade Practices Act ("LUPTA") that was abandoned by Total in the final proposed pretrial order. Around November 2017, Total reduced its demand to a 25% royalty on the profits from PHC's systems from April 2, 2012 through the life of the patent (approximately 14.5 years left at the time the demand changed). (*Id*. at ¶ 3). At the last judicial settlement conference, Total continued to demand tens of thousands of dollars. In its final exhibit list for the jury trial, Total included an expert report for a damages expert who alleged Total was entitled to nearly $100,000. (*Id*. at ¶ 4). Despite knowing of the unenforceability of the patent, Total and its counsel continued to demand unreasonable sums of money for the life of the patent.

Total's Counsel asserted the 25% royalty based on the "25% rule of thumb." At the time Total filed the suit, the "25% rule of thumb" was long dead. The Federal Circuit expressly rejected it in 2011. *Uniloc USA, Inc. v. Microsoft Corp*., 632 F.3d 1292, 1315 (Fed. Cir. 2011). "This court now holds as a matter of Federal Circuit law that the 25 percent rule of thumb is a fundamentally flawed tool for determining a baseline royalty rate in a hypothetical negotiation. Evidence relying on the 25 percent rule of thumb is thus inadmissible under Daubert and the Federal Rules of Evidence, because it fails to tie a reasonable royalty base to the facts of the case at issue." *Id*. Total's Counsel had no good faith basis in law or fact to demand such royalty.

There is not now nor has there ever been a good faith basis to assert PHC engaged in litigation misconduct. Total had full access to PHC files on its systems. On June 7-9, 2017, Chase Manuel, counsel for Total, spent over 20 hours at PHC's Houston, Texas facility reviewing, inspecting, and scanning design documents, drawings, invoices, and other related documents for pressure testing systems sold by PHC on or after April 3, 2012, the date of issue of the '428 Patent. (Dkt. 154-1 at ¶ 2).

Over a year later, on July 23, 2018, this case was reassigned to Judge Brian A. Jackson. Dkt. 147. On August 22, 2018, Judge Jackson set trial for January 22, 2019. (Dkt. 149 at 1). Between June 7-9, 2017 and August 22, 2018, Total did not: (1) serve any interrogatories or requests for production on PHC; (2) indicate that any of PHC's discovery responses were deficient; (3) request additional

inspection of PHC's systems (or anything else from PHC); or notice or take a single deposition. Only after the Court set a trial date on August 22, 2018 did Total re-engage in discovery and actually attempt to identify specific allegedly infringing systems.[5] The reason for Total's inaction was simple—it knew the '428 Patent was invalid and/or unenforceable for inequitable conduct and was hoping to run out the clock.

On September 17, 2018, Total moved to continue the trial date, alleging that PHC "has obstructed the imposition of an agreed scheduling order and the rapidly approaching trial date does not adequately allow for completion of discovery by the parties, or preparation of expert reports for trial." (Dkt. 152 at 1). The Court denied the motion, holding that Total's allegations of discovery misconduct by PHC were "unsupported," "the prejudice Plaintiff alleges as a result of the January 22, 2019 trial setting is likely attributable to Plaintiff's failure to diligently prosecute its case over a three-year prior," and "[i]f Plaintiff is prejudiced by the January 22, 2019 trial setting, it is because Plaintiff failed to exercise due diligence." (Dkt. 161 at 3 n.5, 4, 4 n.6). The Court also stated that it "is troubled by Plaintiff's serious yet unsupported allegations. Should the Court conclude that any party has made an unfounded allegation of litigation misconduct, the Court will sanction that party under its inherent authority." (*Id*. at 3 n.5).

On March 20, 2019, in its Opposing to PHC's Motion to Strike, Total again attempted to blame PHC for its untimely infringement contentions. Total argued that "Total's contentions were not filed under December 2018 because PHC delayed inspections by Total's expert, Brian Fleur," and "[t]hroughout this litigation, PHC has delayed, obfuscated, and restricted Total's access to usable discovery regarding PHC's allegedly infringing devices." (Dkt. 253 at 2, 6).

The Court again rejected Total's claims. In its Ruling and Order on the Motion to Strike, the Court held

---

[5] The only discovery at all Total served during this period was a single set of requests for admission, which were served on November 2, 2017.

> This is not the first time Total Rebuild has accused PHC Fluid Power of misconduct without supporting the accusations; it also did so in its briefing on a motion to continue. (Doc. 152-2 at p. 4). In its ruling on that motion, the Court found that the accusations lacked support and warned the parties that sanctions could follow unfounded accusations of misconduct. (Doc. 161 at p. 3). The Court finds Total Rebuild's unsupported accusations of misconduct as unpersuasive now as it found them then.

(Dkt. 263 at 4-5). The simple fact is Total did not pursue discovery because it knew the '428 Patent was invalid and/or unenforceable and that the vast majority of PHC's systems could never infringe the '428 Patent. Yet, Total asserted in its opening statement at the bench trial that PHC was making false statements: "We're going to show that because most of the testimony they're going to present is based on false or actually untruthful assertions." (Trial Tr. at 10:8-10, Sept. 12).

The pattern of disregard for the Court's Orders appears to have applied to an Order on a motion to compel financial documents as well. Total disregarded an Order to compel (Dkt. 136 at 2) only to produce financial documents that allegedly supported it damages expert long after the close of discovery and immediately prior to trial. (Dkt. 309-3). Moreover, although Total represented it previously produced those financial documents, it would not respond to repeated emails from PHC's counsel requested the date of the previous production. (Miller Decl. ¶¶ at 7-9, Mot. Ex. 2; Mot. Exs. 7, 8, 9).

### C.    All Fees, Expenses, and Costs Should Be Assessed Against Total's Counsel.

To shift the entire cost of defense, the claimant must prove, by clear and convincing evidence, that every facet of the litigation was patently meritless and counsel must have lacked a reason to file the suit and must wrongfully have persisted in its prosecution through discovery, pre-trial motions, and trial. *Procter & Gamble Co.*, 280 F.3d at 526 (citations omitted for brevity).

As explained previously, Total's Counsel's wrongful conduct began when if failed to conduct any reasonable prefiling investigation. The on-sale bar and enforceability due to inequitable conduct was so obvious under the circumstances that it was completely unreasonable to bring sue. All the other misconduct, including but not limited to refusing to face the facts after inequitable conduct had been

proven through Mr. Lavergne's own documents and Total's website, stems from this fundamental flaw. This is not to say that all the other misconduct would not stand on its own as a basis individually or collectively for sanctions under § 1927. As in the trial, there can be no refuting the facts and the overwhelming evidence that supports a finding under § 1927.

PHC seeks its attorney fees and expenses in the amount of $1,309,510.02 ($1,174,276.98 in fees adjusted for the $16,960.56 previously paid by Total under Dkt. 99, and $135,233.04 in expenses), plus costs, prejudgment and post-judgment interest. PHC submits herewith as <u>Exhibit 5</u> the Affidavit of Paul Herbert in support of its request for attorneys' fees, expenses, and costs as evidence that the amounts requested by PHC in this four-plus year litigation are reasonable. PHC also submits herewith at <u>Exhibits 6 and 10</u> the invoices for services rendered by counsel for PHC relating to this litigation. (<u>Miller Decl. at ¶ 6, Mot. Ex. 2</u>; <u>Mot. Ex. 6</u>; <u>LaCour Aff. at ¶ 4, Mot. Ex. 10</u>; <u>Mot. Ex. 11</u>). Moreover, the cost of the defense also is within the AIPLA reported range of the median for cost for patent infringement cases based on Total's and Total's Counsel's demands. (Miller Decl. ¶ at 12, Mot. Ex. 2).

This Court has the discretion to a PHC prejudgment interest given the exceptional nature of the case. *Mathis v. Spears*, 857 F.2d 749, 761 (Fed. Cir. 1988). Such pre-judgment interest should be at the rate of no less than the prime rate for borrowing funds of 5.25% annualized using a 360-day year as shown currently shown by the Federal Reserve. (Miller Decl. at ¶ 10, <u>Mot. Ex. 2</u>). PHC is entitled to post-judgment interest on the foregoing amounts in accordance with 28 U.S.C. § 1961 at 1.86%, which is the current yearly T-Bill rate according to the Federal Reserve. (Miller Decl. at ¶ 11, <u>Mot. Ex. 2</u>).

## III.     CONCLUSION

For the foregoing reasons, PHC respectfully requests that the Court hold Durio, McGoffin, Stagg, Ackerman, PC and attorneys Chase A. Manuel, Steven G. Durio, William W. Stagg, and Ryan

Goudelocke jointly and severally liable for the attorneys' fees, expenses, and costs incurred by PHC in this lawsuit.

Dated: September 18, 2019

Respectfully submitted,

MILLER LEGAL PARTNERS PLLC

/s/ Samuel F. Miller
Samuel F. Miller, TN Bar No. 22936
Nicholas R. Valenti, TN Bar No. 35420
Sara R. Ellis, TN Bar No. 30760
Hayley H Baker, TN Bar No. 37439
Fifth Third Center – Suite 2000
424 Church Street
Nashville, Tennessee 37129
Tel/Fax: (615) 988-9011
Email: smiller@millerlegalpartners.com
      nvalenti@millerlegalpartners.com
      sellis@millerlegalpartners.com
      hbaker@millerlegalpartners.com

NEUNERPATE

/s/ Cliff A. LaCour
Brandon W. Letulier - #28657
Cliff A. LaCour - #30581
One Petroleum Center, Suite 200
1001 West Pinhook Road
Lafayette, Louisiana 70503
Tel: (337) 237-7000
Fax: (337) 233-9450
Email: bletulier@neunerpate.com
      clacour@neunerpate.com

*Attorneys for PHC Fluid Power, L.L.C.*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 18th day of September 2019, a copy of the foregoing was

served on counsel of record listed below via the Court's ECF system:

William W. Stagg
Steven G. Durio
Tyler Rush
Ryan Goudelocke
Durio, McGoffin, Stagg & Ackermann, PC
220 Heymann Boulevard
Post Office Box 51308
Lafayette, LA 70505-1308
Bill@dmsfirm.com Buzz@dmsfirm.com
Tyler@dmsfirm.com
Ryan@dmsfirm.com

Brandon W. Letulier
Cliff A. LaCour
NeunerPate
One Petroleum Center, Suite 200
1001 W. Pinhook Road
Lafayette, LA 70503
bletulier@neunerpate.com
clacour@neunerpate.com

Chase A. Manuel
Brazee, Edwards, & Durio
2901 Johnston Street, Suite 206
Lafayette, Louisiana 70503
Telephone:  (337) 237-0492
Facsimile:   (337) 232-7758
chasemanuel@brazeelawfirm.com

/s/ Samuel F. Miller