# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAFAYETTE DIVISION

| | |
|---|---|
| **TOTAL REBUILD, INC.** | **CASE NO. 6:15-CV-1855** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **PHC FLUID POWER, L.L.C.** | **MAG. JUDGE CAROL B. WHITEHURST** |

## OPINION

This is a patent infringement case in which Plaintiff Total Rebuild ("Total") contends systems and/or methods utilized by or through Defendant PHC ("PHC") infringe claims of United States Patent No. 8,146,428 ("the '428 Patent"). The '428 Patent is directed to systems and methods for safely testing devices and components under high-pressure.

A bench trial on inequitable conduct was conducted from September 12 to September 13, 2019. For the following reason, the Court holds that the '428 Patent is unenforceable due to inequitable conduct, because the inventor, Mr. Terry Lavergne, withheld material information of prior sales from the United States Patent and Trademark Office ("USPTO") with the specific intent to deceive the USPTO into granting the patent. The Court further holds that PHC failed to prove with clear and convincing evidence that Mr. Lavergne knowingly concealed co-inventors in order to deceive the USPTO. The following constitutes the Court's findings of fact, conclusions of law, and order for judgment on issue of inequitable conduct.

## I. FINDINGS OF FACT

### A. Introduction.

1. The '428 Patent is directed to safety systems for testing devices under high pressure. (Ex. 103).

2. The "ABSTRACT" of the '428 Patent describes the invention as follows:

A safety system for testing high-pressure devices comprising an explosion-proof safety housing; a high-pressure pneumatics testing equipment located within the housing; a closeable access opening in the housing for inserting a high-pressure device for testing within the housing; a device located within the housing for coupling the high-pressure pneumatics testing equipment to the high-pressure device for testing; a control panel located outside the housing; and a device linking the high-pressure pneumatics testing equipment to the control panel for operating the high-pressure pneumatics testing equipment within the safety housing from the control panel.

(Ex. 103 at Abstract).

3.  The '428 Patent issued April 3, 2012. (Ex. 103).

4.  The '428 Patent claims priority to U.S. Patent Application No. 61/188,435, filed August 8, 2008. (Ex. 103).

5.  The "Critical Date" for analyzing the on-sale and public-use bars of 35 U.S.C. § 102(b) is August 8, 2007, one year prior to the earliest application.[1]

6.  As shown on the face of the '428 Patent, Thomas Phung of the law firm Jacobson and Johnson was the patent attorney who prosecuted the application that resulted in issuance of the '428 Patent. (Ex. 103).

7.  Mr. Terry J. Lavergne is the sole inventor named in the '428 Patent. (Ex. 103).

**B. Non-disclosure of Material Information.**

8.  On or about July 21, 2006 (more than a year prior to the Critical Date), Total sold to, installed, and demonstrated a Millennium Test System ("MTS") for Cameron in Odessa, Texas ("Odessa MTS"). (Ex. 136; Trial Transcript ("Trans.") at 80:8–87:9).

9.  Under the broadest reasonable interpretation and preponderance of the evidence standards employed by the USPTO when examining a patent application (and that apply to claims

---

[1] The American Invents Act ("AIA"), Pub. L. No. 112-29, took effect on September 16, 2012. Because the application that issued as the '428 Patent was filed before that date, the pre-AIA version § 102 apply. *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 958 n.1 (Fed. Cir. 2014).

of inequitable conduct), the Odessa MTS anticipated claim 1 of the '428 Patent because it had at least the following elements:

  i.  The Odessa MTS included "an explosion-proof safety housing."

  ii.  The Odessa MTS included "a high-pressure pneumatics testing equipment located within said housing."

  iii.  The Odessa MTS included "a bleed valve coupled to said high-pressure pneumatics testing equipment."

  iv.  The Odessa MTS included "a closeable access opening in said housing for inserting a high-pressure device for testing within said housing."

  v.  The Odessa MTS included a "means within said housing for coupling said high-pressure pneumatics testing equipment to said high-pressure device for testing."

  vi.  The Odessa MTS included "a control panel located remote from said housing."

  vii.  The Odessa MTS included a "means linking said high-pressure pneumatics testing equipment to said control panel for operating said high-pressure pneumatics testing equipment within said safety housing from said control panel."

(Ex. 136; Trans. at 80:8–87:9).

10. Under the broadest reasonable interpretation and preponderance of the evidence standards employed by the USPTO when examining a patent application (and that apply to claims of inequitable conduct), the Odessa MTS anticipated claim 16 of the '428 Patent because it had at least the following elements:

  i.  The Odessa MTS included the step of "providing an explosion-proof safety housing."

  ii.  The Odessa MTS included the step of "placing a low-pressure pump, an intermediate-pressure pump, and a high-pressure pump within said housing to provide sequential increase in the pressure to said testing high-pressure devices."

  iii.  The Odessa MTS included the step of "forming a closeable access opening

in said housing."

    iv.    The Odessa MTS included the step of "inserting a high-pressure device for testing within said housing through said access opening."

    v.    The Odessa MTS included the step of "providing a control panel outside said housing."

    vi.    The Odessa MTS included the step of "coupling said control panel to the testing equipment inside said housing."

    vii.    The Odessa MTS included the step of "operating said high-pressure pneumatics testing equipment from said control panel for testing high-pressure devices."

(Ex. 136; Trans. at 80:8–87:9).

11. Total did not argue or present evidence that the Odessa MTS was cumulative of prior art cited in the application that issued as the '428 Patent.

12. The Odessa MTS was material to the patentability of the '428 Patent because at least claim 1 or claim 16 would not have issued had the Odessa MTS been disclosed to the USPTO during prosecution of the '428 Patent.

13. Prior to the Critical Date, Total sold to and installed and demonstrated Millennium Test Systems for Cameron in Broussard, Louisiana (approximately July 6, 2006) (Ex. 142); Oklahoma City, Oklahoma (approximately October 25, 2006) (Exs. 108 and 109); Corpus Christie, Texas (approximately March 12, 2007) (Ex. 110); Grand Junction, Colorado (approximately March 13, 2007) (Ex. 111); Rock Springs, Wyoming (first system) (approximately November 9, 2006) (Ex. 112); Rock Springs, Wyoming (second system) (approximately November 9, 2006) (Ex. 123); Casper, Wyoming (approximately March 12, 2007) (Ex. 124); Bakersfield, California (approximately March 12, 2007) (Ex. 125); Vernal, Utah (approximately March 13, 2007) (Ex. 126); and Laurel, Mississippi (approximately March 13, 2007) (Ex 128) (collectively with the Odessa MTS the "Cameron MTSs"). (Trans. 88:12–106:3).

14. Total did not argue or present evidence that the Cameron MTSs were cumulative of prior art cited in the application that issued as the '428 Patent.

15. The Cameron MTSs were substantially similar and each one alone was material to the patentability of the '428 Patent because each one alone contained all of the elements of claims 1 and 16 of the '428 Patent. (Exhibit 103; Trans. 88:12–106:3).

16. The Cameron MTSs was material to the patentability of the '428 Patent because at least claim 1 or claim 16 would not have issued had the Cameron MTSs been disclosed to the USPTO during prosecution of the '428 Patent.

17. On January 31, 2006, Total sent a quote to Cameron by email, and Mr. Lavergne was copied on the email. (Ex. 134; Trans. at 107:20–110:6).

18. Mr. Lavergne arranged the installation schedule for the Cameron MTSs. (Ex. 135; Ex. 199; Ex. 202; Ex. 203; Trans. at 112:3–114:25, 115:6–117:5, 128:8–129:20).

19. Mr. Lavergne sent Cameron pictures of the Cameron MTSs during their manufacture and installation by Total. (Ex. 137; Ex. 138; Ex. 139; Ex. 204; Trans. 119:10–128:6)

20. Mr. Lavergne observed and participated in the installations of Cameron MTSs. (Ex. 202; Trans. at 116:6–25).

21. On or around June 7, 2006, more than a year before the Critical Date, Total offered for sale, sold to, and installed for Halliburton a Millennium Test System ("Haliburton MTS"). (Ex. 107; Trans. 132:20–133:24).

22. Total did not argue or present evidence that the Halliburton MTS was cumulative of prior art cited in the application that issued as the '428 Patent.

23. The Halliburton MTS was material to the patentability of the '428 Patent because it contained all of the elements of claims 1 and 16 of the '428 Patent. (Trans. 132:20–133:24).

24. The Halliburton MTS was material to the patentability of the '428 Patent because at least claim 1 or claim 16 would not have issued had the Halliburton MTS been disclosed to the USPTO during prosecution of the '428 Patent.

25. On or around May 7, 2007, Total offered for sale, sold to, and installed for Superior Pressure Controls a Millennium Test System ("Superior MTS"). (Ex. 130: Trans. at 129:23–132:18).

26. Total did not argue or present evidence that the Superior MTS was cumulative of prior art cited in the application that issued as the '428 Patent.

27. The Superior MTS was material to the patentability of the '428 Patent because it contained all of the elements of claims 1 and 16 of the '428 Patent. (Trans. at 129:23–132:18).

28. The Superior MTS was material to the patentability of the '428 Patent because at least claim 1 or claim 16 would not have issued had the Superior MTS been disclosed to the USPTO during prosecution of the '428 Patent.

29. The primary reason for the prior uses of the Cameron MTSs, Haliburton MTS, and Superior MTS was to provide income to Mr. Lavergne and Total at least more than one year before the Critical Date. (Trans. 26:22–27:19).

30. Total displayed on its website since at least 2002 the Millennium Test Systems containing all of the elements of Claims 1 and 16 of the '428 Patent. (Ex. 168; Trans. 228:16–230:4, 262:14–264:7).

31. Mr. Lavergne alleges that he was Total's alter ego prior to the Critical Date. (Ex. 155 at 2).

32. Claim 1 of the '428 Patent is directed to the placement of "high pressure pneumatics testing equipment" (*i.e.*, pumps) in the "safety housing" where devices are tested under high-

pressure. (Ex. 103)

33. Mr. Lavergne was aware that the '428 Patent claimed pressure testing systems with pumps in the safety housing. (Exhibit 154, Exhibit 219 at ¶¶ 8, 10; Exhibit 156 ¶¶ 8, 10; Trans. at 62 62:7–63:4, 65:19–73:24; Lavergne Dep. Trans. 130:21–131:5 (Doc. No. 387-4 at 130-31)).

34. Mr. Lavergne was informed of his duty to disclose material information to the USPTO by Thomas Phung, his patent attorney. (Trans. 26:16–21; Lavergne Dep. Trans. 130:8–131:5 (Doc. No. 387-4 at 130-31); Phung Dep. Trans. 24:2–9, 25:17–23, 27:2-25, 62:5-8, 69:12–70:4; Doc. No. 170-1 at 11-12).

35. Mr. Phung advised Mr. Lavergne that the material prior art included Total's offers for sale and sales of the claimed invention prior to the Critical Date. (Phung Dep. Tr. at 24:2-9, 69:12-70:4).

36. Mr. Lavergne understood that Total's sales of Millennium Test Systems prior to the Critical Date were material to patentability of the '428 Patent. (Trans. at 311:15–312:6; Lavergne Dep. Trans. 291:9-19 (Doc. No. 387-4 at 293)).

37. Upon being informed of his duty to disclose material information, Mr. Lavergne did not discuss Total's pre-Critical Date sales of Millennium Test Systems with Mr. Phung. (Phung Dep. Trans. 25:24–26:12, 39:7–12, 42:12–43:6, 44:19-45:2, 62:5-10, 66:19-2; Lavergne Dep. Trans. 291:13–16 (Doc. No. 387-4 at 293)).

38. Instead of discussing the sales with Mr. Phung, Mr. Lavergne testified that he told his Office Manager, Ms. Tara Benoit, to disclose the sales to Mr. Phung. (Trans. at 311:15–312:6; Lavergne Dep. Trans. 291:9–19, 292:16–18 (Doc. No. 387-4 at 293, 294); Doc, No, 170-1 at 12).

39. Mr. Lavergne understood he had a duty to disclose to the USPTO Total's sales of

Millennium Test Systems prior to the Critical Date. (Trans. at 311:15–312:6; Lavergne Dep. Trans. 291:9–19 (Doc. No. 387-4 at 293)).

40. Mr. Phung informed Mr. Lavergne that the duty to disclose material information to the USPTO is constant, throughout the whole process. (Phung Dep. Tr. at 70:8–22).

41. Mr. Phung would not have filed the application that issued as the '428 Patent had he known of Total's pre-Critical Date sales of Millennium Test Systems. (Phung Dep. Tr. at 46:14–25).

42. On August 7, 2009, Mr. Phung sent Mr. Lavergne a fax reminding Mr. Lavergne of his duty to disclose material information to the USPTO. (Ex. 176; Trans. at 45:10–46:13; Phung Dep. Tr. 29:18–21, 31:1–11, 50:3–17).

43. On October 21, 2009, during prosecution of the application that issued as the '428 Patent, and after the application was filed, Mr. Lavergne signed a Declaration for Patent Application wherein he acknowledged his duty to disclose information material to patentability to the USPTO under penalty of perjury. (Ex. 148; Trans. at 54:9–56:18) .

44. Neither Mr. Lavergne nor Ms. Benoit (nor anyone else) disclosed to the USPTO or Mr. Phung during prosecution of the application that issued as the '428 Patent any of Total's pre-Critical Date offers for sale or sales of Millennium Tests Systems. (Phung Dep. Tr. 28:1–21).

45. Mr. Lavergne's non-disclosure of Total's pre-Critical Date offers for sale and sales of Millennium Test Systems was with deceptive intent because the single most reasonable inference is that Mr. Lavergne knowingly withheld the Millennium Test System offers for sale and sales from the USPTO to obtain issuance of the '428 Patent.

**C. Mr. Lavergne's Understanding of His Duty to Disclose and Litigation Misconduct.**

46. On August 24, 2016, PHC's counsel sent Total's counsel a discovery deficiency

letter with screen captures of Total's website from before August 8, 2008 that appeared to demonstrate that the invention was on sale before the critical date. (Ex. 234).

47. In its September 2, 2016 response to Interrogatory No. 3, Total identified its first offer for and/or sale of a pressure safety system as being on August 22, 2008, just 14 days after the filing date of the provisional application from which the '428 Patent claims priority. (Ex. 256; Ex. 257; Ex. 258; Ex. 259; Trans. at 166:23–169:13).

48. Total's September 2, 2016 response to Interrogatory No. 4 indicated that "the subject matter of the '428 Patent was reduced to practice approximate at the time Mr. Lavergne filed U.S. Provisional Application No. 61/188,438 on August 8, 2008." (Ex. 256).

49. Total's September 2, 2016 response to Interrogatory No. 6 indicated that "[t]he conception, reduction to practice, design, and development of patent application Serial No. 13/398,209 were conducted in-house at Total's business location and did not involve documentation as all activities were carry [sic] out as physical experimentation." (Ex. 256).

50. Total's September 2, 2016 response to Interrogatory No. 6 also indicated that "[a] prototype device was developed during the reduction to practice of the '428 Patent apparatus. Such prototype was never publicly disclosed or in public use, being kept exclusively at Total's business facility and shielded from the public. Such device was constructed for purely experimental purposes and was never offered for sale or sold." (Ex. 256).

51. On October 7, 2016, PHC's counsel sent Total's counsel a second discovery deficiency letter that asserted Total's response to Interrogatory No. 3 was deficient because "[t]he interrogatory request lists of all offers for sale and/or sales by Plaintiff of pressure testing systems," "[t]he earliest sale [Total identified] is August 22, 2008," and "[w]e understand that Plaintiff was offering for sale and/or selling pressure safety systems prior to this date." (Ex. 235).

52. On October 27, 2016, Total provided a response letter and served its Supplemental Answers to PHC's First Set of Interrogatories and Requests for Production and a production labeled Exhibit G. Total's supplemental response to Request No. 3 referred to Exhibit G. Exhibit G included five invoices for Millennium Test Systems, with the earliest dated September 26, 2007, which is just over a month after the Critical Date. One of the invoices of Exhibit G identified a Mr. Cory Polk. (Ex. 260; Trans. at 164:1-166:4).

53. On November 14, 2016, PHC's counsel sent Total's counsel an email that indicated that the "earliest invoice [produced] is dated September 26, 2007," and requested confirmation that "invoices prior to this date were destroyed by flooding." (Ex. 237).

54. On November 16, 2016, Total's counsel responded that "Total does not have in its possession or control any further responsive invoices or any prior to the September 26, 2007 invoice. It is not Total's position that any invoices prior to that date were destroyed in the recent flooding." (Ex. 238).

55. On November 28, 2016, PHC's counsel sent Total a discovery deficiently letter indicating that Total's objection to Interrogatory No. 3 on the basis that Total did not sell pressure safety systems prior to the critical date was contradicted by the screen captures on Total's website prior to the critical date, which indicated "Millennium Test Systems are the market standard for safety and excellence." (Ex. 239)

56. On December 1, 2016, PHC demanded that Total supplement its response to Interrogatory No. 7 to include all persons "involved in any 'experimental use, access to, or viewing of prototypes of the claimed invention(s) in the '428 Patent" and asserted that Total's attempt to limit the Interrogatory to only Total employees was improper. (Ex. 241).

57. On December 16, 2016, Total updated its response to Interrogatory No. 7 to include

persons identified in invoices that Total had produced, and stated "Cory Polk, last known to be residing in the country of Azerbaijan, having knowledge of Cameron's purchase of a Millennium System approximately on 12/3/07." (Ex. 261; Trans. at 169:25–172:7).

58. On January 11, 2017, PHC's counsel sent Total a discovery deficiency letter with a quote for Millennium Test Systems, which PHC represents it obtained from Mr. Polk. PHC's counsel demanded that Total supplement its discovery requests and "clearly indicate whether responsive documents once existed but no longer exist or are no longer in Total's possession or control." (Ex. 263).

59. On January 16, 2017, Total's counsel responded, indicating that "[a]ny further documents which may have existed prior to what we gave you were disposed of years ago in the normal course and scope of Total's business." (Ex. 245; Ex. 246).

60. On February 14, 2017, PHC filed a Motion to Compel requesting, among other things, a forensic examination of Total's computer system." (Ex. 247).

61. On February 24, 2017, in its Response to the Motion to Compel, Total stated that PHC was simply "engaging in a fishing expedition with its motion to compel," and:

> At the time of filing the application, Total and Mr. Lavergne, as knowledgeable of the differences between the subject matter of the '428 Patent and that of the "Millennium Test System" products did not find that the "Millennium Test System" products disclosed the novel elements which made the '428 Patent patentable. Total and Mr. Lavergne made good faith representations to the USPTO as they did not see the "Millennium Test System" products as representative of what Total was seeking to be patented.

(Ex. 149 (Doc. No. 93 at 5)).

62. On February 24, 2017, and with its Response to the Motion to Compel, Total submitted a Sworn Written Statement indicating that no further documents existed and that any documents prior to the critical date were destroyed pursuant to Total's document retention policy.

(Exhibit 248 (Doc. No. 93-2)).

63. On March 10, 2017, the Court ordered a forensic examination of Total's computer system. (Ex. 325 (Doc. No. 97)).

64. On April 7, 2017, before the forensic examination occurred, Total served its Supplemental Answers to Defendant's First Interrogatories and produced Exhibits H, I and J. Exhibit H comprised approximately forty invoices and quotes for Millennium Test Systems, thirty-five of which were before the Critical Date. (Ex. 264; Ex. 327; Trans. at 142:13–147:2).

65. On September 5, 2017, Total paid all costs associated with the forensic examination (an amount over $14,000) without intervention by the Court. (Ex. 265).

66. Total also subsequently withdrew its assertion that PHC infringed claims 1, 2, 6-10, and 16-17 of the '428 Patent.

67. As of the date of the Bench Trial, Total had not filed a notice of abandonment with regard to claims 1, 2, 6-10, and 16-17 of the '428 Patent at the USPTO.

**D. Failure to Name a Joint Inventor.**

68. PHC did not provide clear and convincing evidence that Mr. Polk disclosed the Interlock feature to Mr. Lavergne or asked if Total could incorporate the feature. (Polk Dep. Tr. at 26:9-27:10, 27:14-28:10).

69. PHC did not provide clear and convincing evidence that Mr. Lavergne did not conceive of the Interlock Feature but instead obtained it from Mr. Polk. (Polk Dep. Tr. at 26:9-27:10, 27:14-28:10).

70. PHC did not provide clear and convincing evidence that Mr. Lavergne intentionally concealed an actual inventor of the Interlock Feature from the USPTO. (Polk Dep. Tr. at 26:9-27:10, 27:14-28:10).

## II.    APPLICABLE LAW

"As an equitable doctrine, inequitable conduct hinges on basic fairness." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1292 (Fed. Cir. 2011) (en banc).  To prevail on inequitable conduct, the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference or prior commercial sale, knew that it was material, and made a deliberate decision to withhold it. *Id.* at 1290.  In a case such as this, which involves nondisclosure of information to the Patent Examiner, "clear and convincing evidence must show that the applicant *made a deliberate decision* to withhold a *known* material reference." *Id.* (citation omitted).  Thus, the Court must find by clear and convincing evidence that the withheld reference was material, that the applicant knew of the reference, and that the applicant "made a deliberate decision to withhold it." *Id.*

Intent and materiality are separate requirements for a finding of inequitable conduct. *Id.* The Court "must weigh the evidence of intent to deceive independent of its analysis of materiality." *Id.*  "Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence." *Id.*  That said, there is no clear and convincing evidence of an intent to deceive unless such an intent is "the single most reasonable inference able to be drawn from the evidence." *Id.* (citation omitted).  The evidence must be sufficient "to *require* a finding of deceitful intent in light of all the circumstances." *Id.* (citation omitted).  If there are "multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Id.* at 1290-91.

In order for the court to find that information withheld from the Patent Examiner was material, the court must use a "but-for" analysis." *Id.* at 1291. "Hence, in assessing the materiality of the withheld reference, the court must determine whether the USPTO would have allowed the

claim if it had been aware of the undisclosed reference." *Id.* "In making this patentability determination, the court" applies "the preponderance of the evidence standard" and gives "claims their broadest reasonable construction." *Id.*

Congress has provided that a "person shall be entitled to a patent unless – . . . the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective date of the claimed invention . . ." 35 U.S.C. § 102(a)(1). However, under certain circumstances, disclosures "made 1 year or less before the effective filing date of a claimed invention shall not be prior art to the claimed invention . . ." 35 U.S.C. § 102(b)(1). In applying the statutory on-sale bar, the court "must follow the test set forth in *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 66-67 (1998)." *Honeywell Internat'l, Inc. v. Universal Avionics Systems Corp.*, 488 F.3d 982, 996 (Fed. Cir. 2007). A single sale is sufficient to bar patentability. *Electromotive Division of General Motors Corp. v. Transportation Systems Division of General Electric Co.*, 417 F.3d 1203, 1209 (Fed. Cir. 2005).

In order for the on-sale bar to work to invalidate a patent, clear and convincing evidence must establish that "(1) the invention be the subject of a commercial sale or offer for sale and (2) the invention be 'ready for patenting' at the time of the offer or sale." *Honeywell Internat'l, Inc.*, 488 F.3d at 996 (citing *Pfaff v. Wells Elec., Inc.*, 525 U.S. 55). An invention is ready for patenting "when the evidence shows that the invention was reduced to practice or described in a written description sufficient to permit one of ordinary skill in the art to practice the invention without undue experimentation." *Id.* at 997. "An invention is reduced to practice when the patentee has an embodiment that meets every limitation and operates for its intended purpose." *Id.* "Reduction to practice requires proof that the invention worked for its intended purpose." *Honeywell Internat'l Inc.*, 488 F.3d at 997 (citing *EZ Dock v. Shafer Sys., Inc.*, 276 F.3d 1347, 1351 (Fed. Cir. 2002)).

## III.    CONCLUSIONS OF LAW

### E.  Mr. Lavergne Failed to Disclosure Material Information to the USPTO with the Intent to Deceive.

#### 1.  *Mr. Lavergne Had a Duty to Disclosure Material Information to the USPTO.*

"The existence of a disclosure duty is a legal question with factual underpinnings." *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1012 (Fed. Cir. 2008).  Mr. Lavergne is the sole inventor listed in the '428 Patent.  As such, he had a duty to disclosure material information to the USPTO during prosecution of the application that issued as the '428 Patent. 37 C.F.R. § 1.56 ("Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section."); *see also Evident Corp. v. Church & Dwight Co., Inc.*, 399 F.3d 1310, 1315-16 (Fed. Cir. 2005) ("Under the regulations, inventors, patent owners, and attorneys associated with the filing or prosecution of a patent application have an affirmative and continuing duty to disclose material information to the PTO.").

#### 2.  *The Pre-Critical Date Millennium Test Systems ("MTS") Were Material to Patentability.*

"[T]he materiality required to establish inequitable conduct is but for materiality." *Am. Calcar, Inc. v. Am. Honda Motor Co., Inc.*, 768 F.3d 1185, 1189 (Fed. Cir. 2014) (citing *Therasense*, 649 F.3d at 1291).  "[U]ndisclosed prior art is 'but for material if the PTO would not have allowed a claim had it be aware of' it." *Id.*  "This means that to assess materiality, the court must look to the standard used by the PTO to allow claims during examination. To wit: 'The court should apply the preponderance of the evidence standard and give their broadest reasonable interpretation.'" *Id.* (citing *Therasense*, 649 F.3d at 1291-92).  "District courts and the PTO employ different evidentiary standards and rules for claim construction. Therefore,

'even if a district court does not invalidate a claim based on a deliberately withheld reference, the reference may be material if it would have blocked patent issuance under the PTO's different evidentiary standards.'" *Id.*

Here, the Cameron MTSs, Haliburton MTS, and Superior MTS were prior art under 35 U.S.C. § 102(b) because it was an offer for sale, sale, or public use by Total, Cameron, Haliburton, or Superior of a pressure testing system prior to the Critical Date. Furthermore, the offer for sale, sale, or public use of the Cameron MTSs, Haliburton MTS, and Superior MTS was material to the patentability of the '428 Patent because claim 1 and claim 16 would not have issued had the sale been disclosed to the USPTO. This is especially true in view of the broadest reasonable interpretation and preponderance of the evidence standards that apply to the materiality prong of claims for inequitable conduct.

### 3. *Mr. Lavergne's Non-Disclosure was With an Intent to Deceive.*

"[T]he accused infringer must prove that the patentee acted with the specific intent to deceive the PTO." *Therasense*, 649 F.3d at 1290. "In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant made a deliberate decision to withhold a known material reference." *Id.* However, "[b]ecause direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence." *Id.* The clear and convincing standard is met when "the specific intent to deceive [is] 'the single most reasonable inference able to be drawn from the evidence.'" *Id.* (citing *Star Scientific Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)).

Mr. Phung informed Mr. Lavergne about Mr. Lavergne's duty to disclosure material information to the USPTO and the on-sale bar. Mr. Lavergne understood that he could not obtain a patent on the concept of placing the pumps in the safety housing where testing occurs because

Total, Mr. Lavergne's alleged alter ego, had been selling such systems for years. There is no reasonable excuse for the nondisclosure. Indeed, Mr. Lavergne's failure to discuss the sales to Mr. Phung indicates that Mr. Lavergne intended to conceal them. To be sure, Mr. Phung testified he would not have filed the patent applications on behalf of Mr. Lavergne had the prior art been disclosed to him.

In response to the inequitable conduct allegation, Mr. Lavergne has presented two excuses why he did not disclose the sales of the Cameron MTSs, Haliburton MTS, and/or Superior MTS to the USPTO. Mr. Lavergne first attempts to blame the nondisclosure on Total's Office Manager, Tara Benoit, who was his subordinate. He alleges that he asked her to make the disclosures, but she failed to do so. This excuse shows that Mr. Lavergne understood that the sale of the MTSs were material prior art. Indeed, Mr. Phung informed Mr. Lavergne the '428 Patent could be invalid and/or unenforceable if Mr. Lavergne did not disclose all material information known to him. Mr. Lavergne also continued to communicate with Mr. Phung about the patent and was reminded by Mr. Phung of the duty to disclose material information.

Moreover, Mr. Lavergne signed a declaration under penalty of perjury acknowledging his duty to disclose material information after the application was filed, at which time he would have been able to determine or at least inquire whether the Millennium Tests Systems had been disclosed. This would have corrected the alleged accidental non-disclosure. Accordingly, Mr. Lavergne's contention that the non-disclosure was accidental is implausible and directly contradicted by the clear and convincing evidence before the Court.

Mr. Lavergne's next excuse is that his understanding of the "entirety of [his] invention" claimed in the '428 Patent is limited to the "interlock" safety system. Mr. Lavergne contends that he is not aware of the meaning of the language employed by Thomas Phung in drafting his

application for the '428 Patent. The Court concludes that this contention is also implausible. Mr. Lavergne testified to his experience in manufacturing of safety systems, and how it was a major part of his business for 25 years. (Trans. at 258:13–16). Likewise, Mr. Lavergne confirmed that he understood all of the elements of claim 1, and that he intended to patent the system in claim 1 and the method in claim 16. (Trans. at 22:25-23:2; 25:18-20; 335:14–338:3). More importantly, prior to the bench trial, Mr. Lavergne testified that he believed placing a pump inside of bunker was novel, and that he was the "first one to do it." (Lavergne Dep. Trans. at 130:21–131:5 (Doc. No. 387-4 at 130-31)). Consistent with this testimony, the evidence indicates that Mr. Lavergne emailed a potential customer on June 5, 2015, and stated that "[a]ny system where the pumps are in the bunker will infringe on my patent." (Ex. 154). Accordingly, Mr. Lavergne's contention that he believed that Mr. Phung had claimed systems *exclusively* including the "interlock" safety system is implausible and contradicted by the clear and convincing evidence before the Court.

Indeed, up until the eve of the bench trial, Total continued to argue that the scope of the claims of the '428 Patent were not limited to systems that include pumps inside the housing, but also include systems that have pumps located completely outside of the housing. *See, e.g.*, Doc. No. 319 at 3. This litigation position attempts to broaden the claim far beyond the "interlock" safety system that protects operators from pumps located inside of the housing. (Trans. at 269:22–272:22). It is only now that Mr. Lavergne conveniently contends that his understanding of his invention was not as broad as the infringement contentions asserted by Total or his statements he previously made. Mr. Lavergne cannot have it both ways. Accordingly, the Court finds Mr. Lavergne's contention implausible and contradicted by the clear and convincing evidence before the Court.

Based on the evidence, the single most reasonable inference is Mr. Lavergne intentionally

failed to disclose the pre-Critical Date sales of Millennium Test Systems to deceive the USPTO and obtain issuance of the '428 Patent. Here, there is no question that Mr. Lavergne knew of the duty to disclose material prior art, and despite knowing of this duty prior to filing the application, he intentionally ignored that duty under the guise of obtaining a patent.

### F. PHC Failed to Prove that Mr. Lavergne Concealed at least Two Joint Inventors of the '428 Patent.

Under 35 U.S.C. § 102(f), no patent shall issue if the application "did not himself invent the subject matter sought to be patented." "This provision 'makes the naming of the correct inventor or inventors a condition of patentability; failure to name them renders a patent invalid.'" *In re Verhoef*, 888 F.3d 1362, 1367-68 (Fed. Cir. 2018) (citations omitted). "[W]hen named inventors deliberately conceal a true inventor's involvement, the applicants have committed inequitable conduct and the patent is unenforceable." *Junker v. Med. Components, Inc.,* No. 13-4606, 2016 U.S. Dist. LEXIS 176409, at *14 (E.D. Pa. Dec. 21, 2016) (citing *Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*, 607 F.3d 817, 828 (Fed. Cir. 2010). "Inventorship is a question of law with underlying factual issues." *Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 412 F.3d 1331, 1338 (Fed. Cir. 2005).

PHC did not prove with clear and convincing evidence that Mr. Lavergne intentionally concealed a joint inventor of the '428 Patent from the USPTO. The only evidence offered by PHC for this assertion was the deposition testimony of Mr. Cory Polk. Mr. Polk testified that he and Cameron discussed the Interlock Feature internally before disclosing it to Mr. Lavergne. The Court finds that Mr. Polk's testimony fails to provide clear and convincing evidence that Mr. Lavergne intentionally concealed a joint inventor of the '428 Patent from the USPTO. Accordingly, the '428 Patent is not invalid for inequitable conduct for knowingly concealing a co-inventors in order to deceive the USPTO.

### G. Mr. Lavergne's Intent to Deceive Can also be Inferred from His Litigation Misconduct in this Litigation.

In *Regeneron*, the Federal Circuit reviewed a district court decision holding a patent invalid for inequitable conduct where the district court never held a trial "to determine if Regeneron acted with the specific intent to deceive the PTO during prosecution." *Regeneron Pharmaceuticals, Inc. v. Merus N.V.*, 864 F.3d 1343, 1356 (Fed. Cir. 2017). "Instead, the [district] court sanctioned Regeneron for its litigation misconduct by drawing an adverse inference of specific intent." *Id.* The Federal Circuit affirmed the decision and held that an adverse inference with respect to intent to deceive was proper because "Regeneron is accused not only of post-prosecution misconduct but also of engaging in equitable conduct *during* prosecution," and Regeneron's litigation misconduct "obfuscated its prosecution misconduct." *Id.* at 1364.

In this case, as it did during prosecution of the '428 Patent, Total engaged in litigation misconduct by concealing its pre-Critical Date sales of Millennium Test Systems. The evidence of litigation misconduct is overwhelming. For example, Total intentionally withheld material prior art evidence that was only produced after the Court granted PHC's motion to compel. Because PHC has shown Total engaged in post-prosecution misconduct and inequitable conduct during prosecution, the Court applies an adverse inference to the question of fact as to whether Total intended to deceive the USPTO. That said, even without this adverse inference, the Court concludes that Mr. Lavergne intentionally failed to disclose the pre-Critical Date sales of Millennium Test Systems to deceive the USPTO and obtain issuance of the '428 Patent. The adverse inference only further confirms that Mr. Lavergne intentionally withheld material prior art during litigation to obfuscate his prosecution misconduct and hide his specific intent to deceive the USPTO.

## IV.    SUMMARY

PHC has proven with clear and convincing evidence that Mr. Lavergne deliberately withheld information regarding prior sales from the USPTO.  PHC has further proven that claims 1 and 16 of the '428 Patent would not have issued if the Examiner had been provided with the information regarding the prior sales.  PHC has also proven with clear and convincing evidence that the withheld information was material to the issuance of claims 1 and 16 of the '428 Patent. Accordingly, the single most reasonable inference to be drawn from the evidence requires a finding of deceitful intent in light of all of the circumstances.   Therefore, PHC has proven with clear and convincing evidence that Mr. Lavergne specifically intended to deceive the USPTO, and engaged in inequitable conduct in order to obtain claims 1 and 16 of the '428 Patent.

Furthermore, PHC has proven with clear and convincing evidence that Total engaged in litigation misconduct by intentionally withholding material prior art evidence during litigation to obfuscate Mr. Lavergne's prosecution misconduct and hide his specific intent to deceive the USPTO.  Accordingly, Mr. Lavergne's inequitable conduct renders the '428 Patent unenforceable. Finally, PHC failed to prove with clear and convincing evidence that Mr. Lavergne knowingly concealed co-inventors in order to deceive the USPTO.

## V.    CONCLUSION

For these reasons, the Court finds that Mr. Lavergne's inequitable conduct renders the '428 Patent unenforceable.  Accordingly, the Court will enter Judgment in favor of PHC and against Total, dismissing Total's claims with prejudice.

Monroe, Louisiana, this 15th day of October, 2019.

_____
**TERRY A. DOUGHTY**
**UNITES STATES DISTRICT JUDGE**